08:00:11

                        UNITED STATES DISTRICT COURT

                CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

                HONORABLE OTIS D. WRIGHT, U.S. DISTRICT JUDGE


UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,            )
                                 )
            vs.                   )
                                 )   2:19-CR-117-ODW
WALTER CHAVEZ-LARIN,             )
ROBERTO CORADO ORTIZ,            )
EDWIN MARTINEZ,                  )
ERICK ROSALES ARIAS,             )
BRYAN ROSALES ARIAS,             )
                                 )
            Defendants.          )
_____ )




                    REPORTER'S TRANSCRIPT OF JURY TRIAL

                              VOLUME XVII

                        Los Angeles, California

                      Wednesday, October 8, 2025



                _____

                    AMY DIAZ, RPR, CRR, FCRR
                    Federal Official Reporter
                    350 West 1st Street, #4455
                    Los Angeles, CA 90012


        *Please order court transcripts here:  www.amydiazfedreporter.com*

```
 1        APPEARANCES OF COUNSEL:

 2
          For the Plaintiff:
 3

 4                    OFFICE OF THE UNITED STATES ATTORNEY
                      By:  Benedetto Balding
 5                         Assistant United States Attorney
                           Catharine Richmond
 6                         Assistant United States Attorney
                           Eric Siddall
 7                         Assistant United States Attorney
                           Sara Vargas
 8                         Assistant United States Attorney
                           William Larsen
 9                         Assistant United States Attorney
                      312 North Spring Street, Suite 1400
10                    Los Angeles, California 90012

11

12        For the Defendants:

13                    LAW OFFICES OF OLIVER P. CLEARY
                      By:  Oliver Cleary, Attorney at Law
14                    611 S. Palm Canyon Drive, Suite 7-441
                      Palm Springs, California 92264
15
                      MCNICHOLAS LAW OFFICES LLC
16                    By:  John McNicholas, Attorney at Law
                      464 Palos Verdes Boulevard
17                    Redondo Beach, California 90277

18                    SHAUN KHOJAYAN & ASSOCIATES PLC
                      By:  Shaun Khojayan, Attorney at Law
19                    515 South Flower Street, 19th Floor
                      Los Angeles, California 90071
20
                      LAW OFFICE OF CARLOS L. JUAREZ
21                    By:  Carlos Juarez, Attorney at Law
                      P.O. Box 2464
22                    Riverside, California 92516

23

24

25
```

1          Attorney appearances, continued:

2

3                              LAW OFFICE OF SCOTT PACTOR
                               By:  Scott Pactor, Attorney at Law
                               1934 23rd Street
4                              San Diego, California 92102

5                              SIGAL LAW GROUP
                               By:  Vitaly Sigal, Attorney at Law
6                              15250 Ventura Boulevard, Suite 1220
                               Sherman Oaks, California 91403

7
                               Ivette Maningo, Attorney at Law
8                              400 South Fourth Street, Suite 500
                               Las Vegas, Nevada 89101

9
                               LAW OFFICES OF BENJAMIN P. LECHMAN, ESQ.
10                             By:  Benjamin Lechman, Attorney at Law
                               The Executive Tower
11                             11400 West Olympic Boulevard, Suite 200
                               Los Angeles, California 90064

12
                               SCHWARZ LAW FIRM
13                             By:  Robert Schwarz, Attorney at Law
                               28202 Cabot Road, Suite 300
14                             Laguna Niguel, California 92677

15

16

17

18

19

20

21

22

23

24

25

1 08:00:12          THE CLERK:  Calling item one, CR-19-117, United

2 08:00:15    States of America versus Walter Chavez-Larin, et al.

3 08:00:19          Counsel, may I have your appearances, please.

4 08:00:23          MR. BALDING:  Good morning, Your Honor.  Ben Balding

5 08:00:25    for the United States, and joined again by my colleagues,

6 08:00:26    William Larsen and Eric Siddall and Catharine Richmond and

7 08:00:29    also by FBI Special Agent Meagan Buckley.  Sara Vargas will

8 08:00:33    be joining us presently, Your Honor.

9 08:00:36          MR. LECHMAN:  Your Honor, good morning.  Ben

10 08:00:37   Lechman, Robert Schwarz, Sam Rivas on behalf of Walter

11 08:00:41   Chavez-Larin.

12 08:00:43          MR. MCNICHOLAS:  Good morning, Your Honor.  John

13 08:00:45   McNicholas, Shaun Khojayan, and Tracy Vena-Sandstrom with

14 08:00:47   Edwin Martinez.

15 08:00:47          THE COURT:  Good morning.

16 08:00:49          MR. SIGAL:  Good morning, Your Honor.  Vitaly Sigal,

17 08:00:52   Ivette Maningo for Bryan Rosales-Arias.

18 08:00:54          MR. PACTOR:  Good morning.  Scott Pactor, Carlos

19 08:00:56   Juarez for Erick Rosales-Arias.

20 08:00:58          THE COURT:  Good morning.

21 08:00:59          MR. CLEARY:  And good morning, Your Honor.  Oliver

22 08:01:02   Cleary on behalf of Roberto Corado-Ortiz.

23 08:01:04          One of the first items of business today is I filed

24 08:01:07   a motion in limine --

25 08:01:13          THE COURT:  Sit down and use the microphone.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 08:01:16              MR. CLEARY:  Sorry.

2 08:01:20              Good morning, Your Honor.   My apologies.

3 08:01:23              I filed a motion in limine about some clips that the

4 08:01:26    Government is seeking to introduce today, and we were able to

5 08:01:29    resolve some of the disputes, but we do still have

6 08:01:32    outstanding disputes as to three of the clips, which I

7 08:01:36    submitted.  It's --

8 08:01:38              THE COURT:  It's those three that are the subject of

9 08:01:41    the motion in limine, right?

10 08:01:42             MR. CLEARY:  Yes, Your Honor.

11 08:01:43             THE COURT:  Okay.

12 08:01:44             MR. BALDING:  Your Honor, we did resolve one of

13 08:01:47    those clips, but there are still three individual clips.  But

14 08:01:49    the fourth and third clip, 573-T, which is the fourth thing

15 08:01:55    listed on page 5 of the docket, 5 of 6, that has been

16 08:01:59    resolved.

17 08:02:00             MR. CLEARY:  That's correct.

18 08:02:01             MR. BALDING:  It's just the one page, page 4 of 6 on

19 08:02:04    the docket, Your Honor, with three separate cutouts.

20 08:02:08             THE COURT:  Okay.  Hang on.

21 08:03:15             Okay.  Come here.  I want you to walk me through

22 08:03:20    this.  Put that down.

23 08:03:36             (Thereupon, there was a brief off-the-record

24 08:09:36    discussion.)

25 08:09:36             MR. CLEARY:  So the defense -- this is Oliver

08:09:38  Cleary -- has filed a motion in limine to exclude some clips

08:09:42  the Government intends to play in which my client admits to

08:09:46  committing several murders in El Salvador prior to coming to

08:09:49  the United States.

08:09:50      My argument is that these are overly prejudicial,

08:09:54  they are not similar, they are not committed for the same

08:09:57  reasons.  The Government challenges that.  However, there --

08:10:02  the defense position would be that there is -- they are

08:10:04  cumulative, that they do not establish anymore that there is

08:10:09  an enterprise, and it's more prejudicial than probative on

08:10:13  the issue of the enterprise.

08:10:15      As to the last clip, we are objecting to 542-T,

08:10:19  which discusses my client and everything he gained from being

08:10:27  a gang member in El Salvador, which may be more relevant to

08:10:32  the issues the Government raises.  But I think that the first

08:10:35  two clips, 541-T, and the two sections of 541-T that I'm

08:10:41  objecting to where he admits to five murders, and he says he

08:10:45  did five murders a day up to about 50 people, is super

08:10:51  prejudicial, not probative to what is already cumulatively

08:10:56  has been established, and so we are asking to exclude it.

08:11:00      THE COURT:  My understanding is that the

08:11:02  Government's rationale, at least part rationale for

08:11:05  introducing these seemingly completely unrelated murders that

08:11:11  have taken place in El Salvador, is to address a defense that

08:11:18  your client is raising, that he wasn't acting under free

will.  He was acting under duress.  He didn't kill basically

on command like in the United States.  He would be killed.

And we have already received an awful lot of testimony

regarding how fragile life is in and around this organization

that it doesn't take much for the command to go out for

someone to be green lighted and then disappear.

So I can't just shrug it off.  Of course it's

absurd.  This sort of thing wouldn't happen, but it does

happen in that world.

Now, if indeed the defense raised a partial defense

is going to be that your client felt it was kill or be

killed, okay, I think the Government then is entitled to show

how freely he has taken life of his own free will, without

being compelled, without having to do it to save his own

life, that he has killed a lot of people.  I agree with you,

ordinarily, that would not come in.  We cannot bring in all

these other bad acts, particularly involving murder, when he

is on trial here for murder.

But if you are going to use the defense that he only

committed murder in the United States because he felt that

his life would be forfeited if he didn't, if he didn't follow

someone's instructions, that he would be killed, and that is

the only reason he killed in the United States.

So anyway, I just wanted to make sure that you were

heard, but I -- I think the Government's argument prevails

1 08:13:12    here because it is -- this evidence is coming in to directly

2 08:13:18    refute your defense of duress.

3 08:13:23          MR. BALDING:  Your Honor, this is Ben Balding, and

4 08:13:25    just to complete the record, we had additional arguments.  I

5 08:13:28    understand the basis of the Court's ruling.  We also argued

6 08:13:31    that it is directly relevant to the murders at hand.  It

7 08:13:34    involves murdering 18th Street members and the role and

8 08:13:38    position in the clique.  I will accept the Court's ruling on

9 08:13:40    whatever basis he makes it, but I wanted to make that record.

10 08:13:44          THE COURT:  I omitted that, but that is not an

11 08:13:46    irrelevant fact.  Okay.  So thank you.

12 08:13:50          MR. CLEARY:  The defense submits -- understands the

13 08:13:52    Court's ruling, but vigorously objects.

14 08:13:54          THE COURT:  Absolutely.

15 08:13:55          MR. BALDING:  Thank you, Your Honor.

16 08:14:05          (In open court:)

17 08:14:13          THE COURT:  We have one more issue.

18 08:14:16          MR. SIDDALL:  Your Honor.

19 08:14:16          THE COURT:  There you are.

20 08:14:19          Okay.  What else do we have?

21 08:14:21          MR. SIDDALL:  Your Honor, this was an issue that we

22 08:14:24    brought up on Friday, and we asked to address the Court today

23 08:14:28    on it.  It has to do with Mr. Lechman's questioning of

24 08:14:34    Detective Lawler from the Los Angeles County Sheriff's

25 08:14:39    Department.  The question was specifically as it relates to

1 08:14:44    Detective Lawler's interview of another suspect on the Elvin

2 08:14:50    Hernandez case.

3 08:14:51        So this is a suspect of the murder who other co --

4 08:14:57    or other cooperators in this case have identified as being a

5 08:15:01    part of the murder, and he was interviewed by Detective

6 08:15:06    Lawler on his participation in the murder.  The defense asked

7 08:15:14    whether that suspect had identified his client as being part

8 08:15:23    of the murder, and we objected as to hearsay.

9 08:15:28        And the Court at sidebar said that the defense could

10 08:15:31    bring up issues as it relates to the investigation.  And then

11 08:15:37    the defense specifically asked the detective whether --

12 08:15:46    whether Mr. Guevara, the co-defendant, had identified

13 08:15:53    Mr. Chavez-Larin, our current defendant, in the -- during the

14 08:15:59    interview.

15 08:16:00        Now, that is clear hearsay, because it's an

16 08:16:05    identification of a co-suspect during an interview.  It is

17 08:16:11    being offered for the truth of the matter.  It is not being

18 08:16:14    offered for the purpose of showing where the investigation

19 08:16:17    went and how the investigation went.  And as evidence of

20 08:16:21    that, the defense never even asked any follow-up questions as

21 08:16:24    it relates to what that -- where that identification -- or

22 08:16:28    non-identification led them to.

23 08:16:31        So it was purposely done, so that they could bring

24 08:16:35    out that a co-suspect in this case had not identified their

25 08:16:39    client as being part of the murder, which is offered for the

1 08:16:44   truth of the matter, which is hearsay.

2 08:16:47          So I would ask that that portion of the testimony

3 08:16:53   where the defense asked Detective Lawler about the

4 08:16:58   identification -- or the non-identification of their client

5 08:17:04   as not being involved in the murder, that that portion be

6 08:17:07   stricken, and also that the defense be prohibited in closing

7 08:17:13   argument to argue that their client was not identified by

8 08:17:20   this co-suspect.

9 08:17:23          THE COURT:  Okay.  That -- back up a little bit.

10 08:17:32          This non-identification, is that -- because I'm not

11 08:17:36   remembering this as well as you are, was someone asked

12 08:17:42   specifically whether or not someone was in attendance?

13 08:17:47          MR. LECHMAN:  Yes.  So what happened -- Ben Lechman

14 08:17:50   on behalf of Mr. Chavez-Larin.  So when Detective Lawler was

15 08:17:53   on the stand, I asked him about his interview with another

16 08:17:56   suspect -- Government counsel is correct -- Jefferson

17 08:18:00   Guevara, who other cooperators previously had implicated.  He

18 08:18:03   implicated himself, frankly, when he was questioned.

19 08:18:05          THE COURT:  Implicated in an actual crime?

20 08:18:08          MR. LECHMAN:  In the murder of Elvin Hernandez, who

21 08:18:11   people call Winnie Pooh or whatever.  Sorry, I don't mean to

22 08:18:14   be flippant about that.  He implicated himself.

23 08:18:16          My question was:  "Did you interview this person?

24 08:18:18          ANSWER:  Yes."

25 08:18:18          Nothing wrong with that question.

1  08:18:20                "QUESTION:  Did you show Mr. Guevara a photo of

2  08:18:24    Mr. Chavez-Larin?"

3  08:18:26                There was an equivocation.  Wasn't sure how to

4  08:18:27    refresh him with his testimony.

5  08:18:29                THE COURT:  Do you remember her?

6  08:18:30                MR. LECHMAN:  I do, I'm sorry.  Am I speaking too

7  08:18:33    fast?  She's done a great job so far.  I apologize.

8  08:18:37                Those two facts are in evidence.  This investigator

9  08:18:39    interviewed this person; this person implicated themselves;

10 08:18:43    this person was shown -- or asked about Mr. Chavez-Larin.

11 08:18:48    And I didn't want to elicit a hearsay statement.  He did say

12 08:18:52    he couldn't remember, or didn't know.

13 08:18:54                THE COURT:  Wait.  What was the question to him?

14 08:18:57                MR. LECHMAN:  Was he -- was there an ID after that?

15 08:18:59    Was he able to identify him?

16 08:19:01                THE COURT:  Was he asked to identify anyone else?

17 08:19:04                MR. LECHMAN:  He was.

18 08:19:04                THE COURT:  Was he shown a photo spread and asked

19 08:19:08    whether or not he could identify anyone in this six-pack, or

20 08:19:10    whatever it was, as having been present?

21 08:19:12                MR. LECHMAN:  The witness couldn't recall whether or

22 08:19:14    not for sure he was shown a photograph, but he was asked

23 08:19:16    about it.

24 08:19:17                And when I asked him -- when he said he wasn't sure,

25 08:19:19    I said:  Well, you had shown this photograph to suspects

| | |
|---|---|
| 1 08:19:22 | previously, months -- like, I think, four months before that. |
| 2 08:19:25 | It made sense to show -- I think before. |
| 3 08:19:27 | I think the Government objected at that time, |
| 4 08:19:29 | speculation.  But I think it's a reasonable inference to make |
| 5 08:19:31 | at that time. |
| 6 08:19:31 | The point I'm making is:  We have two pieces of |
| 7 08:19:34 | evidence, which is that this person -- Detective Lawler |
| 8 08:19:37 | questioned a suspect who was definitely there, who other |
| 9 08:19:40 | cooperators agree was there, asked -- |
| 10 08:19:42 | THE COURT:  And admitted to being there, right? |
| 11 08:19:44 | MR. LECHMAN:  Correct.  Admitted to being part of |
| 12 08:19:46 | the murder, yes. |
| 13 08:19:47 | And was asked about Mr. Chavez-Larin was unable to |
| 14 08:19:51 | identify him.  I didn't want -- I think his answer -- and I |
| 15 08:19:54 | didn't object to it being stricken at the time, by the |
| 16 08:19:57 | time -- was -- or he couldn't remember.  Whatever he actually |
| 17 08:20:00 | said.  I didn't want the hearsay answer.  I understood that |
| 18 08:20:00 | was hearsay.  That's fine. |
| 19 08:20:03 | I think we are really pushing the bounds of the |
| 20 08:20:05 | Constitution to argue that a criminal defendant cannot argue |
| 21 08:20:08 | about the absence of incriminating evidence in a criminal |
| 22 08:20:12 | trial.  I think it's just sort of the whole function of the |
| 23 08:20:15 | criminal defense attorney in that particular situation.  So I |
| 24 08:20:17 | don't think we could be precluded, as a Fifth or Sixth |
| 25 08:20:21 | Amendment matter. |

1 08:20:22        I agree that the words he actually said should be

2 08:20:24    stricken.  And I said that at the time.

3 08:20:26        MR. SIDDALL:  Your Honor, the question that was

4 08:20:27    asked by the defense was:  Mr. Guevara was unable to place

5 08:20:31    Mr. Chavez-Larin at the murder of Elvin Hernandez, true?

6 08:20:35        That question calls for hearsay, and the Rules of

7 08:20:43    Evidence are -- I don't think there is a question that they

8 08:20:47    are constitutional or not.  So if the defense is questioning

9 08:20:51    that hearsay -- whenever the defense is eliciting hearsay,

10 08:20:57    that somehow it is somehow unconstitutional to prohibit the

11 08:21:00    defense from doing that, I don't think that is the rule.

12 08:21:02        What is the purpose of the question?  The purpose of

13 08:21:04    the question is to have the detective state that another

14 08:21:08    person --

15 08:21:11        THE COURT:  Made a statement, made an assertion.

16 08:21:14        MR. SIDDALL:  Made an assertion for the truth of the

17 08:21:16    matter.

18 08:21:16        THE COURT:  This wasn't an assertion.

19 08:21:20        MR. SIDDALL:  Your Honor, an identification, or a

20 08:21:22    non-identification, is a statement.

21 08:21:28        THE COURT:  If someone says, "Can -- looking at this

22 08:21:32    photo array, do you see anyone on this photo array that was

23 08:21:36    present at the murder?"  I think that comes closer to the

24 08:21:43    hearsay that you are talking about.

25 08:21:47        MR. SIDDALL:  Yes.

1 08:21:48    THE COURT:  But I don't think that -- what I'm

2 08:21:51  hearing, the question wasn't put to him that clearly.

3 08:21:55    MR. SIDDALL:  Your Honor, the question was:  Were

4 08:21:57  you shown a photo -- was he shown a photo of my client.  And

5 08:22:01  he was unable to place my client at the murder scene.  And

6 08:22:04  that --

7 08:22:05    THE COURT:  That sounds conclusionary.  That doesn't

8 08:22:08  sound like something that someone would actually utter.

9 08:22:11    MR. SIDDALL:  Your Honor, the question was asked:

10 08:22:13  Mr. Guevara was unable to place Mr. Chavez-Larin at the

11 08:22:16  murder of Elvin Hernandez, true?

12 08:22:18    That was the question that was asked by the defense.

13 08:22:24    MR. LECHMAN:  It's a lack of a statement, Your

14 08:22:25  Honor.  There's just no statement there.  Hearsay is a

15 08:22:26  statement.  There is no statement here.

16 08:22:28    THE COURT:  I kind of agree with that.

17 08:22:30    MR. SIDDALL:  Except he was -- at the very least,

18 08:22:33  Your Honor -- well, first of all, if the purpose is, and what

19 08:22:36  the Court's ruling was, is that they were going to be allowed

20 08:22:39  to ask these questions in terms of what the investigation was

21 08:22:43  done --

22 08:22:44    THE COURT:  Sure.

23 08:22:44    MR. SIDDALL:  -- what was done in the investigation.

24 08:22:46    THE COURT:  Sure.

25 08:22:46    MR. SIDDALL:  So, yes, of course it is permissible

| | |
|---|---|
| 1 08:22:48 | to say:  Did you interview a co-defendant?  Did you do this? |
| 2 08:22:52 | Did you do that?  But to go into the interview of the |
| 3 08:22:56 | co-defendant -- of the co-suspect and elicit that from that |
| 4 08:23:00 | co-suspect through the detective, that his client was not |
| 5 08:23:04 | present at the murder scene, that is where it goes too far. |
| 6 08:23:09 | THE COURT:  Well, that is your problem here.  It's |
| 7 08:23:11 | like the investigatory steps, yeah, that is fair game, but |
| 8 08:23:15 | then if you get into those steps and what was said -- |
| 9 08:23:20 | MR. SIDDALL:  Right.  That is where our objection |
| 10 08:23:23 | was.  So that is why we are asking for that portion of |
| 11 08:23:27 | Detective Lawler's testimony be stricken.  And at the very |
| 12 08:23:30 | least, Your Honor, what we would ask is -- and if the Court |
| 13 08:23:34 | just wants to review the sections over at some break, I can |
| 14 08:23:39 | provide you the page numbers.  But what I would -- at the |
| 15 08:23:44 | very -- I think at the very least, Your Honor, what we would |
| 16 08:23:47 | ask is that at closing argument, the defense be prohibited |
| 17 08:23:51 | from stating that a -- that that suspect did not identify his |
| 18 08:23:57 | client because that is -- that is completely impermissible |
| 19 08:24:04 | because that is clear hearsay and it is being offered for the |
| 20 08:24:07 | truth. |
| 21 08:24:15 | THE COURT:  Not making a statement? |
| 22 08:24:18 | MR. SIDDALL:  Stating that -- that someone was not |
| 23 08:24:20 | involved. |
| 24 08:24:22 | THE COURT:  That is different.  That is different. |
| 25 08:24:26 | For an attorney to stand up in argument saying, "Okay.  Here |

08:24:28  1   is the conclusion, right?  This person was not involved in

08:24:31  2   this murder," that is entirely different than what I think we

08:24:34  3   are talking about, that there was an investigation conducted,

08:24:38  4   and out of that investigation no identification of my client

08:24:45  5   was made.

08:24:47  6            MR. LECHMAN:  Exactly, Your Honor.

08:24:48  7            MR. SIDDALL:  But, Your Honor, when you are saying

08:24:50  8   that no identification -- this witness was interviewed and no

08:24:53  9   identification was made from that --

08:24:55  10           THE COURT:  Right.

08:24:57  11           MR. KHOJAYAN:  Yes.

08:24:58  12           MR. SIDDALL:  -- that is -- that witness, then you

08:25:02  13  are offering it for the truth of the matter, right?

08:25:04  14           THE COURT:  That statement was not made for the

08:25:06  15  truth of it.  It -- in fact, it's -- it could have been

08:25:13  16  almost anything.  It's like an investigation was done and

08:25:18  17  whatever it is that you think came out of that investigation,

08:25:20  18  no, it didn't happen.

08:25:22  19           MR. SIDDALL:  I understand, but when the question is

08:25:24  20  posed that the -- the declarant --

08:25:30  21           THE COURT:  That is just it.  There is no declarant

08:25:36  22  here.

08:25:36  23           MR. SIDDALL:  Right.

08:25:36  24           THE COURT:  This is fascinating, but it's also

08:25:43  25  time-consuming.  Can we do this under less --

1  08:25:45          MR. SIDDALL:  No, that is fair, Your Honor, but --

2  08:25:46          THE COURT:  Any objection --

3  08:25:48          MR. LECHMAN:  No, Your Honor.

4  08:25:48          THE COURT:  -- to doing this more leisurely and

5  08:25:51  hopefully get it right?

6  08:25:52          Okay.  If there is nothing else pre-jury, then let's

7  08:25:56  get them out here.

8  08:25:57          Who did we have --

9  08:25:59          MR. BALDING:  Should I have the witness take the

10 08:26:01  stand, Your Honor?

11 08:26:02          THE COURT:  Please.

12 08:26:03          MR. BALDING:  It's Karen Shonka.

13 08:27:18          THE COURT:  All right.  Detective Shonka, you are

14 08:27:20  still under oath.

15 08:27:21          Where did you go?  Oh, there you are.  You are still

16 08:27:24  under oath, ma'am.

17 08:27:25          THE CLERK:  Wait.  Wait.  We've got to get our jury.

18 08:27:29          (Thereupon, the jury returned to the courtroom.)

19 08:27:59          THE CLERK:  Recalling item one, CR-19-117, United

20 08:28:10  States of America versus Walter Chavez-Larin.

21 08:28:13          Counsel, may I have your appearances, please.

22 08:28:15          MR. BALDING:  Good morning, Your Honor.  Ben Balding

23 08:28:17  for the United States, and joined by my colleagues, Catharine

24 08:28:19  Richmond, William Larsen, and Eric Siddall, and also by FBI

25 08:28:23  Special Agent Meagan Buckley.

|   |   |   |
|---|---|---|
| 1 | 08:28:25 | THE COURT:  Good morning, everyone. |
| 2 | 08:28:26 | MR. LECHMAN:  Your Honor, good morning.  Ben |
| 3 | 08:00:37 | Lechman, Robert Schwarz, Sam Rivas on behalf of Walter |
| 4 | 08:00:41 | Chavez-Larin. |
| 5 | 08:28:31 | THE COURT:  Good morning. |
| 6 | 08:28:35 | MR. MCNICHOLAS:  Good morning, Your Honor.  John |
| 7 | 08:00:45 | McNicholas, Shaun Khojayan, and Tracy Vena-Sandstrom for |
| 8 | 08:00:45 | Edwin Martinez. |
| 9 | 08:28:44 | THE COURT:  Good morning. |
| 10 | 08:28:44 | MR. SIGAL:  Good morning, Your Honor.  Vitaly Sigal, |
| 11 | 08:28:46 | Ivette Maningo for Bryan Rosales-Arias. |
| 12 | 08:28:48 | THE COURT:  Good morning. |
| 13 | 08:28:48 | MR. PACTOR:  Good morning, Your Honor.  Scott Pactor |
| 14 | 08:28:49 | and Carlos Juarez for Erick Rosales-Arias. |
| 15 | 08:28:54 | MR. CLEARY:  Good morning, Your Honor.  Oliver |
| 16 | 08:28:55 | Cleary on behalf of Roberto Corado-Ortiz. |
| 17 | 08:28:59 | THE COURT:  Good morning. |
| 18 | 08:29:01 | And good morning, ladies and gentlemen. |
| 19 | 08:29:01 | All right.  Let's pick up where we left off on |
| 20 | 08:29:03 | Friday with Mr. Balding's direct examination of this |
| 21 | 08:29:13 | Detective Shonkin (sic). |
| 22 | 08:29:16 | Go ahead, sir. |
| 23 | 08:29:17 | MR. BALDING:  It's "Shonka," I believe, sir. |
| 24 | 08:29:19 | THE COURT:  "Shonka"?  I'm sorry. |
| 25 | 08:29:20 | THE WITNESS:  It's okay. |

```
1  08:29:21            THE COURT:  No, it's not okay.  I'm sorry.
2  08:29:23            Okay.  Go ahead.
3  08:29:23            MR. BALDING:  Thank you, Your Honor.
4  08:29:23                (CONTINUED) DIRECT EXAMINATION
5  08:29:23   BY MR. BALDING:
6  08:29:25    Q. Good morning, Detective Shonka.
7  08:29:27    A. Good morning.
8  08:29:28    Q. So on Friday, we were discussing that the homicide
9  08:29:33   investigation has a unique case number with the sheriff's
10 08:29:36   department as well as with the medical examiner.
11 08:29:39            Do you recall that?
12 08:29:39    A. I do.
13 08:29:40    Q. And they are separate numbers; is that right?
14 08:29:42    A. Yes.
15 08:29:42    Q. And in this investigation, was the LA Sheriff's
16 08:29:46   Department investigation case number 018-04413-1026-011?
17 08:29:52    A. Yes.
18 08:29:53    Q. Did you obtain Facebook and phone records for the victim,
19 08:29:58   Roger Chavez's, accounts?
20 08:30:00    A. Yes, I did.
21 08:30:01    Q. And do you have an understanding as to what call detail
22 08:30:06   records are?
23 08:30:07    A. I do.
24 08:30:07    Q. What are they?
25 08:30:08    A. Call detail records, when you write a search warrant for
```

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

08:30:12    a specific phone, you get the date, time, whether it's a call

08:30:18    or a text, and whether it's incoming or outgoing from that

08:30:24    specific number.

08:30:25    Q. And did you obtain call detail records for the victim's

08:30:28    phone?

08:30:28    A. Yes, I did.

08:30:29    Q. And did you get that phone information from his family,

08:30:32    as you discussed on Friday?

08:30:33    A. I received the victim's phone number from his family,

08:30:36    yes.

08:30:36    Q. If you'll look at Exhibit 529 in your -- in the binder to

08:30:41    your left -- or one of the binders to your left.

08:31:04    A. Okay.

08:31:05    Q. Do you recognize Exhibit 529?

08:31:08    A. Yes, I do.

08:31:09    Q. What is it?

08:31:11    A. It is the Hawk analytical report for the phone number for

08:31:16    the victim's phone, 323-674-1777.

08:31:22    Q. Does that include the call detail records of that phone?

08:31:24    A. Yes, it does.

08:31:25        MR. BALDING:  Your Honor, I move to admit

08:31:28    Exhibit 529.

08:31:29        THE COURT:  Okay.  Without objection.  Admitted.

08:31:31        (Exhibit No. 529 received.)

08:31:31    Q. Now, you can put that exhibit away.

08:31:34    I asked you on Friday that the gun that was obtained
08:31:39  from Defendant Corado-Ortiz's arrest, was that sent to the
08:31:44  ballistics lab for testing against the bullets that we
08:31:47  discussed on Friday?
08:31:48  A. Yes.
08:31:48  Q. And we talked about the bullet fragment that -- or the
08:31:54  bullet, excuse me, that was recovered from the victim's head.
08:31:56    Do you recall discussing that?
08:31:57  A. I do.
08:31:58  Q. And your testimony that it was due to some sort of
08:32:01  oxidation, there wasn't a positive match made?
08:32:03  A. Correct.
08:32:04  Q. Now, the bullets that you recovered from the ground, did
08:32:07  you submit those for testing?
08:32:08  A. Yes, I did.
08:32:09  Q. And do you have an understanding as to whether a positive
08:32:13  match made or whether they did not match the gun found from
08:32:17  Corado-Ortiz?
08:32:17  A. They did not match the gun.
08:32:19  Q. Did they match each other?
08:32:20  A. Yes, they did.
08:32:21  Q. And I think you said they were consistent with the type
08:32:28  of gun that were found from Corado-Ortiz; is that correct?
08:32:31  A. They were consistent with the 9mm, yes.
08:32:33  Q. But they were not a match for that specific gun; is that

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

108:32:35   right?

208:32:35    A. No, sir.

308:32:37    Q. I mean, it's -- they were not a match; is that correct?

408:32:39    A. They were not a match.

508:32:42    Q. Now, I showed you, I believe, a picture of Exhibits 39

608:32:48   and 40, and I'm going to try to zoom in to see, but this is

708:32:53   Exhibit 39, and it's hard to make out, but do you generally

808:32:58   see the serial number being 77955 on that?

908:33:01    A. Yes, I do.

1008:33:02    Q. And then going to Exhibit 40, is that the same serial

1108:33:08   number?

1208:33:08    A. Yes, it is.

1308:33:09    Q. So does it appear that Exhibits 39 and 40 are in fact

1408:33:15   just a picture of a single gun -- a close-up of the same gun?

1508:33:19    A. It's the same gun, yes.

1608:33:20    Q. So there were a total of three guns -- pictures of three

1708:33:25   different guns in Corado-Ortiz's phone; is that right?

1808:33:28    A. Yes, sir.

1908:33:29    Q. We saw Exhibit 32, Exhibit 36, and then these two photos

2008:33:33   are just a single gun?

2108:33:34    A. Correct.

2208:33:35    Q. And the gun that was pictured in Exhibit 39 and 40 --

2308:33:42   excuse me -- are the same gun?  Sorry.

2408:33:44    A. Yes.

2508:33:45    Q. Now, we played several clips from the Erick Arias *Perkins*

1 08:33:51  operation.  Do you recall that?

2 08:33:53   A. I do.

3 08:33:55   Q. I'm going to go pick up where I think we left off.

4 08:34:04        Now, at the beginning of the Snapchat video, do you

5 08:34:08  recall how many vehicles you could see briefly in that video?

6 08:34:12   A. I do.  There was one truck and one smaller sedan.

7 08:34:17   Q. And was the sedan black as well as the truck?

8 08:34:20   A. Yes.

9 08:34:22   Q. And showing you Exhibit 524 again, is this a picture --

10 08:34:28  what is this a picture of?

11 08:34:29   A. That is a picture of a black Silverado pickup truck.

12 08:34:33   Q. Is this Defendant Corado-Ortiz's truck?

13 08:34:37   A. Yes.

14 08:34:38   Q. I'm just showing you -- we haven't talked about this, but

15 08:34:41  I'm showing you what's in evidence as Exhibit 255.

16 08:34:44        What type of vehicle are we looking at in

17 08:34:46  Exhibit 255?

18 08:34:46   A. That is a Toyota Corolla.

19 08:34:50   Q. What color is it?

20 08:34:51   A. Black.

21 08:34:58   Q. I'm going to be playing Exhibit 585 in a moment, and I'm

22 08:35:07  showing you on the screen the transcript, Exhibit 585-T.

23 08:35:12        Again, I think we discussed it earlier, but did you

24 08:35:16  listen to the recordings and confirm that the names on the

25 08:35:19  transcript matched with the voices you had heard in the

| | | |
|---|---|---|
| 1 | 08:35:21 | recordings? |
| 2 | 08:35:21 | A. Yes, I did. |
| 3 | 08:35:22 | Q. Including this one, 585? |
| 4 | 08:35:24 | A. Yes. |
| 5 | 08:35:28 | (Thereupon, the audio was played.) |
| 6 | 08:35:49 | Q. I'm now going to play and display -- Exhibit 586, and |
| 7 | 08:36:06 | display on the right Exhibit 586-T. |
| 8 | 08:36:10 | (Thereupon, the audio was played.) |
| 9 | 08:36:39 | Q. And again, are these the voices -- Erick Arias saying |
| 10 | 08:36:52 | that everybody but two shot the victim? |
| 11 | 08:36:54 | A. Yes. |
| 12 | 08:36:59 | Q. I'm displaying Exhibit 587 -- excuse me -- I'm playing |
| 13 | 08:37:07 | Exhibit 587 and displaying the transcript on the right, of |
| 14 | 08:37:10 | 587-T. |
| 15 | 08:37:11 | (Thereupon, the audio was played.) |
| 16 | 08:38:22 | Q. So I'm stopping the clip at the 1-minute 10-second mark. |
| 17 | 08:38:27 | Does Defendant Erick Arias talk about another |
| 18 | 08:38:29 | murder? |
| 19 | 08:38:30 | A. Yes. |
| 20 | 08:38:30 | Q. Does he say he wasn't physically -- wasn't physically |
| 21 | 08:38:34 | present at that murder? |
| 22 | 08:38:36 | A. Yeah, he was not there. |
| 23 | 08:38:39 | Q. I'm going to pick up. |
| 24 | 08:38:45 | (Thereupon, the audio was played.) |
| 25 | 08:39:14 | Q. I think you testified earlier, but did Walner Bonilla -- |

08:39:19  1  did you learn in your investigation about whether or not

08:39:22  2  Walner Bonilla worked with the victim Roger Chavez?

08:39:24  3  A. Yes, I did.

08:39:25  4  Q. What was that?

08:39:26  5  A. They worked together at a construction site in the city

08:39:28  6  of Downey.

08:39:33  7  Q. Showing you what's in evidence at Exhibit 507.  Do you

08:39:39  8  recall talking about Exhibit 507 earlier?

08:39:42  9  A. Yes, I do.

08:39:45  10  Q. And do you recall discussing the presence of beer cans

08:39:48  11  around the body at the time this picture was taken?

08:39:51  12  A. Yes.

08:39:53  13  Q. I'm playing Exhibit 588, and showing Exhibit 588-T.

08:40:03  14          (Thereupon, the audio was played.)

08:41:10  15  Q. And again, were those the voices of the *Perkins* agent and

08:41:21  16  Erick Arias, as reflected in the transcript on the right side

08:41:25  17  of the screen?

08:41:26  18  A. Yes.

08:41:26  19  Q. I'm showing you Exhibit 597.  Do you remember discussing

08:41:31  20  this exhibit on Friday?

08:41:32  21  A. Yes, I do.

08:41:33  22  Q. And is it your understanding that during the *Perkins*

08:41:36  23  operation, that the *Perkins* agent and Erick Arias had this

08:41:43  24  document in the room with them?

08:41:45  25  A. Yes.

```
1  08:41:45    Q. Because you had given it to Erick Arias?

2  08:41:48    A. We provided them with that copy, yes.

3  08:41:49    Q. We'll come back to that.  But playing now Exhibit 589,

4  08:42:05    and showing you 589-T.

5  08:42:11            MR. BALDING:  And Your Honor, I will just say the

6  08:42:13    parties have discussed there is a portion of some of these

7  08:42:15    clips that were played on Friday, and today, where it's

8  08:42:18    muted, at the mutual agreement of the parties that that part

9  08:42:21    be left out of the recording.

10 08:42:22            THE COURT:  All right.  Thank you.

11 08:42:27            (Thereupon, the audio was played.)

12 08:42:32    Q. Pausing it at the 5-second mark.

13 08:42:36            Who was the first person on Exhibit 597, from left

14 08:42:40    to right?

15 08:42:41    A. The -- in the number 1 position was Roberto Ortiz, also

16 08:42:46    known as Infernal.

17 08:43:03            (Thereupon, the audio was played.)

18 08:43:05    Q. And again, who is in the number two position?

19 08:43:14            I'm displaying 597 now on the left side of the

20 08:43:18    screen.  Who is in the number 2 position of 597?

21 08:43:22    A. That is CW-O.

22 08:43:23    Q. Is he also known as Mentiroso?

23 08:43:27    A. Also known as Mentiroso.

24 08:43:30    Q. Who is in the number 4 position?  Or do you know the

25 08:43:34    nickname of the person in the number 4 position?
```

1  08:43:35    A. His nickname is Silent.   CW-X is his last name.

2  08:43:42    Q. Is there another portion of the recording that you've

3  08:43:46    listened to, and reviewed the transcript, where Defendant

4  08:43:53    Erick Arias states that the person in position 1 had -- was

5  08:44:01    Infernal, and had been one of the shooters?

6  08:44:02    A. Yes.

7  08:44:09    Q. I'm playing now Exhibit 591, and displaying the

8  08:44:14    transcript.

9  08:44:15            (Thereupon, the audio was played.)

10 08:44:27    Q. So I think earlier we played a clip -- or on Friday we

11 08:44:31    played a clip where Erick Arias mentioned that he's from

12 08:44:34    Fulton.  Do you recall that?

13 08:44:34    A. Yes, I do.

14 08:44:35    Q. And here, is he also saying he's from Los Angeles Locotes

15 08:44:42    Salvatrucha?

16 08:44:42    A. Yes.

17 08:44:43    Q. Now, I showed you Exhibit 522, but I'll briefly show it

18 08:44:47    again.  Do you recall this being -- and I'm playing the

19 08:44:51    video.  Do you recall this being generally the location where

20 08:44:53    the body was found?

21 08:44:54            (Whereupon, the video was played.)

22 08:44:54    A. Yes, that is.

23 08:44:56    Q. I'm playing now Exhibit 592, and displaying the

24 08:45:08    transcript.

25 08:45:09            (Thereupon, the audio was played.)

08:46:02  Q. And does Erick Arias say in this clip that you could see

08:46:05  the entire ocean where they had left the fool?

08:46:10  A. Yes, he does.

08:46:15  Q. Now displaying Exhibit 593.

08:46:19          (Thereupon, the audio was played.)

08:46:37  Q. And again, are these the voices of Erick Arias and the

08:46:42  *Perkins* agent?

08:46:42  A. Yes, it is.

08:46:43  Q. Now playing Exhibit 594.

08:46:54          (Whereupon, the audio was played.)

08:46:55  Q. And does Erick Arias in 594-T say that at the time he had

08:47:00  another phone?

08:47:00  A. Yes.

08:47:11  Q. Finally, I'm going to play Exhibit 595, and display

08:47:15  595-T.

08:47:17          (Thereupon, the audio was played.)

08:47:28  Q. And again, is this the voice of Erick Arias talking about

08:47:32  playing dumb?

08:47:33  A. Yes.

08:47:36          MR. BALDING:  Nothing further, Your Honor.

08:47:36                          CROSS-EXAMINATION

08:47:42  BY MR. PACTOR:

08:47:42  Q. Good morning, Detective Shonka.

08:47:59  A. Good morning.

08:48:02  Q. You said that you worked on between 100 and 200 homicide

| | |
|---|---|
| 1 08:48:05 | investigations? |
| 2 08:48:07 | A. Yes. |
| 3 08:48:07 | Q. Not all of those are murder investigations, right? |
| 4 08:48:12 | A. We handle murder investigations, officer-involved |
| 5 08:48:16 | shootings, deputy shootings, suicides.  Sometimes they don't |
| 6 08:48:23 | know when they are at the scene, so we have to go and |
| 7 08:48:27 | determine.  So, yeah, several different types of cases. |
| 8 08:48:30 | Q. What percentage of those that you have handled are murder |
| 9 08:48:32 | versus other types of homicide? |
| 10 08:48:35 | A. I would only handle murder. |
| 11 08:48:38 | Q. Okay.  You only handle murder investigations? |
| 12 08:48:42 | A. Well, we get called out to a lot of different things, but |
| 13 08:48:46 | we handle murder, which is death by another, which would be |
| 14 08:48:51 | an officer-involved shooting, is what we call those, |
| 15 08:48:54 | deputy-involved shootings.  We do roll out to suicides.  So |
| 16 08:48:58 | suicides would probably be a certain percentage, maybe |
| 17 08:49:02 | 30 percent. |
| 18 08:49:03 | Q. Got it. |
| 19 08:49:04 | And you work for the sheriff's department, correct? |
| 20 08:49:08 | A. Yes, I do. |
| 21 08:49:09 | Q. And your jurisdiction that you covered, did it include |
| 22 08:49:14 | cities in Los Angeles County? |
| 23 08:49:15 | A. We cover all LA County, unincorporated cities, and then |
| 24 08:49:23 | we are contracted by some cities to go and handle their |
| 25 08:49:28 | homicides. |

08:49:29  1    Q. What was the largest city that you worked in when you

08:49:31  2    worked for the sheriff, or as you worked for the sheriff?

08:49:34  3    A. Well, as a homicide detective, I worked the entire

08:49:38  4    county.

08:49:38  5    Q. So you worked in the city of Los Angeles?

08:49:40  6    A. No.  The city of Los Angeles is handled by Los Angeles

08:49:45  7    Police Department.

08:49:45  8    Q. So my question for you is:  What is the largest city that

08:49:47  9    you worked in, that you investigated?

08:49:50  10   A. That's kind of hard to answer, because we get called out

08:49:55  11   to all different cities throughout LA County, but we handle

08:49:59  12   the entire county.

08:50:01  13   Q. Understood.

08:50:04  14        So I would like to ask you some questions about

08:50:07  15   *Perkins* operations.

08:50:09  16   A. Okay.

08:50:09  17   Q. So you testified that you are experienced in these sorts

08:50:14  18   of investigations?

08:50:16  19   A. I have participated in a few *Perkins* operations.

08:50:19  20   Q. You testified that there are typically two *Perkins* agents

08:50:26  21   that you used?

08:50:26  22   A. Yes.

08:50:27  23   Q. And is that just for Spanish-speaking targets or was that

08:50:33  24   for everybody?

08:50:34  25   A. Well, we -- I did use others, but the main operators that

1 08:50:41    we use were Hispanic for Hispanic gang-related-type

2 08:50:46    homicides.

3 08:50:46    Q. So do you have *Perkins* operatives of different races?

4 08:50:51    A. Yes, sir, and sex.

5 08:50:55    Q. And you say you have white *Perkins* operatives?

6 08:50:58    A. Not that I recall, no.

7 08:51:01    Q. Black *Perkins* operatives?

8 08:51:04    A. Yes, sir.

9 08:51:04    Q. Asian *Perkins* operatives?

10 08:51:07    A. Personally, no.

11 08:51:08    Q. And are you aware if the Federal Government does *Perkins*

12 08:51:14    operations in their investigations?

13 08:51:18        MR. BALDING:  Objection, relevance.

14 08:51:19        THE COURT:  Sustained.

15 08:51:21        THE WITNESS:  I --

16 08:51:22        THE COURT:  Don't even try.

17 08:51:27    Q. You testified that *Perkins* operatives are typically older

18 08:51:32    and larger in stature, correct?

19 08:51:38    A. Not really, no.  Not always, I should say.

20 08:51:41    Q. Okay.  But do you remember testifying to that on Friday?

21 08:51:46    A. Yes.  On this case, yes.

22 08:51:47    Q. Okay.  So what you meant is this *Perkins* operative is

23 08:51:53    older and larger in stature?

24 08:51:55    A. Those agents that we used, the two, they are older and

25 08:51:58    larger in stature.

Q. Do they have tattoos?

A. I don't know.

Q. You don't know if they have tattoos?

A. I don't.

Q. Does that mean you couldn't see any tattoos on the people?

A. Not that I recall, and not that I recall seeing.

Q. Are one of the reasons that the *Perkins* operatives selected because of their prior or current gang membership?

A. I don't know who selected them.

Q. Do you know if the *Perkins* operative in this case was a current or former gang member at the time that you used them?

A. I don't know.

Q. Is the *Perkins* operative in this case somebody who had been to jail before?

        MR. BALDING:  Objection, relevance.

        THE COURT:  I'll permit it.  Go ahead.

        THE WITNESS:  I couldn't hear you.  I'm sorry, I couldn't hear you.

        I don't recall.

Q. Do you know if this *Perkins* operative had been to prison before?

A. I don't know.

Q. Do you know if this *Perkins* operative had been convicted of crimes?

1 08:53:01  A. I don't know.

2 08:53:02  Q. Did you -- do you know if this *Perkins* operative had

3 08:53:06  received any training in interrogation techniques?

4 08:53:09  A. I don't know.

5 08:53:13  Q. For this *Perkins* operation, did you prepare this

6 08:53:18  operative before he was placed into the cell with Mr. Arias?

7 08:53:22  A. I did not.

8 08:53:24  Q. Did you provide him any facts about the target,

9 08:53:31  Mr. Arias?

10 08:53:33  A. No, I did not, other than my partner giving him the

11 08:53:39  sheriff's bulletin for stimulation.

12 08:53:42  Q. For stimulation, yes.

13 08:53:44      Now, before this *Perkins* operation took place, you

14 08:53:50  investigated Mr. Arias?

15 08:53:53  A. Yes, sir.

16 08:53:53  Q. Do you know if he speaks Spanish or English?

17 08:53:57  A. Spanish.

18 08:53:59  Q. Do you know his level of education?

19 08:54:02  A. I do not.

20 08:54:03  Q. Do you know if he can read English?

21 08:54:09  A. I don't know.

22 08:54:11  Q. Do you know how old he is, or was at the time of the

23 08:54:14  investigation?

24 08:54:15  A. I did then.  I don't now.  I don't recall.

25 08:54:20  Q. Okay.  Do you remember running his DMV record?

08:54:24  A. Yes.

08:54:25  Q. Would it refresh your recollection if I provided you with

08:54:28  the record that you ran?

08:54:29  A. Yes, it would.

08:54:31          THE COURT:  Refresh her recollection on what?

08:54:34          MR. PACTOR:  His age and his date of birth.

08:54:36          THE COURT:  It doesn't matter.

08:54:39  Q. Would you agree with me that he was 21 at the time of

08:54:42  this *Perkins* operation?

08:54:43  A. He was in or around 21 years of age.  He was an adult.

08:54:47  Q. And would you agree with me that the record that you

08:54:49  looked up showed that his date of birth was July 22nd, 1998?

08:54:55  A. I would have to look at the record.  I'm sorry.

08:54:58  Q. Would it surprise you if that was the case?

08:55:00  A. No.

08:55:01  Q. And that DMV record, it contains height and weight

08:55:08  information as well, correct?

08:55:09  A. It typically does, yes.

08:55:11  Q. So you wouldn't argue with me if I told you that the

08:55:14  record that you searched showed that he was 5-foot 4?

08:55:18  A. Right.

08:55:19  Q. And that he weighed 145 pounds?

08:55:22  A. Yes.

08:55:24  Q. And this *Perkins* operation, this took place on May 31,

08:55:29  2019, correct?

| | | |
|---|---|---|
| 1 | 08:55:30 | A. Yes. |
| 2 | 08:55:30 | Q. And it lasted about an hour and a half? |
| 3 | 08:55:34 | A. Yes. |
| 4 | 08:55:35 | Q. Did you tell the *Perkins* operative to represent himself |
| 5 | 08:55:45 | as a member of the Echo Park Big Time Locos gang? |
| 6 | 08:55:48 | A. I did not. |
| 7 | 08:55:49 | Q. Are you familiar with that gang? |
| 8 | 08:55:51 | A. No, I'm not. |
| 9 | 08:55:53 | Q. Are you aware that that is an older, well-established |
| 10 | 08:55:57 | gang from northeast Los Angeles? |
| 11 | 08:55:59 | MR. BALDING:  Objection, relevance. |
| 12 | 08:56:00 | THE COURT:  She's not aware of it. |
| 13 | 08:56:03 | MR. BALDING:  Foundation. |
| 14 | 08:56:05 | THE COURT:  Foundation sustained. |
| 15 | 08:56:08 | Q. That would be a Surenos gang, correct? |
| 16 | 08:56:11 | A. Yes. |
| 17 | 08:56:12 | MR. BALDING:  Objection. |
| 18 | 08:56:36 | Q. So do you remember the physical size of this *Perkins* |
| 19 | 08:56:38 | operative? |
| 20 | 08:56:39 | A. Yes, I do. |
| 21 | 08:56:46 | Q. And how big was he? |
| 22 | 08:56:48 | A. He's a probably 5-foot 11, maybe about 200 pounds -- |
| 23 | 08:57:00 | Q. And -- |
| 24 | 08:57:01 | A. -- or less. |
| 25 | 08:57:01 | Q. -- age? |

1 08:57:02    A. Age is probably late 20s, 30s.

2 08:57:05    Q. Okay.

3 08:57:08         MR. PACTOR:  Now, if I could show -- if you could

4 08:57:17    show Exhibit 597.

5 08:57:43    Q. Okay.  This is -- we have been calling it the stimulus.

6 08:57:47    Is that what we have been calling this exhibit, 597?

7 08:57:52    A. A special bulletin from the sheriff's department that was

8 08:57:56    used to stimulate conversation.

9 08:57:57    Q. Got it.

10 08:57:58         And this is a special bulletin that you created just

11 08:58:02    for this investigation, correct?

12 08:58:04    A. Yes, sir.

13 08:58:05    Q. And did you just say that this was provided to the

14 08:58:12    *Perkins* agent before he walked into the cell?

15 08:58:15    A. No.

16 08:58:15    Q. And is this something that you and your partner talked to

17 08:58:23    him about without providing it to him before he went into the

18 08:58:26    cell?

19 08:58:28    A. No.

20 08:58:28    Q. Okay.  And you said you are unaware of whether Mr. Arias

21 08:58:32    can read English, correct?

22 08:58:34    A. Right.  I believe the confidential source read the

23 08:58:40    contents of this to him during the *Perkins* operation.

24 08:58:44    Q. Right.

25 08:58:44         So it's fair to say that the *Perkins* agent knew the

1 08:58:49    facts of the case before Mr. Arias did, correct?

2 08:58:54         MR. BALDING:  Objection, relevance and

3 08:58:55    argumentative.

4 08:58:56         THE COURT:  Yeah.  No foundation for that.

5 08:59:01    Q. So this *Perkins* agent, he knew the name of the victim,

6 08:59:07    right?

7 08:59:08    A. I'm not sure because this was conducted at the LAPD

8 08:59:14    station.  I was not part of setting up the operation, so I

9 08:59:18    don't know what was discussed with the -- with the agent.

10 08:59:21    Q. Okay.  But I'm just talking about Exhibit 597 that lists

11 08:59:26    the name of the victim right there on top, right, Roger

12 08:59:33    Chavez?

13 08:59:33    A. Yes, it says, "Victim:  Roger Chavez."

14 08:59:35    Q. And this individual, this *Perkins* agent, knew the

15 08:59:37    location of the crime, correct?

16 08:59:40    A. Based on the bulletin that I'm aware of, yes, he did.

17 08:59:44    Q. And did he know when it had taken place, or was alleged

18 08:59:49    to have taken place?

19 08:59:50    A. It says it on the bulletin, but I don't know if he was

20 08:59:55    told that prior to the operation.

21 08:59:58    Q. But you agree that these are facts that the *Perkins* agent

22 09:00:05    told Erick Arias in the cell?

23 09:00:08    A. Yes.

24 09:00:08    Q. And you testified that it's normal for targets of a

25 09:00:17    *Perkins* operative to boast or exaggerate their participation

109:00:20    in a crime when talking to the operative?

209:00:23            MR. BALDING:  Objection, misstates the testimony.

309:00:25            THE COURT:  Sustained.

409:00:28    Q. Do you remember testifying last week?

509:00:31    A. I do.

609:00:34            THE COURT:  Just re-ask the question.

709:00:36    Q. You testified on Friday that it's normal for targets of

809:00:41    *Perkins* operations to exaggerate their participation in a

909:00:43    crime?

1009:00:44            MR. BALDING:  Objection -- same objection.

1109:00:45            THE COURT:  Just re-ask the question, the original

1209:00:48    question.  It may save time.

1309:00:53            MR. PACTOR:  Sorry, I'm just looking at the

1409:00:55    transcript here.

1509:00:58    Q. Okay.  You testified that it's normal for subjects of a

1609:01:03    *Perkins* operation to exaggerate their participation in a

1709:01:06    crime, right?

1809:01:07    A. It's typical.

1909:01:09    Q. The example you gave is -- or that the prosecutor gave in

2009:01:12    this case was that somebody might say they shot 20 times when

2109:01:15    they didn't shoot 20 times?

2209:01:18    A. Yes, it's typical to promote their gang in certain ways.

2309:01:25    Q. And you said that one of the reasons that *Perkins*

2409:01:28    operatives are selected is so that the target might look up

2509:01:32    to the operative, correct?

A. That's one of the tools that we may use, depending on what we know about the suspect on the case.

Q. So it's fair to say that you select an operative based on your evaluation of whether they will be successful getting the target to open up to them?

MR. BALDING:  Objection, foundation.

THE COURT:  Overruled.

THE WITNESS:  It's -- it's a tool that is used when we have a subject that we want to place in a *Perkins* operation to try and find someone that we feel that would work with that person.

Q. And so it's important that the *Perkins* operative can represent himself as an older, more-experienced gang member so that the target is more likely to talk to him, correct?

A. Yeah, we would consider him like a veterano in a -- that sense.

MR. PACTOR:  One moment, Your Honor.

(Pause in proceedings.)

Q. You attempted to interview Mr. Arias in the conventional manner after his arrest, correct?

A. That's correct.

Q. And that did not -- you did not obtain any useful information from that interview?

A. Correct.

Q. And then was it after that that you decided to introduce

109:03:24   the *Perkins* agent into the cell?

209:03:27    A. We interviewed him after the *Perkins*.

309:03:30    Q. Was your decision to use the *Perkins* agent contingent on

409:03:35   him not making a statement or is that something -- would you

509:03:38   have used the *Perkins* agent under any circumstances in this

609:03:41   case?

709:03:41    A. I'm sorry, I don't understand.

809:03:43        MR. BALDING:  Objection, vague.

909:03:44        THE COURT:  Sustained.

1009:03:46   Q. So your testimony is that you interviewed him before the

1109:03:49   *Perkins* agent was introduced into the cell?

1209:03:52        MR. BALDING:  Objection, misstates the testimony.

1309:03:54   Q. When did you interview him?

1409:03:56   A. After the *Perkins* operation.

1509:03:59        MR. PACTOR:  No further questions.  Thank you.

1609:04:01        THE WITNESS:  You're welcome.

1709:04:04        THE COURT:  Anyone else wish to cross?

1809:04:07        MR. LECHMAN:  No questions.  Thanks, Detective.

1909:04:09        THE COURT:  Any redirect?

2009:04:10        MR. BALDING:  Briefly, Your Honor.

2109:04:10                    REDIRECT EXAMINATION

2209:04:12   BY MR. BALDING:

2309:04:12   Q. Detective Shonka, I'm just going to go through a few

2409:04:38   things.  I showed you Exhibit 598-T, I believe, on Friday.

2509:04:41        In this clip, does the *Perkins* agent feed Erick

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 09:04:45   Arias that Erick Arias is from MS or does that come from

2 09:04:51   Erick Arias?

3 09:04:51   A. That comes from Erick Arias after he was asked.

4 09:04:54   Q. Sorry, 596-T.

5 09:04:58          Does *Perkins* agent feed the specific clique Fulton,

6 09:05:04   or does that come from Erick Arias?

7 09:05:06   A. It comes from Erick Arias.

8 09:05:12   Q. 577-T, does the *Perkins* agent feed the nickname, the

9 09:05:18   moniker, Extrano, or does Erick Arias provide that?

10 09:05:21  A. Erick Arias provides that.

11 09:05:23  Q. Is that moniker, Extrano, on Exhibit 597 that has the

12 09:05:28  special bulletin?  It's not on that?

13 09:05:31          I can show it to you if you want.

14 09:05:34          Does it anywhere appear on this document?

15 09:05:37  A. It does not.

16 09:05:39  Q. I'm showing you Exhibit 582-T.

17 09:05:59          So the -- in this exhibit, does the *Perkins* agent

18 09:06:02  ask whether the victim was shot or butchered?

19 09:06:05  A. Yes.

20 09:06:05  Q. And is it Erick Arias that offers that they had a gun?

21 09:06:09  A. Yes.

22 09:06:19  Q. In Exhibit 583-T, does the *Perkins* agent suggest that

23 09:06:24  they threw the body down a ravine, or does that come from

24 09:06:28  Erick Arias?

25 09:06:29          MR. JUAREZ:  Your Honor, I'm going to object.  This

09:06:30  1    is beyond the cross.

09:06:33  2            THE COURT:  Sustained.

09:06:39  3    Q. I think we talked about *Perkins* operations.  The *Perkins*

09:06:43  4    operation in this case took place in LA Sheriff's or LAPD?

09:06:46  5    A. At LAPD 77th division.

09:06:49  6    Q. Was LAPD in charge of and did they run their protocols,

09:06:53  7    as you understand it, in this *Perkins* operation?

09:06:58  8    A. Yes, sir.

09:06:59  9            MR. BALDING:  Nothing further.

09:07:00  10           THE COURT:  Mr. Pactor?

09:07:01  11           MR. PACTOR:  No, Your Honor.  Nothing, Your Honor.

09:07:03  12           THE COURT:  May this witness be excused?

09:07:05  13           MR. BALDING:  Yes, Your Honor.

09:07:08  14           At this time, before we call our next witness, may I

09:07:11  15    make a request, Your Honor, that we read in the remainder of

09:07:14  16    the trial stipulation that I started reading last time?

09:07:19  17           I think it's an opportune time to read that before

09:07:22  18    the next witness takes the stand.

09:07:23  19           THE COURT:  Okay.  Have you given the defense a

09:07:25  20    heads-up?

09:07:26  21           MR. BALDING:  We have -- I haven't asked them to

09:07:28  22    read it today, but I have asked them if I could read it in

09:07:31  23    court.

09:07:32  24           THE COURT:  Yes.  That is what I'm concerned about.

09:07:34  25           MR. BALDING:  And this is the stipulation that is

109:07:35    signed by all counsel in this case and filed with the Court.

209:07:38           THE COURT:  Okay.  Go ahead.

309:07:39           MR. BALDING:  And I'll skip the preliminaries that I

409:07:43    sped through on Friday and just start with Stipulated Fact 1.

509:07:48           1.  "Elvin Hernandez is deceased and his body was

609:07:51    recovered by law enforcement on June 12, 2017, from the

709:07:55    mountainside area of the Angeles Forest Highway close to Mile

809:08:00    Marker 20.72 near the 'Too Late Helipad' south of Big Tujunga

909:08:08    Canyon Road in Los Angeles County, California.  The Los

1009:08:11    Angeles County Department of Medical Examiner-Coroner case

1109:08:11    number associated with Elvin Hernandez is 2017-04354;

1209:08:19           2.  Brayan Andino is deceased and his body was

1309:08:22    recovered by law enforcement on December 15, 2017, in the

1409:08:26    area south of Lopez Canyon Road and west of Indian Canyon

1509:08:30    Road in Los Angeles County, California.  The Los Angeles

1609:08:36    County Department of Medical Examiner-Coroner case number

1709:08:37    associated with Brayan Andino is 2017-09159."

1809:08:43           I've already read points 3 and 4 relating to the

1909:08:47    Roger Chavez murder, Your Honor, so I'll skip to 5 on the

2009:08:50    stipulation, which is that:

2109:08:52           "Osvaldo Hernandez and Matthew Sanchez were each

2209:08:56    shot on December 6, 2018, in the carport area adjacent to

2309:09:00    apartment complex at 7358 Vista Del Monte Avenue, Van Nuys,

2409:09:06    California.  Osvaldo Hernandez died as a result of his

2509:09:11    wounds.  The Los Angeles Department County of Medical

09:09:13  Examiner-Coroner case number associated with Osvaldo

09:09:16  Hernandez is 2018-09292;

09:09:21          6.  One fired bullet recovered from the crime scene

09:09:25  on or about December 7, 2018, is listed as evidence item 20

09:09:30  in the LAPD property report of December 21, 2018;

09:09:36          7.  One fired bullet recovered from Osvaldo

09:09:40  Hernandez's back on or about December 11, 2018, is listed in

09:09:44  his autopsy report as evidence item 36-A;

09:09:49          8.  One fired bullet recovered from Osvaldo

09:09:52  Hernandez's hand on or about December 11, 2018, is listed in

09:09:57  his autopsy report as evidence item 36-B;

09:10:01          9.  Bradley Hanaway is deceased, and his body was

09:10:07  recovered by law enforcement on January 14, 2019, from

09:10:10  Whitsett Park, near 7100 Whitsett Avenue, Van Nuys,

09:10:14  California.  The Los Angeles County Department of Medical

09:10:20  Examiner-Coroner case number associated with Bradley Hanaway

09:10:22  is 2019-00369;

09:10:25          10.  A bullet recovered from Whitsett Park on

09:10:29  January 14, 2019, is listed in the Los Angeles Police

09:10:33  Department property report dated January 21, 2019, as item 4;

09:10:39          11.  A bullet recovered from Whitsett Park on

09:10:43  January 14, 2019, is listed in the Los Angeles Police

09:10:47  Department report dated January 21, 2019, as item 5;

09:10:53          And again, 12, this stipulation is admissible at

09:10:56  trial into evidence for all purposes."

1 09:10:58          THE COURT:  All right.  Ladies and gentlemen, just

2 09:10:59   once again, at the risk of being unduly repetitious, when the

3 09:11:04   parties have stipulated to facts, you are to accept those

4 09:11:07   facts as having been proved.

5 09:11:11          All right.  Next?

6 09:11:13          MS. RICHMOND:  The Government calls Derrick McClarin

7 09:11:16   to the stand.

8 09:11:39   THEREUPON:

9 09:11:39                          DERRICK MCCLARIN,

10 09:11:39   Called in these proceedings, and after having been first duly

11 09:11:46   sworn, testifies as follows:

12 09:11:46          THE CLERK:  Thank you.  Please be seated in the

13 09:11:48   chair.

14 09:12:02          Please state your first and last name, spell it, and

15 09:12:04   speak slowly for the record.

16 09:12:05          THE WITNESS:  My name is Derrick, D-e-r-r-i-c-k,

17 09:12:09   McClarin, M-c-C-l-a-r-i-n.

18 09:12:15          THE CLERK:  Thank you.

19 09:12:22          MS. RICHMOND:  May I inquire, Your Honor?

20 09:12:23          THE COURT:  Please.

21 09:12:23                          DIRECT EXAMINATION

22 09:12:24   BY MS. RICHMOND:

23 09:12:24    Q. Mr. McClarin, what do you do for work?

24 09:12:26    A. I am a forensic examiner in the Firearms and Tool Marks

25 09:12:31   Unit of the FBI laboratory in Quantico, Virginia.

09:12:34   Q. What is your title?

09:12:35   A. I'm a physical scientist-forensic examiner.

09:12:39   Q. How long have you worked there?

09:12:40   A. I've worked there for more than 10 years.

09:12:43   Q. What are your responsibilities?

09:12:44   A. My responsibilities include receiving evidence, possibly

09:12:51   inventorying evidence, determining what examinations need to

09:12:54   be done on that evidence, performing those examinations,

09:12:58   putting the results of those examinations in notes, forms,

09:13:01   and then ultimately in a report, and in some cases such as

09:13:06   this, testifying to those results.

09:13:07   Q. Did you work somewhere before?

09:13:09   A. Yes, I did.

09:13:10   Q. Where did you work?

09:13:11   A. I worked at the Alabama Department of Forensic Sciences.

09:13:15   Q. How long were you there?

09:13:16   A. I was there for 11 years.

09:13:18   Q. Do you have any degrees?

09:13:19   A. Yes, I do.

09:13:20   Q. What degrees do you have?

09:13:21   A. I have a bachelor's of science in chemistry from Lambuth,

09:13:27   L-a-m-b-u-t-h, University in Jackson, Tennessee, and I have a

09:13:33   master's of science in forensic sciences from the University

09:13:36   of Alabama at Birmingham.

09:13:38   Q. Do you have any professional certifications?

1 09:13:40  A. Yes, I do.

2 09:13:42  Q. What certifications do you have?

3 09:13:44  A. I am a certified firearms specialist.

4 09:13:47  Q. Were you trained for the job that you have now?

5 09:13:50  A. Yes, I was.

6 09:13:52  Q. Between the two jobs you just described, about how many

7 09:13:56  examinations of firearms have you done?

8 09:13:58  A. I've examined thousands of firearms.

9 09:14:00  Q. About how many comparisons of ballistics?

10 09:14:05  A. That would be in the tens of thousands.

11 09:14:06  Q. How many times have you testified, approximately?

12 09:14:08  A. I want to say approximately around 40 times.

13 09:14:13      MS. RICHMOND:  Your Honor, the Government asks the

14 09:14:14  Court to designate this witness as an expert, subject to the

15 09:14:16  proposed order that was previously lodged.

16 09:14:19      THE COURT:  Okay.  In the category of forensic

17 09:14:23  science, not just anything.  But in the areas in which he has

18 09:14:29  expressed he has education and experience, will be -- he'll

19 09:14:33  be deemed as an expert witness.

20 09:14:35  Q. Mr. McClarin, were you asked to work on this case?

21 09:14:38  A. Yes, I was.

22 09:14:40  Q. In the most basic terms, what evidence did you review?

23 09:14:42  A. I received three fired .38 Special caliber cartridge

24 09:14:49  cases.

25 09:14:49  Q. How did you get that evidence?

09:14:51  A. That evidence was received in the laboratory.  And

09:14:56  originally, that evidence was handled by our Evidence

09:15:00  Management Unit, which receives all evidence.

09:15:02         Then there is -- the Evidence Management Unit

09:15:07  determines which units need to receive that evidence.  That

09:15:11  is done through a request coordinator.  So if there are other

09:15:14  units prior to Firearms and Tool Marks, it goes to those

09:15:18  units first, and then ultimately shows up at our unit.

09:15:22  Q. Is there something that you receive in addition to the

09:15:25  physical evidence?

09:15:26  A. We receive an incoming communication from the case agent,

09:15:33  to just describe what it is that we are receiving, and then

09:15:37  what exams that they are requesting.

09:15:41  Q. Do you receive any records associated with the evidence?

09:15:44  A. Could you explain?

09:15:48  Q. For example, when you receive evidence, is there any kind

09:15:51  of internal log that comes with it?

09:15:53  A. I don't believe there is an internal log, but there is a

09:15:57  chain of custody that is maintained within our laboratory.

09:16:02  That is done through a database that we use, which is called

09:16:05  forensic advantage.  That is the repository for all of the

09:16:08  information such as the chain of log, and also the reports

09:16:12  that we generate.

09:16:13  Q. Did you review that information?

09:16:15  A. I did review some of that, yes.

1 09:16:17    Q. And did it appear that the evidence had been properly

2 09:16:20    stored?

3 09:16:20    A. Yes, it did.

4 09:16:21    Q. After you reviewed that information, did you perform an

5 09:16:26    examination?

6 09:16:26    A. Yes, I did.

7 09:16:28    Q. Let's talk about that.  What was the first examination

8 09:16:31    you conducted?

9 09:16:31    A. The first examination I conducted is essentially an

10 09:16:36    evaluation.  It's looking at each piece of evidence to

11 09:16:40    determine what value that it has.

12 09:16:43    Q. Mr. McClarin, can you please turn to Government's

13 09:16:48    Exhibit 610.  It should be opened for you.  Can you please

14 09:16:51    look at the document behind there.

15 09:17:05            Do you recognize Government's Exhibit 610?

16 09:17:07    A. Yes, I do.

17 09:17:07    Q. How?

18 09:17:08    A. It appears to be a copy of the worksheets that I created

19 09:17:11    in this case.

20 09:17:15            MS. RICHMOND:  Your Honor, the Government moves to

21 09:17:16    admit Government's Exhibit 610.

22 09:17:23            MR. MCNICHOLAS:  No objection.

23 09:17:24            THE COURT:  Did you say "objection"?

24 09:17:26            MR. MCNICHOLAS:  No objection.

25 09:17:26            THE COURT:  Okay.  Admitted.

1 09:17:28          (Exhibit No. 610 received.)

2 09:17:28   Q. Now publishing on the screen page 1 of Government's

3 09:17:31   Exhibit 610.

4 09:17:39          Mr. McClarin, what is on the screen in front of the

5 09:17:42   jury?

6 09:17:43   A. What's on the screen in front of the jury is a copy of

7 09:17:47   the worksheet that was generated in my unit.

8 09:17:51          And it is a photograph of the three cartridge cases

9 09:17:54   that was received, as well as the notes that I made about

10 09:17:57  those three cartridge cases.

11 09:17:59  Q. Did you perform a visual inspection on these casings?

12 09:18:03  A. Yes, I did.

13 09:18:03  Q. Did you come -- based on that visual inspection, did you

14 09:18:08  come to a conclusion about what caliber these casings were?

15 09:18:11  A. I did.

16 09:18:11  Q. What was that conclusion?

17 09:18:13  A. That these are .38 Special caliber cartridge cases.

18 09:18:17  Q. Do you know what kind of guns can shoot those bullets?

19 09:18:21  A. Those are typically fired in revolvers.

20 09:18:23  Q. And do you know the caliber of those revolvers?

21 09:18:27  A. That -- these could be fired in either a .38 Special

22 09:18:31  caliber gun or a .357 Magnum caliber gun.

23 09:18:35  Q. Did you learn anything else about the casings during your

24 09:18:38  visual inspection?

25 09:18:39  A. Yes.  During the classification, I am not only

09:18:43  determining the caliber of the cartridge cases, but I'm also

09:18:49  looking at what we call class characteristics.  And that is

09:18:53  the physical characteristics that we see on the cartridge

09:18:55  case, such as the firing pin being a hemispherical shape, and

09:19:00  then there were granular defects on the primer, as well.

09:19:06  Q. Apart from those class characteristics, did you look for

09:19:08  anything else?

09:19:09  A. Just the material of the cartridge cases.  In this case,

09:19:16  the casing or the cartridge case being nickel, and the primer

09:19:23  also being nickel.

09:19:24  Q. Did you look for individual characteristics?

09:19:27  A. Yes.  Moving into the next part of that, I am evaluating

09:19:36  the individual characteristics to determine the value, and

09:19:38  then also to make certain that I can do a comparison on those

09:19:41  items.

09:19:41  Q. Why are you looking for those?

09:19:43  A. We are looking for those to determine if there is any

09:19:47  value to the individual characteristics that we see.  Because

09:19:51  if there is no value, then there is no reason to do a

09:19:53  comparison.  But once I determine that there is value in the

09:19:57  individual characteristics, I go to the next phase, which is

09:20:00  comparison.

09:20:00  Q. Did you determine there was value?

09:20:02  A. Yes, I did.

09:20:03  Q. Did you move on to the next examination?

09:20:05  1  A. Yes, I did.

09:20:06  2  Q. Can you please tell the jury what that examination was?

09:20:08  3  A. That would be comparison.  Comparison can be done using

09:20:13  4  light comparison microscopy, or virtual comparison

09:20:18  5  microscopy, or both.

09:20:20  6  Q. Did you do both in this case?

09:20:21  7  A. I did.

09:20:22  8  Q. Let's start with the virtual comparison.  What is that?

09:20:25  9  A. Virtual comparison is using a digital microscope that

09:20:32  10  collects images of the headstamps of these cartridge cases.

09:20:37  11  The headstamp is where the information is where it

09:20:40  12  says .38 Special, and also has the manufacturer information

09:20:44  13  on it.

09:20:44  14       The digital microscope collects those images, and

09:20:47  15  then I use a virtual comparison on my computer, so that I can

09:20:53  16  look at the individual information from each of those

09:20:56  17  cartridge cases.

09:20:57  18  Q. What does the virtual comparison do?

09:21:00  19  A. The virtual comparison itself is just displaying 3D

09:21:06  20  images of the headstamps, and allows me to compare two items

09:21:11  21  at one time.

09:21:11  22  Q. Are you trained to use that machine?

09:21:13  23  A. Yes, I am.

09:21:15  24       MS. RICHMOND:  Can you please publish pages 2 and 3

09:21:18  25  side by side.  Or just you can go to page 2 first.

09:21:26    Q. Mr. McClarin, can you please tell the jury what they are

09:21:29    looking at on their screens?

09:21:31    A. What you see on the screen are two separate screenshots

09:21:35    of a comparison I'm doing using this virtual comparison.

09:21:40            In the center of the two images, you will see a

09:21:44    black line that is vertical.  To the left of that black line

09:21:49    is one of the cartridge cases, which is laboratory item 8,

09:21:57    and to the right of that black line is a second cartridge

09:22:02    case, which is the lab item number 7.

09:22:08            MS. RICHMOND:  Can you please go to the next page?

09:22:13    Can you go back one?  Thank you.

09:22:17    Q. Did you learn anything after performing this examination?

09:22:19    A. I did.  I did make a conclusion from this, yes.

09:22:24    Q. What was your conclusion?

09:22:25    A. My conclusion was that these two cartridge cases were

09:22:29    fired in the same firearm.

09:22:31    Q. How did you decide that?

09:22:32    A. I decided that by look -- comparing the patterns noted on

09:22:38    the two cartridge cases you see here, and looking at the

09:22:41    agreement between those two patterns.

09:22:43    Q. After you performed this examination, did you move to

09:22:47    another?

09:22:48    A. I did.

09:22:48    Q. What was that?

09:22:49    A. I went to the light comparison microscope to do some more

1 09:22:54    comparisons.

2 09:22:55            MS. RICHMOND:  Can you go to page 4.

3 09:22:58    Q. What is that on the screen?

4 09:23:04            If you look above your shoulder, it's on the screen.

5 09:23:07    A. You skipped a page, is the only reason why I was asking.

6 09:23:09    Q. Oh, that's okay.  I can go back.

7 09:23:11            MS. RICHMOND:  If you'll go back one page.

8 09:23:12    Q. Can you tell the jury what they are seeing in this

9 09:23:15    picture?

10 09:23:16    A. So what you are seeing now is comparisons I did using a

11 09:23:19    light comparison microscope.  Essentially a light comparison

12 09:23:24    microscope is a collection of two compound microscopes with

13 09:23:30    an optical bridge that allows you to see two items at one

14 09:23:34    time using one set of eyepieces.

15 09:23:37            MS. RICHMOND:  Can you go to the next page?

16 09:23:41    Q. Is that the same with this picture?

17 09:23:42    A. It is the same.  And I would like to note, similar to

18 09:23:45    what you saw in the virtual comparison, there is a black line

19 09:23:49    that runs vertical in this image.  To the left of that black

20 09:23:53    line is the laboratory item 7.  To the right of that black

21 09:23:58    line is item 8.  And that line allows me to look at the

22 09:24:02    patterns of both at the same time.

23 09:24:04    Q. What did you see when doing these comparisons?

24 09:24:07    A. I saw that there was sufficient agreement in the

25 09:24:10    individual characteristics so that I could come to a

109:24:12    conclusion.

209:24:13    Q. What agreement was that?

309:24:14    A. The agreement in the patterns of the individual.

409:24:20    Q. And what areas were those agreements in?

509:24:22    A. On either side of the black line, you can see where there

609:24:26    is agreement of peaks and -- of ridges and furrows, and that

709:24:31    is what I'm evaluating.

809:24:32    Q. Did you reach any conclusions after performing this

909:24:36    examination?

1009:24:36    A. Yes, I did.

1109:24:36    Q. What conclusion was that?

1209:24:37    A. The conclusion I reached was that the three cartridge

1309:24:42    cases I received, which are laboratory items 6, 7, and 8,

1409:24:46    were fired in the same firearm.

1509:24:48    Q. Was your report final after you completed this

1609:24:51    examination?

1709:24:51    A. No, it was not.

1809:24:52    Q. What happened after?

1909:24:54    A. After I come to a conclusion, my results have to be

2009:24:58    verified by a second qualified examiner, which means someone

2109:25:01    who is also qualified to do these exams takes a look at the

2209:25:05    evidence themselves and has to come to the same conclusion

2309:25:09    before it can be reported.

2409:25:11    Q. Did that happen in this case?

2509:25:12    A. Yes, it did.

09:25:13  Q. So is it fair to say that your scientific exam showed

09:25:19  that these three casings were fired by the same gun, which

09:25:22  would have been a .38 Special or a .357 Magnum?

09:25:27  A. It is my opinion that these three cartridge cases were

09:25:29  fired in the same firearm.

09:25:30  Q. Have you also studied bullets during your career?

09:25:33  A. Yes, I have.

09:25:34  Q. Could a bullet lose weight if damaged?

09:25:36  A. It certainly could.

09:25:37  Q. Is a weight-reduced bullet necessarily inconsistent with

09:25:41  casings that are of a higher weight class?

09:25:43  A. If a bullet receives damage, it could be less than it was

09:25:48  when it was manufactured, but it does not -- it does not mean

09:25:52  that it couldn't have been fired in a particular caliber

09:25:55  cartridge case.

09:25:56          MS. RICHMOND:  Nothing further on direct, Your

09:25:59  Honor.

09:26:03          THE COURT:  Okay.  Counsel and ladies and gentlemen,

09:26:07  this appears to be a good time for us to take our morning

09:26:10  break.  10 minutes.

09:26:14          (Thereupon, the jury retired from the courtroom.)

09:42:47          (Thereupon, there was a brief recess.)

09:42:49          (Thereupon, the jury returned to the courtroom.)

09:43:09          THE COURT:  All right.

09:43:10          MR. CLEARY:  May I proceed?

| | | |
|---|---|---|
| 1 | 09:43:11 | THE COURT:  Yes, Mr. Cleary. |
| 2 | 09:43:12 | MR. CLEARY:  Thank you. |
| 3 | 09:43:12 | CROSS-EXAMINATION |
| 4 | 09:43:13 | BY MR. CLEARY: |
| 5 | 09:43:13 | Q. Is it Special Agent McClarin? |
| 6 | 09:43:16 | A. No, sir, I'm not a special agent. |
| 7 | 09:43:19 | Q. Okay.  Mr. McClarin? |
| 8 | 09:43:20 | A. That is fine. |
| 9 | 09:43:21 | Q. All right, sir. |
| 10 | 09:43:22 | You are an expert in the area they call tool marks, |
| 11 | 09:43:26 | right? |
| 12 | 09:43:27 | A. Yes.  That is one area, yes. |
| 13 | 09:43:30 | Q. And firearms analysis? |
| 14 | 09:43:31 | A. That's correct. |
| 15 | 09:43:32 | Q. And I'm sure you've heard of in 2009, there was a |
| 16 | 09:43:36 | National Research Council report about the area of your |
| 17 | 09:43:41 | expertise, firearms and tool mark analysis? |
| 18 | 09:43:45 | A. Yes. |
| 19 | 09:43:45 | Q. And the report kind of criticized the area of firearms |
| 20 | 09:43:50 | and tool mark analysis, finding that there was a general lack |
| 21 | 09:43:54 | of scientific validity.  Have you heard of that? |
| 22 | 09:43:57 | A. That is one of the arguments they made. |
| 23 | 09:44:00 | Q. And they stressed there was a need for more scientific or |
| 24 | 09:44:05 | evidence-based practices; fair to say? |
| 25 | 09:44:08 | MS. RICHMOND:  Objection, Your Honor, outside the |

```
 1 09:44:10   scope, foundation, and relevance.

 2 09:44:23           THE COURT:  Overruled.

 3 09:44:25    Q. And then in 2016, I'm sure you are aware the President's

 4 09:44:31   Council of Advisors on Science and Technology report came

 5 09:44:35   out -- or it was known as the PCAST report.  You are familiar

 6 09:44:40   with that, correct?

 7 09:44:40    A. Yes, I am.

 8 09:44:41    Q. And that was addressing the science in criminal courts,

 9 09:44:47   like this one, correct?

10 09:44:49           MS. RICHMOND:  Objection, Your Honor, outside the

11 09:44:50   scope and hearsay.

12 09:44:51           THE COURT:  Yes.  I'm having trouble with you

13 09:44:58   summarizing this report.

14 09:44:59           MR. CLEARY:  Okay.  I'm not going to summarize the

15 09:45:00   report.  I'm just going to ask him if he agrees and -- if his

16 09:45:05   findings agree with this.

17 09:45:07           THE COURT:  Assuming he's got foundation to agree or

18 09:45:11   disagree.

19 09:45:12           MR. CLEARY:  Correct.  And if he doesn't, he can

20 09:45:14   just say it.

21 09:45:15           THE COURT:  "I'm not familiar with that report."

22 09:45:17           MR. CLEARY:  Right.  Correct.  But he did say he was

23 09:45:19   familiar with it, so if I could ask a few more questions, and

24 09:45:22   we can get into the heart of it.

25 09:45:26    Q. So one of the questions was how you do your job
```

10 09:45:39 essentially by comparing marks that you see on, for example,

20 09:45:46 a bullet or, for example, a cartridge, and comparing that in

30 09:45:51 order to render, like you have in this case, an opinion as

40 09:45:55 to, for example, what firearm discharged the bullet or the

50 09:46:00 cartridge, correct?

60 09:46:01   A. I think that's a mischaracterization of what those

70 09:46:04 reports were saying.

80 09:46:05   Q. Okay.  Well, so you understand that the reports were

90 09:46:08 saying that -- that the analysis was -- in the report's

100 09:46:17 opinion, that there was kind of a weakness in the scientific

110 09:46:20 criteria.  And you disagree with that?

120 09:46:22   A. Yes, I do.

130 09:46:24   Q. Okay.  But would you agree that one of the things that

140 09:46:30 you are asked to do is to make comparisons of markings using

150 09:46:35 your eyes?

160 09:46:37   A. Yes, I am.

170 09:46:37   Q. And one of the criticisms was that doing so is

180 09:46:43 subjective?

190 09:46:45   A. That's not really a criticism.  It's just a fact.  It is

200 09:46:48 subjective when I come to an opinion.

210 09:46:50   Q. And so one of the ways that you, in your job, guard

220 09:46:55 against this subjectivity is you hand off your report to

230 09:46:59 another forensic examiner to review to see if they come to

240 09:47:02 the same conclusions you did?

250 09:47:03   A. Not the report -- I mean, the report does go through a

109:47:07    technical review at some point, but originally, the

209:47:10    conclusions that I come to, in this case an identification,

309:47:13    is verified by a second qualified examiner.

409:47:16    Q. So that means another examiner in your office, a

509:47:19    colleague, right?

609:47:20    A. That's correct.

709:47:20    Q. So you go up to your friend, and you say, "Hey, look,

809:47:23    this is the cartridges I looked at and here are the

909:47:26    conclusions I made.  I would like you to double-check them

1009:47:28    for me"?

1109:47:28    A. I just hand off that evidence to another individual for

1209:47:32    them to do a verification.  In some cases, they may be aware

1309:47:35    of my results.  In this case, I believe that he was, and that

1409:47:39    is because he has signed off that his conclusion is the same

1509:47:42    as mine.

1609:47:43    Q. Is not the same?

1709:47:44    A. Is the same as mine.

1809:47:45    Q. Right.

1909:47:46         But he knew what your conclusions were before he

2009:47:48    signed off on them, right?

2109:47:49    A. In this case, I believe so, yes.

2209:47:51    Q. And he's a friend of yours?

2309:47:56    A. Does that matter?

2409:47:58    Q. I don't know.

2509:47:58         MS. RICHMOND:  Objection, Your Honor, argumentative.

109:47:59          THE COURT:  That is, I think, inappropriate.

209:48:07     Q. So one of the criticisms, I believe, and I would like you

309:48:11     to address, is that the area of firearms and tool marks

409:48:17     suffers from a lack of scientific validation.  Would you

509:48:21     agree or disagree?

609:48:22     A. I would disagree.

709:48:23     Q. And the reason that they say that it is -- suffers from a

809:48:30     lack of scientific validation is that there hasn't been shown

909:48:33     to be accurate, reliable, or consistent in producing the same

1009:48:38    results under similar circumstances in the case of examining

1109:48:46    firearms and tool marks?

1209:48:48          MS. RICHMOND:  Your Honor, objection, hearsay.

1309:49:00          THE COURT:  Okay.  Do you understand the question?

1409:49:04    I just read it and it's confusing, but if you understand it,

1509:49:07    you can answer it.

1609:49:08          THE WITNESS:  I don't fully understand the question,

1709:49:10    but again, I think he's mischaracterizing what those reports

1809:49:12    are stating.

1909:49:13    Q. Well, didn't they -- isn't it true that there is no

2009:49:16    established error rates?

2109:49:20          THE COURT:  Let -- never mind.  I'll get to it at

2209:49:25    the next break.

2309:49:27    Q. You can answer.

2409:49:29    A. So there's not an established error rate for the

2509:49:32    discipline as a whole.  There are error rates that are

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

09:49:34    published for various validation studies and for proficiency

09:49:39    tests.  The issue about those error rates is it's only -- the

09:49:41    error rate can only be applied to the individuals who took

09:49:44    that exam and that particular validation study.  They can't

09:49:49    be used for predictive error rates.

09:49:51    Q. So without knowing the rate at which tool mark examiners

09:49:54    make mistakes, isn't it impossible to assess the reliability

09:49:59    of the conclusions they make?

09:50:01    A. I do not agree.

09:50:02    Q. All right.  But you will agree that the methods are

09:50:06    inherently subjective?

09:50:08    A. The methods are not inherently subjective, but the

09:50:16    conclusion that I come to is.

09:50:17    Q. So relying, in essence, on the practitioner's, in your

09:50:20    case yourself's, judgment rather than an objective repeatable

09:50:25    measurement?

09:50:25    A. It's not just judgment.  It's based on knowledge,

09:50:28    training, skills.  It's the job that I do day-in and day-out.

09:50:31    And also, I am proficiency tested in this area every year.

09:50:34    That is where I don't have -- I don't know the ground truth.

09:50:38    A third party does.  And I have successfully passed every

09:50:42    single one of those proficiency tests.

09:50:44    Q. Good for you.

09:50:45             Doesn't the subjectivity make it vulnerable to such

09:50:48    things as bias?

09:50:49  1   A. I don't think so.

09:50:52  2   Q. Isn't it true that the Association --

09:51:05  3          THE COURT:  Okay.  I can't wait until the next

09:51:07  4   break.

09:51:09  5          MR. CLEARY:  Okay.

09:51:09  6          THE COURT:  Lose that phrase in this courtroom,

09:51:12  7   "Isn't it true?"

09:51:13  8          MR. CLEARY:  I'm sorry.  I will.  I will lose that

09:51:14  9   phrase.

09:51:14 10          THE COURT:  Thank you.

09:51:15 11   Q. Are you familiar with the Association of Fire Mark and

09:51:20 12   Tool Mark Examiners, the AFTE?

09:51:23 13   A. It is the Association of Firearms and Tool Mark

09:51:26 14   Examiners.

09:51:26 15   Q. You are familiar with that?

09:51:27 16   A. Yes, I am.

09:51:28 17   Q. Are you a member?

09:51:30 18   A. Yes, I am.

09:51:31 19   Q. And isn't it true that -- I'm sorry.

09:51:34 20          Would you agree that the theory of identification,

09:51:37 21   which uses the concept of sufficient agreement to link two

09:51:44 22   marks, is often criticized as circular or lacking scientific

09:51:49 23   specific protocols?

09:51:50 24   A. I know that is an argument that has been raised in court,

09:51:53 25   but I do not see it that way.

1  09:51:55    Q. Have you worked for the development of objective

2  09:52:03    standards for all forensic features, comparison methods,

3  09:52:07    including tool mark analysis?

4  09:52:09    A. For whom did you say?

5  09:52:10    Q. Have you -- have you worked with the Association of

6  09:52:16    Firearms and Tool Mark Examiners?

7  09:52:16    A. Yes.  I'm actually the chair of the Scientific

8  09:52:19    Advancement Committee.

9  09:52:20    Q. Okay.  So then the enhanced oversight, does that mean

10 09:52:26    that you oversee your own work?

11 09:52:27    A. No.  I don't understand what you are getting at.

12 09:52:33    Q. Well, if you are the chair of Scientific Advancement and

13 09:52:35    the criticism is that the -- that Firearms and Tool Marks are

14 09:52:38    not sufficiently objective and reliable, are you kind of the

15 09:52:43    fox guarding the henhouse?

16 09:52:45    A. Of course not.  This -- I'm a chair of a committee that

17 09:52:49    is putting together new terminology to maybe better explain

18 09:52:55    what we do, to include methodology.

19 09:52:57    Q. All right.

20 09:53:02            MR. CLEARY:  No further questions.

21 09:53:08            THE COURT:  Any other cross?

22 09:53:09            MR. MCNICHOLAS:  Yes, Your Honor.  Thanks.

23 09:53:09                         CROSS-EXAMINATION

24 09:53:11    BY MR. MCNICHOLAS:

25 09:53:11    Q. Good morning, Mr. McClarin.

109:53:55    A. Good morning.

209:53:56    Q. So you have your specialty in firearm and tool mark

309:54:04    identification, correct?

409:54:05    A. Yes, I do.

509:54:06    Q. Is that also -- and just -- this is speaking for

609:54:10    everybody's educational benefit.  Is that considered

709:54:14    ballistics, as well, or is that a different category?

809:54:16    A. No, ballistics is a different category.

909:54:18    Q. Okay.  Would you not consider yourself a ballistics

1009:54:25    aficionado or expert?

1109:54:26    A. I would not consider that.  That is not my purview.

1209:54:29    Q. So you would not have special knowledge regarding bullet

1309:54:35    trajectory or wound morphology or anything like that, or is

1409:54:41    that more part of what you do?

1509:54:44    A. So I do perform shooting incident reconstructions, in

1609:54:47    which I develop trajectories.  However, with bodies, that is

1709:54:50    not something we deal with.  We deal with objects.

1809:54:53    Q. So is it safe to say, then, analysis of bullets and

1909:55:00    casings is -- go hand in hand, or do you specialize in

2009:55:03    casings?

2109:55:04    A. No, I can -- I can examine both.

2209:55:07    Q. All right.  So you have been doing fire mark and tool

2309:55:15    mark -- firearm and tool mark analysis since 2009, correct?

2409:55:20    A. That's correct.

2509:55:21    Q. And as you stated when Mr. Cleary was here, you are a

member of the Association of Firearm and Tool Mark Examiners?

A. Yes, I am.

Q. And as far as being a member of the Association of
Firearms and Tool Mark Examiners, do you have access to
materials, like library materials, that would help you in
your research and analysis?

A. I can have access to certain databases or historical
things, such as general articles, if need be.

Q. So if -- do you ever utilize the library to determine,
let's say, the age of a particular item that you are
analyzing?

A. I have never had occasion to do that.

Q. So are you familiar with the Western Cartridge Company?

A. Only loosely.

Q. Did you know that items 6, 7, 8 --

        MR. MCNICHOLAS:  If we could -- Ben, if we could put
them up there?  Oh, it's 610, yes.

Q. So you analyzed Exhibit -- the three items, 6, 7, 8,
which are included in Government's Exhibit 610, right?

A. Yes, I did.

Q. Did you know that those three cartridge cases are
actually Western Cartridge Company cases?

A. Yes, because I -- it's in my notes.

Q. All right.  So are you familiar with the history of the
Western Cartridge Company?

09:56:59   A. I am not.

09:57:00   Q. So if I were to tell you that those cartridge cases are

09:57:04   actually at least 50 years old, would you have a response to

09:57:08   that?

09:57:09       MS. RICHMOND:   Objection, Your Honor, outside the

09:57:10   scope, and also asked and answered with regard to foundation.

09:57:13       THE COURT:   Sustained.

09:57:16   Q. You have no idea how old these cartridge cases are, do

09:57:20   you?

09:57:20   A. I do not.

09:57:22   Q. You made -- you had an opinion that the three cartridge

09:57:29   cases were fired by the same firearm based upon your tool

09:57:36   mark analysis, correct?

09:57:37   A. I did determine, or it was my opinion, that the three

09:57:40   cartridge cases were fired in the same firearm.

09:57:43   Q. All right.   And that is based upon using what they call a

09:57:52   confocal microscope?

09:57:54   A. No, we did not use a confocal microscope.   That is

09:57:57   something totally different.

09:57:58   Q. Did you use just a regular microscope?

09:58:00   A. I used a light comparison microscope, and then we have a

09:58:03   3D instrument called a Cadre that we used for the virtual

09:58:09   comparison.

09:58:10   Q. So you actually did use a Cadre for this?

09:58:13   A. The Cadre, yes.

1 09:58:14   Q. And a Cadre is not a confocal microscope?

2 09:58:17   A. No, it is not.

3 09:58:18   Q. But it has pinpoint technology?

4 09:58:20   A. I don't know what you mean by that.

5 09:58:22   Q. Well, the ability to -- for it to focus on a small object

6 09:58:27   inside of the cartridge case?

7 09:58:29   A. The Cadre uses what is called photometric stereo.  The

8 09:58:35   cartridge case is actually put into a painted gel, and then

9 09:58:39   six images are taken of the cartridge case, with the light in

10 09:58:42   different position.  This allows it to build the 3D image of

11 09:58:47   the cartridge case headstamp.

12 09:58:49   Q. All right.  So you were able to make a pretty precise

13 09:58:53   determination that each of those three casings were fired

14 09:58:57   from one single firearm, correct?

15 09:59:00   A. I was able to use both the Cadre virtual comparison and

16 09:59:05   my traditional light comparison microscopy to evaluate the

17 09:59:12   patterns that I saw on each of these items to determine they

18 09:59:14   were fired in the same firearm.

19 09:59:16   Q. All right.  And as you stated on direct examination, it's

20 09:59:21   because every firearm has distinct characteristics, when a

21 09:59:26   cartridge is loaded into the firearm, there is actually tool

22 09:59:29   marks that are created, correct?

23 09:59:32   A. During the discharge process, the interaction of the

24 09:59:35   cartridge case and the primer with the firing pin and breech

25 09:59:40   face of the gun -- the breech face is the part of the gun

that the cartridge case headstamp rests on -- there is a
transfer of the characteristics from the firearm to the
cartridge case.

Q. Okay.  But you said during the discharge of the firearm.
You are not saying that even the loading of a cartridge case
creates some marks?

A. In some cases that could be the case, but with a
revolver, there would have to be some sort of defect, and I
would expect to see that.  But with respect to the cartridge
case head, the individual characteristics that I saw on the
primer and the firing pin was the result of the discharge.

Q. Now, we asked if in fact -- you said you did know that
they were Western Cartridge cases, correct?

A. That's correct, because I labeled them as such in my
worksheet.

Q. But you didn't take photographs of the actual label,
which is on the top of the cartridge case, correct?

A. I did not in this case.

Q. All right.  And the cartridge cases, did you actually
look at those before this report was done, like a few years
earlier?

A. No.

Q. So the first time you saw these -- these cases was when?

A. Either September or October of last year.

Q. And you were asked specifically to determine whether you

1 10:00:58  could do -- what?  Just determine that it was the same

2 10:01:03  firearm, or were you asked to determine something else?

3 10:01:05  A. I was just -- I was asked to examine these.  And

4 10:01:10  logically, whenever I'm examining fired cartridge cases, the

5 10:01:12  examination step is to compare both the class and individual

6 10:01:16  to see if I could come to a source conclusion.

7 10:01:18  Q. All right.  The ultimate -- the ultimate conclusion is

8 10:01:21  the source, correct?

9 10:01:24  A. If I could determine that it came from a single source,

10 10:01:27  that is a conclusion, but I could also determine that they

11 10:01:29  come from different sources.

12 10:01:30  Q. All right.  Did you attempt to determine whether items 6,

13 10:01:37  7, 8 came from a single source?

14 10:01:41  A. Through my comparison of the patterns seen on these items

15 10:01:46  6, 7, and 8, I did come to the conclusion that there was

16 10:01:49  agreement, that I could state that these were fired in a

17 10:01:52  single firearm.

18 10:01:53  Q. In a single firearm?

19 10:01:55  A. In the same firearm.  That is my opinion, yes.

20 10:01:57  Q. Okay.  Before I get back to that, does your analysis

21 10:02:04  enable you to determine when the firearm discharged these

22 10:02:11  three casings?

23 10:02:12  A. No, it does not.

24 10:02:13  Q. So you have no idea when in fact those -- the bullets

25 10:02:20  would have been discharged from those casings?

1 10:02:24    A. I do not.

2 10:02:25    Q. Now, earlier you testified on direct examination that

3 10:02:33    those three -- those three cartridge casings are capable of

4 10:02:37    firing a .38 Special, right --

5 10:02:41    A. Um-hum.

6 10:02:41    Q. -- bullet?

7 10:02:41    A. Yes.

8 10:02:42    Q. A .38 Special bullet?

9 10:02:43    A. Yes.

10 10:02:44            THE COURT:  Wait.  Wait.  Wait.  Wait.  Wait.  Wait.

11 10:02:49    Wait.

12 10:02:49    Q. And the --

13 10:02:49            THE COURT:  Wait.  Wait.

14 10:02:50            Listen to the words of the question.

15 10:02:53            THE WITNESS:  I already --

16 10:02:54            THE COURT:  Those casings aren't capable of firing

17 10:02:57    anything.

18 10:02:59            Do it again.

19 10:03:00    Q. All right.  So my lead-up was:  You testified that those

20 10:03:05    casings were capable of loading and ultimately shooting

21 10:03:10    a .38 Special bullet, correct?

22 10:03:13    A. I think the testimony would reflect that I said a

23 10:03:17    firearm, a .357 Magnum firearm or a .38 Special caliber

24 10:03:21    firearm, could fire those.

25 10:03:22    Q. All right.  Okay.  All right.  However, these are just

1 10:03:26  casings, these are not bullets, right?

2 10:03:28   A. These are cartridge cases.

3 10:03:29   Q. Right.  So the bullet actually goes inside of the case,

4 10:03:33  correct?

5 10:03:34   A. That is correct.

6 10:03:34   Q. And most bullets are sold inside the case, like you buy

7 10:03:40  them in one piece, correct?

8 10:03:41   A. That is one way that you could purchase them.

9 10:03:44   Q. Unless, of course, a bullet is reloaded, right?

10 10:03:49   A. That's correct.

11 10:03:50   Q. And did you look for evidence of reloading in this case?

12 10:03:53   A. I did not see any evidence of it.

13 10:03:55   Q. So from what you could see evidence of, it was most

14 10:04:01  likely, or it was actually, an original bullet loaded into

15 10:04:07  this original cartridge case?

16 10:04:09   A. I would say most likely.

17 10:04:10   Q. So back to where I was.  You stated that the cartridge

18 10:04:20  case shown in items 6, 7, and 8 would fit into a .38 Special

19 10:04:29  firearm, right?

20 10:04:30   A. Yes.

21 10:04:30   Q. And a .357 firearm?

22 10:04:34   A. .357 Magnum.

23 10:04:36   Q. Okay.  .357 Magnum.

24 10:04:38      However, aren't there other -- well, I mean, you say

25 10:04:43  the cases would.  Could you make a determination as to the

| | |
|---|---|
| 1 10:04:46 | type of bullet that actually fits into this case or not? |
| 2 10:04:52 | A. I -- I did not receive a bullet, so I could make no |
| 3 10:04:56 | determination. |
| 4 10:04:56 | Q. All right.  All right. |
| 5 10:05:00 | Do you know whether or not this case could be fit |
| 6 10:05:02 | into a 9mm firearm? |
| 7 10:05:05 | A. It would not fit into a 9mm firearm. |
| 8 10:05:08 | Q. In this case were you given background information as to |
| 9 10:05:39 | where these casings came from? |
| 10 10:05:42 | A. I was given background information that they were |
| 11 10:05:44 | recovered from a garden bed. |
| 12 10:05:45 | Q. And is that all you knew? |
| 13 10:05:47 | A. Yes.  I mean, there may have been an address with that, |
| 14 10:05:50 | but that doesn't mean anything to me. |
| 15 10:06:21 | MR. MCNICHOLAS:  The Court's indulgence. |
| 16 10:06:22 | (Pause in proceedings.) |
| 17 10:06:38 | Q. Were you able to determine approximately when these |
| 18 10:06:44 | particular casings in Government Exhibit 610 were actually |
| 19 10:06:48 | manufactured? |
| 20 10:06:49 | A. That is not something that I was concerned with, so I did |
| 21 10:06:54 | not evaluate that. |
| 22 10:06:56 | Q. Do you have any knowledge based upon your expertise in |
| 23 10:07:01 | fire mark -- firearm and tool mark examination regarding |
| 24 10:07:06 | historical ammunition, like the history of ammunition in this |
| 25 10:07:11 | country? |

10:07:13  A. I understand some of the history of the ammunition, yes,

10:07:17  but of this particular company, I do not.

10:07:21  Q. Are you familiar with the Olin Corporation?

10:07:25          MS. RICHMOND:  Your Honor, outside the scope,

10:07:26  foundation.

10:07:27          THE COURT:  Relevance, sir?

10:07:29          MR. MCNICHOLAS:  The Olin Corporation that owns --

10:07:32  well, actually took over the Western Cartridge Company.  I'm

10:07:38  asking if he's familiar with it.

10:07:40          THE COURT:  I don't understand the relevance.

10:07:43          MR. MCNICHOLAS:  Well, it would -- it would go to

10:07:45  the age of these -- of the item.  We want to know how old it

10:07:50  is.

10:07:51          THE COURT:  Still, I don't understand the relevance.

10:07:54  Did they misfire?

10:07:57          MR. MCNICHOLAS:  Your Honor, I'm going to stop.  No

10:07:59  further questions.

10:08:00          THE COURT:  Okay.

10:08:02          Anybody else?

10:08:06          Any redirect?

10:08:07          MS. RICHMOND:  Yes, Your Honor.

10:08:07                          REDIRECT-EXAMINATION

10:08:08  BY MS. RICHMOND:

10:08:08  Q. Mr. McClarin, do you remember me asking you some

10:08:28  questions about specific characteristics?

                    AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

10:08:30    A. Yes.

10:08:30    Q. Can you remind the jury what those are?

10:08:32    A. With respect to the cartridge cases, we evaluate the

10:08:37    class characteristics.  That is -- class characteristics are

10:08:41    essentially characteristics that are designed by the

10:08:44    manufacturer, such as the caliber, the weight of a bullet,

10:08:47    the lands and grooves, which is the rifling inside of a

10:08:52    barrel that imparts spin on the bullet, the number of those

10:08:55    lands and grooves, whether they twist to the left or right.

10:08:57    That is the class characteristics that we evaluate.

10:09:02        Furthermore, we look at the individual

10:09:02    characteristics, the peaks, the valleys, the furrows, the

10:09:04    ridges, and we look at those patterns to determine are there

10:09:07    individual characteristics in which I can do a comparison.

10:09:09        When there's more than one item that has marks of

10:09:12    value in the individual characteristics, I can do that

10:09:14    comparison and come to a conclusion.

10:09:16    Q. So how does an evidence item get a specific

10:09:20    characteristic?  How are specific characteristics created?

10:09:25    A. Well, as far as the class characteristics, again, some of

10:09:27    those are designed prior to the manufacture, such as the

10:09:31    caliber, .38 Special in this case, on a cartridge case.  The

10:09:36    bullet that was inserted into those cartridge cases were all

10:09:39    designed by the manufacturer.

10:09:40        Then additional class characteristics are imparted

10:09:44    1    onto the cartridge case through the discharge of the

10:09:46    2    cartridge.  At the same time of that discharge, you also have

10:09:50    3    a transfer of those individual characteristics, which is what

10:09:52    4    I used to do my comparison.

10:09:54    5    Q. Mr. Cleary asked you some questions about various

10:10:00    6    reports.  Do you remember that?

10:10:00    7    A. Yes, I do.

10:10:01    8    Q. It sounds like you disagreed with some of the conclusions

10:10:04    9    that those reports came to?

10:10:05   10    A. Yes, in a way, but also how he was characterizing it.

10:10:09   11    Q. Understood.

10:10:11   12         Did you follow your lab's procedures in this case?

10:10:13   13    A. Yes, I did.

10:10:14   14    Q. Do you believe those procedures are scientifically valid?

10:10:17   15    A. Yes, I do.

10:10:18   16    Q. Do you stand by your conclusion?

10:10:19   17    A. Yes, I do.

10:10:20   18    Q. Mr. Cleary also asked you some questions about

10:10:23   19    subjectivity.  Do you remember that?

10:10:24   20    A. Yes.

10:10:25   21    Q. He asked if there is subjectivity in your conclusions?

10:10:29   22    A. Yes.

10:10:30   23    Q. And then he asked you if it's subject to bias.  Do you

10:10:34   24    remember that?

10:10:34   25    A. I do.

| | |
|---|---|
| 1 10:10:35 | Q. Do you know any of these defendants? |
| 2 10:10:37 | A. No, I do not. |
| 3 10:10:38 | Q. Do you know if a match is good or bad for the Government? |
| 4 10:10:41 | A. We are -- we have a job to do, and it's to come to a |
| 5 10:10:46 | conclusion.  It doesn't matter which side it's for or |
| 6 10:10:50 | against. |
| 7 10:10:50 | Q. You are just asked to compare casings, that's it? |
| 8 10:10:54 | A. Cartridge cases, yes. |
| 9 10:10:56 | Q. Cartridge cases.  I apologize. |
| 10 10:10:57 | And then testify to the results? |
| 11 10:10:59 | A. That's correct. |
| 12 10:11:00 | MS. RICHMOND:  Nothing further, Your Honor. |
| 13 10:11:05 | MR. MCNICHOLAS:  Nothing further, Your Honor. |
| 14 10:11:08 | MR. CLEARY:  Thank you. |
| 15 10:11:09 | THE COURT:  May this witness be excused? |
| 16 10:11:11 | MS. RICHMOND:  Yes, Your Honor.  Thank you. |
| 17 10:11:12 | THE COURT:  Thank you, sir. |
| 18 10:11:20 | MR. LARSEN:  The Government calls Phil Teramoto. |
| 19 10:11:45 | THE CLERK:  Good morning.  Right here. |
| 20 10:11:48 | THEREUPON: |
| 21 10:11:48 | PHIL TERAMOTO, |
| 22 10:11:48 | Called in these proceedings, and after having been first duly |
| 23 10:11:56 | sworn, testifies as follows: |
| 24 10:11:56 | THE CLERK:  Thank you.  Please be seated. |
| 25 10:12:07 | Please state your first and last name, spell it, and |

1 10:12:09   speak slowly for the record.

2 10:12:10         THE WITNESS:  The name is Phil Teramoto.  Last name

3 10:12:13   is T-e-r-a-m-o-t-o; first is P-h-i-l.

4 10:12:20         THE CLERK:  Thank you.

5 10:12:22         MR. LARSEN:  May I inquire, Your Honor?

6 10:12:24         THE COURT:  Yes, please.

7 10:12:24                  DIRECT EXAMINATION

8 12:37:55   BY MR. LARSEN:

9 12:37:55    Q. All right.  Good morning, Mr. Teramoto.

10 10:12:27    A. Good morning.

11 10:12:27    Q. Are you here to testify about some cartridge casings and

12 10:12:33   bullet analysis results that you performed from evidence

13 10:12:37   collected at the Roger Chavez murder scene in Malibu?

14 10:12:40    A. Yes.

15 10:12:41    Q. And just to not bury the lead here for the jury, was one

16 10:12:46   of the items you evaluated a bullet received from the

17 10:12:53   coroner's office?

18 10:12:53    A. Yes, I did.

19 10:12:54    Q. Were you ultimately able to determine any matches to the

20 10:12:57   bullet received from the coroner's office?

21 10:12:59    A. The caliber was determined to be 9mm Luger caliber.  It's

22 10:13:05   been a while, but it -- I have seen photographs.  It was very

23 10:13:09   heavily oxidized and very little detail on the bullet.

24 10:13:13    Q. Okay.  And we'll get to more of the detail in a moment,

25 10:13:15   but were you able to determine any matches between that

1 10:13:18   bullet and any other bullets?

2 10:13:20    A. No.

3 10:13:21    Q. Sir, where are you employed?

4 10:13:23    A. I'm sorry?

5 10:13:25    Q. Where are you employed, sir?

6 10:13:26    A. I'm employed by the Los Angeles County Sheriff's crime

7 10:13:31   lab, or Scientific Services Bureau.

8 10:13:33    Q. And what do you do with the Scientific Services Bureau?

9 10:13:37    A. Actually, I retired in March of 2020, was rehired back as

10 10:13:43   -- they categorized it a 120-day hire back, basically a

11 10:13:48   part-time employee.  That was in August of 2022.

12 10:13:52    Q. Okay.  And what is your current job title?

13 10:13:54    A. I'm sorry.  I'm assigned to the firearms identification

14 10:13:58   section of the laboratory.

15 10:13:59    Q. And so ultimately, how long have you been in firearms

16 10:14:03   identification with the --

17 10:14:05    A. I transferred into the section when working full-time in

18 10:14:09   2005, so approximately a little over 15 years in the section,

19 10:14:13   and currently about two and a half years.  So totality of

20 10:14:18   almost 17 and a half years.

21 10:14:20    Q. And can you estimate how many times you have done a

22 10:14:23   firearms or bullet identification analysis?

23 10:14:26    A. This is a rough guesstimation.  It's over hundreds.

24 10:14:31    Q. Do you hold any degrees?

25 10:14:32    A. I'm sorry?

10:14:33  1    Q. Do you hold any degrees, sir?

10:14:35  2    A. Yeah.

10:14:36  3    Q. And what are those?

10:14:37  4    A. I'm sorry?

10:14:39  5    Q. I'm sorry, what degrees do you hold?

10:14:41  6    A. I have to apologize.  I forgot my hearing aids, so it's a

10:14:45  7    little --

10:14:47  8            MR. LARSEN:  Your Honor, maybe we get a headset for

10:14:50  9    the witness?

10:14:52  10            THE WITNESS:  I'm sorry.

10:14:53  11            THE COURT:  No, don't be sorry.  Be glad you

10:14:56  12    celebrated all those birthdays.  We'll take care of it.  Our

10:14:59  13    technology is a little rudimentary, but it will get the job

10:15:02  14    done.

10:15:28  15            THE CLERK:  Somebody say something just to test it.

10:15:31  16            MR. LARSEN:  Testing.  Testing.  Can you hear me?

10:15:44  17            THE WITNESS:  Thank you.

10:15:53  18    Q. Okay.  Mr. Teramoto, can you hear me better now?

10:15:56  19    A. Yes.  Absolutely.  Sorry for the inconvenience.

10:15:58  20    Q. No.  No problem at all.  And I apologize.

10:16:00  21            THE COURT:  Thank you.

10:16:00  22    Q. So, sir, what training have you undergone in the field of

10:16:04  23    firearms identification?

10:16:05  24    A. I earned a bachelor of science degree in general

10:16:11  25    microbiology from California State University at Long Beach.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1  10:16:13        As it pertains to training to perform my duties in

2  10:16:16   the firearms identification section, we have a two- to

3  10:16:20   three-year in-house training program that covers everything

4  10:16:22   from the history of firearms identification, history of

5  10:16:25   firearms, just briefly training in all the different types of

6  10:16:32   examinations we perform.

7  10:16:34        I've also attended several firearm manufacturer

8  10:16:38   training, which is actually categorized armor training, where

9  10:16:43   you basically learn specific models of how they operate,

10 10:16:47   basically to fully disassemble and reassemble them and

11 10:16:51   troubleshoot what could be an issue as to why this firearm is

12 10:16:55   not functioning.

13 10:16:57   Q. And have you testified in court as an expert witness in

14 10:17:00   firearms analysis?

15 10:17:01   A. Yes, I have.

16 10:17:01   Q. How many times have you done that?

17 10:17:04   A. It would be over a hundred, easily.  Maybe even 200.

18 10:17:11   Q. Is the LA County Sheriff's Department Scientific Bureau

19 10:17:16   accredited?

20 10:17:16   A. Yes, it is an accredited laboratory.

21 10:17:19   Q. What is it accredited by?

22 10:17:21   A. It's called ANAB.

23 10:17:25   Q. Is that the person or organization that accredits

24 10:17:28   firearms laboratories?

25 10:17:29   A. It's a national organization that accredits crime

1  10:17:34  laboratories throughout the country.

2  10:17:35  Q. Can you just in a couple sentences provide a broad

3  10:17:40  overview of the process you follow to conduct a firearms

4  10:17:46  identification?

5  10:17:47  A. After receiving evidence from the evidence section of the

6  10:17:51  laboratory, we take the evidence to the laboratory section of

7  10:17:56  the -- of the firearms identification section, making

8  10:18:01  notations as to how the evidence was packaged, was it

9  10:18:04  properly sealed, document whatever type of evidence it is, a

10  10:18:10  firearm, a fired bullet, a fired cartridge case, making all

11  10:18:14  the documentations and proceeding to do whatever examination

12  10:18:19  has been requested.

13  10:18:21  Q. And we'll go into more detail on the analysis process in

14  10:18:27  a moment, but once the analysis is done, is it subject to a

15  10:18:31  review process?

16  10:18:32  A. Yes.  Once an examiner completes an examination, a second

17  10:18:36  examiner in the section performs either what we call a

18  10:18:39  technical review or a peer review, and essentially the peer

19  10:18:42  review is the total reexamination by a second examiner.

20  10:18:45  Q. In this case, were you the initial analyst or were you

21  10:18:48  the peer reviewer?

22  10:18:50  A. The peer reviewer.

23  10:18:52  Q. Have you ultimately performed -- I think you said this a

24  10:18:55  moment ago, but you performed your own analysis and came to

25  10:18:57  your own conclusions; is that right?

1 10:18:58    A. Yes, that's correct.

2 10:18:59    Q. And are the methodologies you followed generally

3 10:19:04    considered reliable by those in your field?

4 10:19:06    A. Yes.  We have -- based on being an accredited laboratory,

5 10:19:11    our section -- I mean our laboratory has a quality assurance

6 10:19:15    section, and we have in our bureau -- in our policies the

7 10:19:22    methods and procedures that are performed in the section.

8 10:19:26         MR. LARSEN:  Your Honor, at this time the Government

9 10:19:27    would request the Court issue the proposed order located at

10 10:19:30    Docket 1865 and make the findings contained in that order

11 10:19:34    consistent with *United States v. Holguin.*

12 10:19:37         THE COURT:  All right.  The next break I'll dig it

13 10:19:39    up and review it one more time.

14 10:19:41         MR. LARSEN:  Thank you.

15 10:19:41         THE COURT:  I don't see a problem.

16 10:19:43         MR. LARSEN:  All right.

17 10:19:44    Q. Mr. Teramoto, what were you asked to analyze in this

18 10:19:48    case, if you recall?

19 10:19:48    A. There was a firearm submitted along with three fired

20 10:19:54    bullets and two fired cartridge cases.

21 10:19:57    Q. Okay.  And you said you were the peer reviewer, correct?

22 10:20:02    A. That's correct.

23 10:20:02    Q. So where did you get the firearm and the bullets and the

24 10:20:07    casings?

25 10:20:08    A. The evidence is obtained from the primary examiner who

1 10:20:11    conducted the initial examination.

2 10:20:12    Q. So the primary analyst receives those items from

3 10:20:20    evidence, unseals them, does his analysis, and then gives

4 10:20:23    them to you; is that right?

5 10:20:24    A. Yes.  I keep it in a secure locker within the section,

6 10:20:27    and then we do an evidence transaction that shows possession,

7 10:20:31    that I received the evidence from him.

8 10:20:33    Q. And does the Scientific Bureau have standard procedures

9 10:20:38    that are followed to make sure evidence is properly logged?

10 10:20:41    A. Yes.

11 10:20:42    Q. And what are those?

12 10:20:43    A. Basically evidence can come into the laboratory in two

13 10:20:49    ways.  We have evidence couriers that pick up evidence,

14 10:20:53    property at given sheriff's stations or at outside agencies.

15 10:20:58         They can also be brought directly to our property --

16 10:21:01    or Evidence and Property section at the laboratory -- and

17 10:21:03    that is by the agencies -- kept and secure until examination

18 10:21:11    requests are made.  The criminalist will make an evidence

19 10:21:18    request through the Evidence and Property section.

20 10:21:22         Once it is ready, they will notify the criminalist

21 10:21:25    to come down to the -- Evidence and Property to obtain it.

22 10:21:29    It's taken up to respective sections, where the examination

23 10:21:33    process begins.

24 10:21:34    Q. And so were all of the standard procedures of the

25 10:21:37    Scientific Bureau has that you just described for handling

110:21:41   evidence followed in this case?

210:21:42    A. Yes.

310:21:42    Q. Were all the items that you tested logged with LASD file

410:21:47   number 018044131026011?

510:21:54    A. Yes.

610:21:55    Q. I want to be clear with the jury about what exactly you

710:21:59   analyzed.  The first item you analyzed was a bullet obtained

810:22:03   from the coroner's office, labeled number EV34, correct?

910:22:07    A. That's correct.

1010:22:08    Q. And the second set of items you said were two additional

1110:22:14   bullets and casings, right?

1210:22:15    A. That's correct.

1310:22:16    Q. And those were labeled items number 41, 42, and 43; is

1410:22:20   that right?

1510:22:20    A. That's correct.

1610:22:21    Q. And then the third item was a Heckler & Koch pistol

1710:22:26   labeled item F1; is that accurate?

1810:22:30    A. That's correct.

1910:22:30    Q. As a criminalist, do you have any idea or personal

2010:22:33   knowledge about where these items came from?

2110:22:35    A. No.

2210:22:36    Q. You are not out in the field collecting guns and bullets,

2310:22:40   right?

2410:22:40    A. The majority of the times we are not, but there are

2510:22:44   occasions where investigators can request the firearms

1 10:22:48    identification or other members of the laboratory for other

2 10:22:50    types of evidence to respond and help process a scene.

3 10:22:54         But majority of the times, the evidence is submitted

4 10:22:58    to the evidence section, so we have no idea where the

5 10:23:01    evidence was collected or what is involved.

6 10:23:03    Q. Sorry.  I asked a bad question.

7 10:23:04         I just mean:  In this case, you did not go out into

8 10:23:07    the field and collect the items that you analyzed, right?

9 10:23:09    A. No, I did not.

10 10:23:10    Q. So let's take the last item first.

11 10:23:12         The Heckler & Koch pistol, what caliber was that?

12 10:23:16    A. 9mm Luger.

13 10:23:18    Q. And was the pistol operational?

14 10:23:19    A. Yes.

15 10:23:21    Q. How did you determine that?

16 10:23:22    A. There was a deputy sheriff within our section as a

17 10:23:28    firearms examiner that did the initial function check

18 10:23:32    examination.  I overlooked the worksheet that the

19 10:23:40    individual -- actually looked at the pistol myself, and it

20 10:23:40    was functional.

21 10:23:41    Q. And, sorry, you said a function test.  Is that a

22 10:23:45    test-fire?  They fire the pistol?

23 10:23:46    A. Basically we make the documentation as to manufacturer,

24 10:23:51    model, serial number, barrel length.  Just make total

25 10:23:56    examination.  Once -- checking all -- making sure that the

1  10:24:00   safety features on the firearm is functioning properly,

2  10:24:03   documenting anything that is not functioning properly.  In

3  10:24:07   this instance, the pistol was functioning properly.  The

4  10:24:11   deputy generated test-fires.

5  10:24:14    Q. And then the test-fire gives you sample bullets that you

6  10:24:17   can use for comparison; is that right?

7  10:24:20    A. That's correct.

8  10:24:21    Q. So let's move to the second set of items, which were the

9  10:24:24   intact bullets and the casing provided by LASD.  I believe

10 10:24:29   you said these were labeled items 41, 42, and 43.

11 10:24:34         Do you sometimes receive items recovered from a

12 10:24:37   crime scene?

13 10:24:37    A. Yes.

14 10:24:38    Q. And what was the caliber of the bullets in the casing

15 10:24:41   that you analyzed in this case?

16 10:24:42    A. They were determined to be 9mm Luger.

17 10:24:46    Q. Did you make a determination about whether these bullets

18 10:24:51   and casing matched the Heckler & Koch pistol that you

19 10:24:56   analyzed that was item F1?

20 10:24:58    A. Yes.

21 10:24:58    Q. And did they match?

22 10:25:00    A. No.

23 10:25:01    Q. Same question for the cartridge.  Did that match the

24 10:25:05   Heckler & Koch?

25 10:25:07    A. It did -- I'm sorry.  It did not.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1  10:25:08   Q. It did not.  Did you analyze whether the bullets were

2  10:25:12   fired from the same firearm?

3  10:25:14   A. Yes.  And once I determined that the two fired bullets

4  10:25:19   were not -- were fired from the same gun, and compared to the

5  10:25:24   test-fires from the Heckler & Koch pistol, it was determined

6  10:25:28   that the two bullets are not fired from the Heckler & Koch

7  10:25:30   pistol.

8  10:25:30   Q. Okay.  So the bullets were fired from the same gun, but

9  10:25:34   not the Heckler & Koch pistol that you looked at, right?

10 10:25:38   A. That's correct.

11 10:25:38   Q. Let's talk about the bullet from the coroner.  Do you

12 10:25:44   sometimes receive bullets from a coroner's office that might

13 10:25:47   be recovered from a deceased person's body?

14 10:25:50   A. Quite often.

15 10:25:51       MR. LARSEN:  And I would like to publish for the

16 10:25:53   jury what's been previously admitted as Government's

17 10:25:56   Exhibit 515.

18 10:26:00   Q. Do you recognize the bullet in this exhibit?

19 10:26:05   A. Yes.

20 10:26:06   Q. Is this the bullet that you examined that was given to

21 10:26:10   you by the coroner's office?

22 10:26:11   A. Yes.

23 10:26:12   Q. Okay.  And was this item logged with Coroner Case Number

24 10:26:21   1805798?

25 10:26:23   A. Yes.

10:26:23  1    Q. What caliber was this bullet?

10:26:25  2    A. It was 9mm Luger.

10:26:28  3    Q. Can you just describe to the jury the condition of the

10:26:31  4    bullet?

10:26:31  5    A. The bullet was a full metal -- what we categorize as a

10:26:37  6    full metal jacketed bullet.  And that usually has a copper

10:26:42  7    jacket on the exterior, or a brass jacket around it.  You can

10:26:47  8    kind of make out little areas that are kind of brownish in

10:26:53  9    coloration, and the rest of it is silvery.  It's pretty --

10:26:59 10    pretty oxidized, as you can see.

10:27:02 11    Q. When you say "oxidized," is the blue -- this is just

10:27:05 12    maybe a dumb question for people who don't look at bullets.

10:27:08 13         Are bullets normally blue?

10:27:10 14    A. No.

10:27:10 15    Q. So is that the result of the oxidation process?

10:27:13 16    A. Yes.

10:27:14 17    Q. Okay.  So that means there has been a chemical reaction

10:27:17 18    with the bullet that has sort of changed its color, right?

10:27:21 19    A. Yes.

10:27:21 20    Q. And does a bullet sometimes lose mass when it oxidizes?

10:27:27 21    A. Yes.  Well, whatever object that it penetrates, you do

10:27:34 22    have some -- possibly losing some of the mass of the bullet.

10:27:39 23    Sometimes they fragment, just get -- potentially losing some

10:27:45 24    mass.

10:27:45 25    Q. Right.

| | |
|---|---|
| 1 10:27:47 | And just to be clear -- we touched on this at the |
| 2 10:27:50 | beginning of your testimony -- but were you able to determine |
| 3 10:27:53 | whether this bullet we are looking at matched any of the |
| 4 10:27:56 | other bullets or the Heckler & Koch firearm? |
| 5 10:27:58 | A. The detail on this fired bullet from the coroner's was so |
| 6 10:28:03 | oxidized, there was very, very minimal detail on there. |
| 7 10:28:07 | There were some areas that possibly could, however, and we |
| 8 10:28:13 | couldn't say whether it was fired from the pistol or whether |
| 9 10:28:19 | it was fired from another firearm.  It was just so oxidized, |
| 10 10:28:22 | and minimal detail there, so it was an inconclusive result. |
| 11 10:28:27 | Q. Right.  So fair to say it could have been fired from a |
| 12 10:28:32 | 9mm Heckler & Koch? |
| 13 10:28:35 | MR. LECHMAN:  Objection, asked and answered. |
| 14 10:28:36 | THE COURT:  Overruled. |
| 15 10:28:38 | MR. LARSEN:  I don't think that was asked. |
| 16 10:28:38 | Q. You can answer, sir.  Do you need me to repeat the |
| 17 10:28:41 | question? |
| 18 10:28:41 | A. No.  It possibly could have been. |
| 19 10:28:44 | Q. Okay.  It could have been.  We just don't know whether it |
| 20 10:28:47 | was fired from this pistol or any other? |
| 21 10:28:49 | A. As far as comparison purposes, there is just not enough |
| 22 10:28:55 | detail there that -- to say one way or the other whether it |
| 23 10:28:59 | possibly could have or whether it was eliminated.  There is |
| 24 10:29:02 | just not sufficient detail for an individual to make a |
| 25 10:29:05 | conclusion. |

1 10:29:06   Q. When a bullet looks like this, are you generally able to

2 10:29:10   do anything more than determine the caliber?

3 10:29:12   A. It's on a case-by-case basis.  Sometimes you have some

4 10:29:14   areas that have nice detail.  In particular, this particular

5 10:29:20   bullet, there is -- just wasn't enough detail there to make a

6 10:29:25   conclusion.

7 10:29:26          MR. LARSEN:  Thank you, sir.  No further questions

8 10:29:27   at this time.

9 10:29:27          THE COURT:  Cross?

10 10:29:27                    CROSS-EXAMINATION

11 10:29:31   BY MR. CLEARY:

12 10:29:31   Q. Hi, Mr. Teramoto.  Can you hear me?

13 10:29:42   A. Yes, sir.

14 10:29:43   Q. Good.

15 10:29:44          I wanted to ask you a question about the opinion

16 10:29:47   that the bullet could have been fired from an H&K.  Isn't it

17 10:29:52   also true that -- that many, if not all, firearms

18 10:29:58   manufacturers who make handguns make it in a caliber similar

19 10:30:02   to the bullet in this case, the 9mm?

20 10:30:06   A. Yes, there is -- there are -- 9mm is a very -- 9mm Luger

21 10:30:11   is a very popular caliber.

22 10:30:13   Q. And so consistent with your findings, isn't it true --

23 10:30:18   I'm sorry, but could you agree that the -- that this bullet

24 10:30:23   could have also been fired by a pistol manufactured by

25 10:30:28   American Eagle?

1 10:30:30    A. There are what we call -- categorize rifling in handguns

2 10:30:35    and rifles, and some shotguns.  Rifling in these handguns --

3 10:30:43    rifles and these rifled shotguns basically is inside a barrel

4 10:30:48    that gives the bullet stability, much like someone throwing a

5 10:30:52    football.  It comes out in a spiral direction.  If you didn't

6 10:30:55    have rifling in rifle barrels, the bullet, once it leaves the

7 10:31:01    barrel of the firearm, basically will tumble, and it wouldn't

8 10:31:07    be accurate.

9 10:31:08         So the rifling -- different manufacturers have

10 10:31:12    different rifling.  The rifling, very quickly, are raised

11 10:31:16    areas that run the length of the barrel, and then alternate

12 10:31:19    on each side is what we call a valley.  It's not a raised

13 10:31:24    metal, it's -- it's --

14 10:31:27    Q. A groove, maybe?

15 10:31:28    A. Yes, a groove that runs the length of the barrel.

16 10:31:32    Q. That causes the projectile, when it's forced through the

17 10:31:35    barrel, to spin?

18 10:31:36    A. Yes.  And that is what gives it stability, as I gave an

19 10:31:42    analogy of somebody throwing a football in a nice spiral, as

20 10:31:46    opposed to one tumbling.  With no rifling, it wouldn't be as

21 10:31:49    accurate.

22 10:31:50         THE COURT:  Sir, how does your answer bear on the

23 10:31:54    question as to whether or not this bullet could have been

24 10:31:58    fired by an American Eagle?

25 10:32:01         THE WITNESS:  The rifling could be different on

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 10:32:03 American Eagle.  At this point in time -- oh, it is a six,

2 10:32:08 right.  I'm sorry.  So you could have the six lands and

3 10:32:12 grooves.  The raised area on the barrel is what we consider

4 10:32:17 land; the depressed area is the groove.

5 10:32:19          You can have six lands and grooves with a right-hand

6 10:32:23 twist.  The width measurements can be different.  And even if

7 10:32:27 they are the same, each individual firearm has what we call

8 10:32:32 tool marks, because of the manufacturing processes.

9 10:32:36          So in our training -- I hate to elaborate, but this

10 10:32:40 is to explain it real quickly.  The best-case scenario is if

11 10:32:45 you have a barrel that is manufactured consecutively, 10

12 10:32:48 right after the other.  You would think, same manufacturer,

13 10:32:51 same number of lands and grooves, the markings are going to

14 10:32:55 be the same, but they are not.

15 10:32:56          And these are barrels -- it's a best-case scenario

16 10:33:00 being a match, that barrel number 1, barrel number 2, they

17 10:33:06 are all going to be the same markings.  But you will be able

18 10:33:09 to distinguish each fired bullet and identify it to a given

19 10:33:12 barrel.  So that is your best case.

20 10:33:15          So even though they are 9mm, you could have

21 10:33:18 different number of land and grooves.  That is an easy

22 10:33:20 elimination.  You could have -- in this instance it was six

23 10:33:23 land and grooves, right-hand twist.  You could have a 9mm

24 10:33:27 Luger with five lands and grooves with a right-hand twist, or

25 10:33:31 different directionality of a left-hand twist.

| | |
|---|---|
| 1 10:33:34 | So that is elimination.  If they are the same, six |
| 2 10:33:37 | lands and grooves with the same width measurements, an |
| 3 10:33:40 | experienced examiner can still distinguish it, whether it was |
| 4 10:33:43 | fired from one particular firearm or not. |
| 5 10:33:45 | Q. And the problem with this particular bullet was that it |
| 6 10:33:48 | was oxidized, or damaged, so it was difficult to actually |
| 7 10:33:52 | make the match in this particular case? |
| 8 10:33:56 | A. That's correct.  There is minimal detail based on the |
| 9 10:33:58 | condition of the bullet. |
| 10 10:33:59 | Q. And you were not the examiner who actually did the |
| 11 10:34:01 | testing on this bullet; is that correct? |
| 12 10:34:02 | A. The primary examiner did it; however, I performed a |
| 13 10:34:06 | reexamination of the evidence. |
| 14 10:34:08 | Q. You reviewed it? |
| 15 10:34:08 | A. Yes. |
| 16 10:34:09 | Q. You didn't perform the testing yourself? |
| 17 10:34:11 | A. I did.  I reexamined the bullet myself under the |
| 18 10:34:15 | microscope. |
| 19 10:34:15 | Q. All right.  Thank you for that clarification. |
| 20 10:34:17 | So is it your opinion, then, that this bullet could |
| 21 10:34:20 | have been produced by a Luger, for example? |
| 22 10:34:22 | A. I would have to look at the actual -- what we consider a |
| 23 10:34:26 | type and caliber.  An examiner looks at a bullet, determines |
| 24 10:34:30 | caliber, looks at the number of lands and grooves, if the |
| 25 10:34:33 | width measurements are the same.  We enter that into a |

1 10:34:36  database and it gives us the -- investigators a clue as to

2 10:34:40  what manufacturer could have fired this bullet.

3 10:34:43  Q. Well, and the science behind rifling is pretty much the

4 10:34:49  same through all manufactures.  They put grooves and the

5 10:34:53  other marks you discussed inside the barrel to create the

6 10:34:56  spin.  They all use grooves and marks inside the barrel to

7 10:35:01  create rifling so the bullet spins, right?

8 10:35:04  A. Yes.

9 10:35:05  Q. So would you disagree with -- or would you have any

10 10:35:09  disagreement with the opinion that in this particular case,

11 10:35:13  the bullet could have been -- the manufacturer of the firearm

12 10:35:17  in this case could have been anybody among the following:

13 10:35:20  American Eagle, Beretta, Browning, Kirici, Ceska zbrojovka,

14 10:35:27  Colt, Diamondback, Cobray, Browning, Heckler & Koch, Kahr

15 10:35:29  Arms, KelTec, Luger, Mauser, Navy Arms, Norinco random Ruger,

16 10:35:36  Sardis, Springfield, Sten, Sterling Arms, Tanfoglio, Taurus,

17 10:35:43  Tisas, Vulcan, Walther, and Zastava?

18 10:35:46  A. It could have been, yes.

19 10:35:53  Q. Thank you.

20 10:35:53          MR. CLEARY:  No further questions.

21 10:35:54          THE COURT:  Any other cross?

22 10:35:56          Any redirect?

23 10:35:57          MR. LARSEN:  May I have a moment, Your Honor?

24 10:35:58          THE COURT:  Certainly.

25 10:36:00          (Pause in proceedings.)

                            REDIRECT-EXAMINATION

BY MR. LARSEN:

Q. I'm just going to ask you a couple of questions on
everybody's favorite topic, rifling marks.  No.

        I just want to make sure that everybody is following
along, some of this explanation, and has background on how
guns are fired and how -- what happens to cartridges and
bullets when that happens.

        Could you -- Mr. Teramoto, could you just
potentially explain the parts of a gun involved in firing a
bullet?  Let's start there.

A. In a semi-automatic pistol, a cartridge has the slide,
which is the top portion of the pistol.  It is pulled or
retracted rearward.  At some point it will stop.  You cannot
pull it any further.  Once you release it, there is what we
call a main spring within.  As you pull the slide back, the
spring compresses, you release it.

        Two processes are taking place in a semi-automatic
pistol.  As the slide is being pulled rearward, the hammer,
or striker, is also moving along with the slide rearward.
That is getting the firearm ready to fire or what we call
cocking the hammer, or the striker.

        Once it's released, the compressed spring propels
the slide forward.  In that process, the live cartridge on
the top of a magazine, those are loaded in however many -- it

1 10:37:49  could be 15, 10.  The top one is pushed forward by the bottom

2 10:37:54  of the slide up into the chamber or the rear portion of a

3 10:37:58  barrel of a firearm.

4 10:38:01       Once it gets there, the firearm now is cocked and

5 10:38:03  ready to be fired as long as the safety mechanism, the

6 10:38:07  safeties, are off.

7 10:38:08  Q. Okay.  So say you have a bullet in the chamber, right?

8 10:38:13  And somebody pulls the trigger -- the guns already cocked,

9 10:38:16  like you just described.  What strikes the bullet?  What

10 10:38:19  happens to the back of the bullet -- or, sorry, the casing of

11 10:38:22  the bullet?

12 10:38:23  A. The firing pin on the pistol of a firearm is released

13 10:38:28  forward as it releases from what we call the sear.  It's like

14 10:38:31  a shelf that holds that hammer, or that striker, rearward.

15 10:38:36  As you pull the trigger, that sear at some point on the

16 10:38:41  trigger assembly will be lowered.  That propels the firing

17 10:38:47  pin, or the striker, forward.  That also is under a separate

18 10:38:51  spring --

19 10:38:51  Q. I just want to make it much more basic for the jury.

20 10:38:51  A. Okay.

21 10:38:56  Q. You pull the trigger and then the firing pin hits the

22 10:38:58  back of the cartridge; is that --

23 10:38:58  A. Yes.  And what it is is on the centerfire cartridge,

24 10:39:01  there are four components:  the primer; the cartridge case,

25 10:39:05  which is the body; the bullet; and inside is the smokeless or

1 10:39:10   gun powder.

2 10:39:11   Q. Okay.  So cartridge case is sort of an object that is,

3 10:39:16   you know, long, metal, right?  And can have things in it?

4 10:39:20   A. It's like a cup, yes.

5 10:39:21   Q. Yeah.

6 10:39:21        And then there is a primer in it?

7 10:39:22   A. Yes.  On the bottom of the cartridge case is what we call

8 10:39:27   a primer.  Once the firing pin, or striker, strikes that,

9 10:39:31   there is a friction-sensitive chemical in the primer.  It

10 10:39:34  gets compressed.  What happens is it creates a flame.  There

11 10:39:38  is a hole in the bottom of a cartridge case that flames shoot

12 10:39:43  inside the cartridge case and ignites the smokeless powder

13 10:39:46  within.  You get gas pressure being developed.

14 10:39:50       It's almost -- the bullet is making it a closed

15 10:39:52  container, like a pressure cooker.  Once the gas pressure is

16 10:39:56  sufficient enough, it separates the bullet from the cartridge

17 10:39:59  case, propels it down and out the barrel.

18 10:40:01  Q. I want to ask about two specific things that touch on

19 10:40:04  your analysis.

20 10:40:06       When the firing pin hits the back of the cartridge

21 10:40:08  casing, does that leave particular marks?

22 10:40:11  A. Yes, that is one of the marks that we can look at on a

23 10:40:14  fired cartridge case.

24 10:40:15  Q. And then when the bullet gets fired after that process we

25 10:40:17  just talked about and goes through -- I'm sorry, what

10:40:23    1    exactly?

10:40:24    2    A. The barrel.

10:40:25    3    Q. The barrel.  Thank you.  I'm doing all this without

10:40:27    4    notes.

10:40:28    5            When it goes through the barrel, does that leave

10:40:30    6    particular marks on the bullet?

10:40:31    7    A. Yes.  And that goes back to what we call rifling, which

10:40:34    8    is the inner part of the barrel.  So you have this bullet

10:40:38    9    traveling through the barrel during the firing process, so

10:40:42   10    what you are getting is basically an engraving of the inside

10:40:49   11    of the barrel on the rifling, and those are the marks that we

10:40:52   12    look for as examiners.  That tells us the number of lands and

10:40:55   13    grooves that that firearm had, whether right-hand twist.  We

10:41:00   14    can do width measurements of the land and the groove

10:41:04   15    impressions to give us further information, enter that into a

10:41:07   16    database, which gives you a list of potential firearms that

10:41:09   17    could have fired that.

10:41:11   18    Q. Okay.

10:41:11   19            MR. LARSEN:  That is all I have.

10:41:12   20            Thank you, Mr. Teramoto.

10:41:16   21            MR. CLEARY:  No, thank you.

10:41:16   22            THE COURT:  May this witness be excused?

10:41:19   23            MR. LARSEN:  Yes, Your Honor.

10:41:20   24            THE COURT:  All right.  Thank you, sir.

10:41:21   25            THE WITNESS:  I apologize for the inconvenience.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1  10:41:26          THE COURT:  No apologies necessary.

2  10:41:41          Next?

3  10:41:41          MS. RICHMOND:  The United States calls Shawn

4  10:41:45   Gervais.

5  10:42:02          THE CLERK:  I can't get over here quick enough.

6  10:42:05   Turn around.

7  10:42:09   THEREUPON:

8  10:42:09                     SHAWN GERVAIS,

9  10:42:09   Called in these proceedings, and after having been first duly

10 10:42:16   sworn, testifies as follows:

11 10:42:16          THE CLERK:  Thank you.  Please be seated.

12 10:42:21          MS. RICHMOND:  Deputy Gervais, there are two binders

13 10:42:24   that have your name on them.  Do you mind pulling them over

14 10:42:26   to your table before you begin?

15 10:42:45          THE CLERK:  Please state your first and last name,

16 10:42:48   spell it, and speak slowly for the record.

17 10:42:50          THE WITNESS:  First name is Shawn, S-h-a-w-n; last

18 10:42:53   name Gervais, G-e-r-v-a-i-s.

19 10:42:56          THE CLERK:  Thank you.

20 10:42:59          THE COURT:  Go ahead, Ms. Richmond.

21 10:43:01          MS. RICHMOND:  Thank you.

22 10:43:01                     DIRECT EXAMINATION

23 12:37:55   BY MS. RICHMOND:

24 12:37:55    Q. Good morning, Deputy Gervais.  What do you do for work?

25 10:43:04    A. Currently, I am a motor deputy for Los Angeles County

1 10:43:09    Sheriff's Department out of Lost Hills station.

2 10:43:11    Q. What are your responsibilities?

3 10:43:12    A. I am responsible for enforcing the traffic code for my

4 10:43:19    area that I work.

5 10:43:20    Q. Which geographic area do you work in?

6 10:43:22    A. My station handles the LA County portion of Westlake

7 10:43:30    Village, all of Agoura, Calabasas, Malibu, and then we handle

8 10:43:35    county areas in between that and up to the city of

9 10:43:38    Chatsworth.

10 10:43:39    Q. Were you working on January 28, 2019?

11 10:43:42    A. Yes.

12 10:43:42    Q. Does that day stick out in your mind?

13 10:43:45    A. Yes, it does.

14 10:43:47    Q. Why?

15 10:43:48    A. It was my second day on patrol training, so my -- I was

16 10:43:52    very new to everything as far as the aspects of patrol.  And

17 10:43:57    it was my first double shift, meaning I was going to be

18 10:44:00    working 16 hours straight.  My training officer decided to

19 10:44:04    skip briefing that morning.  He wasn't a fan of briefings.

20 10:44:08    And we set out in the patrol vehicle to patrol our area.  We

21 10:44:13    were a county vehicle, so we handled mostly the county area

22 10:44:17    of my station.

23 10:44:17    Q. Did you see anything on that patrol?

24 10:44:20    A. Yes.  We went to an area off of Topanga Canyon, which is

25 10:44:25    an overlook, it overlooks all of the Valley, and observed two

1 10:44:31    vehicles in the parking lot.  At that time in the morning, it

2 10:44:35    was before sunrise, so the parking lot is closed.  No

3 10:44:38    vehicles are supposed to be in there.

4 10:44:40            We contacted the first vehicle that we came across,

5 10:44:44    which was a silver sedan.  It was backed into a parking spot.

6 10:44:49    Observed the vehicle had no front license plate, so my

7 10:44:54    training officer instructed me to get out of the vehicle --

8 10:44:57    get out of the patrol vehicle and make contact with the

9 10:44:59    occupants.

10 10:45:00    Q. May I pause you there?

11 10:45:01            Why was the no front plate an issue?

12 10:45:04    A. It is a violation of the California Vehicle Code.

13 10:45:07    Vehicles in California must have a front and rear license

14 10:45:10    plate.

15 10:45:11    Q. After seeing that vehicle code violation, you got out of

16 10:45:14    your car.  What happened next?

17 10:45:15    A. I got out of the car and approached the silver sedan.

18 10:45:19    While approaching the silver sedan, I could smell the odor of

19 10:45:23    burnt marijuana.  We approached the vehicle and conducted an

20 10:45:28    investigation as to the source of the burnt marijuana.

21 10:45:32    Q. Why did the smell of burnt marijuana catch your

22 10:45:36    attention?

23 10:45:36    A. In the state of California, it's illegal to smoke

24 10:45:40    marijuana or ingest marijuana in public.  It is legal to do

25 10:45:45    so within your own home, but it cannot be done so in public.

1 10:45:49  Q. When you approached the car, did anything catch your

2 10:45:52  attention?

3 10:45:52  A. The front passenger was fidgeting and reaching between

4 10:45:59  the center console and passenger seat of the vehicle.  So

5 10:46:04  that immediately caught mine and my training officer's

6 10:46:07  attention.

7 10:46:07  Q. Why?

8 10:46:07  A. It is common for items to be either concealed or hidden

9 10:46:14  in between the center console and passenger seat of a

10 10:46:19  vehicle, or even the center console and driver seat, so that

11 10:46:23  way they can either be retrieved quickly or tucked down out

12 10:46:26  of view.

13 10:46:27  Q. As you approached the vehicle, did you speak with the

14 10:46:30  occupants?

15 10:46:30  A. I attempted to speak with the occupants, and they were --

16 10:46:34  they did not understand me, later to find out that none of

17 10:46:38  them spoke English, and I do not speak Spanish.

18 10:46:40  Q. Did your partner speak Spanish?

19 10:46:42  A. My partner did, yes.

20 10:46:44  Q. Did he speak with them?

21 10:46:46  A. He did.

22 10:46:46  Q. Did he speak with the person who had been in the front

23 10:46:49  passenger seat?

24 10:46:49  A. Yes, he did.

25 10:46:50  Q. After speaking -- after your partner spoke with that

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1  10:46:53  person, did you go into the vehicle?

2  10:46:54  A. I did.  I was instructed to.

3  10:46:55  Q. Did you retrieve anything from the vehicle?

4  10:46:57  A. I retrieved a stainless steel revolver from the area

5  10:47:05  between the center console and the front passenger seat.

6  10:47:08  Q. Did you run any checks on the vehicle's license plate?

7  10:47:10  A. I did, yes.

8  10:47:12  Q. What information did you learn from that check?

9  10:47:14  A. I learned that the vehicle was registered to the front

10 10:47:18  passenger, an Edwin Martinez.

11 10:47:21  Q. I apologize, do you know if the gun was loaded?

12 10:47:23  A. I believe the gun was loaded, yes.

13 10:47:25  Q. Using the binders in front of you, can you please flip to

14 10:47:30  Government's Exhibits 1203 through 1218.  And again, that is

15 10:47:37  1203 through 1218.

16 10:47:40            THE CLERK:  Through what?

17 10:47:42            MS. RICHMOND:  1218.

18 10:47:44            THE CLERK:  Thank you.

19 10:48:06            THE WITNESS:  Okay.

20 10:48:06  Q. Do you recognize those pictures?

21 10:48:08  A. I do, yes.

22 10:48:08  Q. How?

23 10:48:09  A. That is the silver sedan.  It's a Nissan Sentra that was

24 10:48:14  backed into the parking lot.

25 10:48:16  Q. After the occupants were out of the vehicle and you ran

1 10:48:19   the license plate, what did you and your partner do next?

2 10:48:21    A. After that, we conducted a search of the vehicle for our

3 10:48:29   initial reason for the detention, which was the source of the

4 10:48:34   marijuana.

5 10:48:35    Q. Did you later impound the vehicle?

6 10:48:36    A. We did, yes.

7 10:48:37    Q. Are those photos that you just looked at also photos of

8 10:48:40   the items that were in the vehicle?

9 10:48:42    A. Yes, they are.

10 10:48:42        MS. RICHMOND:  Your Honor, the Government moves to

11 10:48:44   admit Government's Exhibits 1203 through 1218.

12 10:48:50        THE COURT:  Without objection.  They are admitted.

13 10:48:52        MR. KHOJAYAN:  Objection 403.

14 10:48:54        THE COURT:  They are admitted.

15 10:48:55        (Exhibit Nos. 1203 through 1218 received.)

16 10:48:56        MS. RICHMOND:  Please publish 1203.

17 10:49:06    Q. Is that the silver car you just spoke about?

18 10:49:08    A. Yes.

19 10:49:08        MS. RICHMOND:  Please go to the next one, 1204.

20 10:49:13    Q. Was there something about the license plate that caught

21 10:49:15   your attention?

22 10:49:16    A. In the front, the dealer plates.  So you have to have an

23 10:49:21   actual DMV-issued license plate.  And then underneath the --

24 10:49:27   when we got a closer look at the vehicle, underneath the

25 10:49:29   paper plates were the actual issued license plates for the

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

10:49:33  1   vehicle.

10:49:34  2   Q. That is to say, there was a paper plate over the actual

10:49:37  3   metal plate?

10:49:38  4   A. Yes.

10:49:39  5        MS. RICHMOND:  Can you flip to 1205, please.  1206,

10:49:47  6   please.  1207.

10:49:56  7   Q. Is this what you just spoke about?

10:49:57  8   A. Yes, it is.

10:49:58  9   Q. Paper plate being over the metal plate?

10:50:02  10  A. Over the metal plate.

10:50:03  11  Q. Was there anything else about the car that caught your

10:50:05  12  attention with regard to identifying the vehicle?

10:50:08  13  A. Yes.  The VIN number is usually displayed in a little

10:50:12  14  window on the windshield, the bottom right-hand corner, if

10:50:15  15  you are staring directly at the car.  That way, it can be

10:50:19  16  easily seen and identified.  There was black tape covering

10:50:24  17  the vehicle identification number.

10:50:25  18  Q. What is a vehicle identification number?

10:50:27  19  A. It's a unique -- I guess a unique way of identifying

10:50:32  20  vehicles.  None of them are alike.  It tells you -- could be

10:50:36  21  the origin of the vehicle, where it was manufactured, where

10:50:38  22  it came from.  But they are all unique.  None of them are

10:50:41  23  similar.

10:50:41  24  Q. So that VIN had black tape over it?

10:50:44  25  A. That VIN had black tape.

1 10:50:47          MS. RICHMOND:  1208, please.

2 10:50:54   Q. Is this a picture of the trunk?

3 10:50:56   A. Yes, it is.

4 10:50:57          MS. RICHMOND:  1209.

5 10:51:03   Q. Looking at Government's Exhibit 1209, was there anything

6 10:51:05   in the trunk that caught your attention?

7 10:51:07   A. The two baseball bats in the trunk, just by themselves.

8 10:51:13   Q. Anything else?

9 10:51:14   A. That, and the knife in the front of the trunk area.

10 10:51:19          MS. RICHMOND:  1210.

11 10:51:24   Q. Is that a closer-up view of the knife you just described?

12 10:51:27   A. Yes, it is.

13 10:51:29          MS. RICHMOND:  1211.

14 10:51:31   Q. Is this a picture of the backseat of the car?

15 10:51:32   A. Yes, it is.

16 10:51:34          MS. RICHMOND:  1212.

17 10:51:38   Q. Was there anything on the front seat of the car that

18 10:51:40   caught your attention?

19 10:51:43   A. The green cylinder, and also the blue cylinder that is in

20 10:51:47   the picture on the seat, passenger seat.

21 10:51:51   Q. Are those the two things I just circled?

22 10:51:54   A. Yes.

23 10:51:55   Q. And why did those catch your attention?

24 10:51:57   A. Those are used to grind up marijuana, so that way it can

25 10:52:02   be usually rolled into a joint and smoked.

1 10:52:24          MS. RICHMOND:  1213, please.

2 10:52:30    Q. Is that a closer-up view of that green cylinder we just

3 10:52:33    saw?

4 10:52:34    A. Yes, it is.

5 10:52:35          MS. RICHMOND:  1214.

6 10:52:39    Q. What do you see in this picture?

7 10:52:41    A. I see a red lighter, and also a pipe, glass pipe.

8 10:52:46          MS. RICHMOND:  1215.

9 10:52:54    Q. Is this another shot of the trunk?

10 10:52:57    A. Yes, it is.

11 10:52:58    Q. Is that a better angle of those two baseball bats you

12 10:53:01    just talked about?

13 10:53:01    A. Yes, it is.

14 10:53:03          MS. RICHMOND:  1216.

15 10:53:05    Q. Same knife?

16 10:53:06    A. Same knife, yes.

17 10:53:08          MS. RICHMOND:  1217.  And 1218.

18 10:53:18    Q. Did you find a hat in the car?

19 10:53:20    A. We did, yes.

20 10:53:21    Q. What kind of a hat was it?

21 10:53:22    A. Just a Los Angeles Rams football cap.

22 10:53:31          MS. RICHMOND:  I have about five more minutes with

23 10:53:33    this witness.

24 10:53:33    Q. Deputy, can you please turn to Government's Exhibits 2019

25 10:53:39    through 2021.

1  10:53:44   A. Okay.

2  10:53:45   Q. Do you recognize those?

3  10:53:46   A. Yes, I do.

4  10:53:46   Q. How?

5  10:53:47   A. This picture here of a black beanie was located in the

6  10:53:54   passenger compartment of the vehicle.

7  10:53:56   Q. Can you look at 2019, 2020, and 2021, please.

8  10:54:01   A. Sure.  2021, blue beanie, was also located in the

9  10:54:09   vehicle, as well as 2021, the ski mask.

10 10:54:16         MS. RICHMOND:  I apologize.  For the record,

11 10:54:18   Ms. English, it's 1219, 1220, and 1221.

12 10:54:23         THE CLERK:  Okay.

13 10:54:25         MS. RICHMOND:  I think I started writing dates

14 10:54:25   instead of the exhibit number, so I apologize.

15 10:54:28   Q. You said those were recovered from the vehicle?

16 10:54:30   A. Yes, ma'am.

17 10:54:31         MS. RICHMOND:  Move to admit, Your Honor.

18 10:54:33         MR. KHOJAYAN:  Objection, relevance, 403.

19 10:54:37         THE COURT:  Overruled.

20 10:54:37         (Exhibit No. 1219, 1220, 1221 received.)

21 10:54:38         MS. RICHMOND:  Please publish 1219.

22 10:54:39   Q. What does that hat say?

23 10:54:41   A. It's got the initials MS on it.

24 10:54:44         MS. RICHMOND:  1220.

25 10:54:49   Q. How about that?

10:54:49  1   A. Same thing, the initials MS.

10:54:53  2        MS. RICHMOND:  And finally, 1221, please.

10:54:59  3   Q. What is that?

10:54:59  4   A. That is a ski mask with the eyes and mouth cut out.

10:55:04  5   Q. Using the other binder, can you please now flip to

10:55:07  6   Government's Exhibit 1002.

10:55:35  7   A. Okay.

10:55:36  8   Q. Do you recognize that?

10:55:37  9   A. I do, yes.

10:55:38  10  Q. How?

10:55:39  11  A. It appears to be a printout of the return we would

10:55:44  12  receive on our patrol computers.

10:55:47  13  Q. A printout of what?

10:55:48  14  A. This looks to be -- let me -- vehicle information.

10:55:56  15  Q. And that is the vehicle information that was returned

10:55:58  16  from the search of the license plate?

10:55:59  17  A. That is correct, yes.

10:56:01  18        MS. RICHMOND:  Move to admit, Your Honor,

10:56:02  19  Government's Exhibit 1002.

10:56:05  20        MR. KHOJAYAN:  Objection, relevance, 403.

10:56:08  21        THE COURT:  Overruled.  Admitted.

10:56:10  22        (Exhibit No. 1002 received.)

10:56:10  23  Q. I believe you said this earlier, but was the car

10:56:14  24  registered to someone?

10:56:15  25  A. It was, yes.

Q. Who was it registered to?

A. To Edwin Martinez.

Q. Did you make any arrests in this case?

A. I did, yes.

Q. Did you keep the case afterwards?

A. I did not.

Q. Why not?

A. Once I make the arrest, I do the report, it is transferred over to the Detective Bureau, assigned to -- assigned for them to handle. My part is done.

            MS. RICHMOND:  Nothing further on direct, Your Honor.

            THE COURT:  Cross?

            THE CLERK:  Give me one second.  Have to take a small break.  So if someone needs to excuse themselves, time to go, come right back.  Not really breaking.

            (Pause in proceedings.)

            MR. MCNICHOLAS:  Your Honor, we are waiting for Mr. Khojayan.

            THE COURT:  I see that.

            THE CLERK:  Somebody else?

            THE COURT:  Does anyone else want to examine?

            MR. MCNICHOLAS:  I believe we may be the only ones.

            MR. PACTOR:  He's here.  He's coming in.

            THE COURT:  Oh, thank you.

11:02:53           MR. KHOJAYAN:  The restroom was closed.

11:02:53                        CROSS-EXAMINATION

11:03:02  BY MR. KHOJAYAN:

11:03:02   Q. Good morning.

11:03:14   A. Good morning, sir.

11:03:15   Q. Officer Gervais, you prepared a report from that date,

11:03:24  for January 20, 2019; is that right?

11:03:27   A. That is right.

11:03:31   Q. And am I right, when you approached the sedan -- it was a

11:03:35  Nissan Sentra, correct?

11:03:36   A. That's correct, yes, sir.

11:03:37   Q. And when you approached, the occupants were sleeping; is

11:03:41  that right?

11:03:42   A. I don't recall.

11:03:43   Q. And when you approached, you told us about the smell of

11:04:01  marijuana.  Do you recall that?

11:04:03   A. Yes, sir.

11:04:03   Q. And the -- you told us that you saw -- well, before I get

11:04:11  to that.

11:04:12           When you prepare your report, you try to put in

11:04:14  there everything that is important from your encounter with

11:04:16  the suspect; am I correct?

11:04:18   A. Yes, sir.

11:04:18   Q. Because a report could be relied on in court; is that

11:04:22  right?

11:04:22   A. Yes, sir.

11:04:22   Q. And you told us that you saw the passenger reaching for

11:04:27   the center console.  Do you remember saying that today?

11:04:30   A. Reaching in between the center console and passenger

11:04:33   seat.

11:04:33   Q. And you did not write that in your report; am I right?

11:04:37   A. That specifically, no.

11:04:39   Q. And in the center console -- you searched the car,

11:04:44   correct?

11:04:44   A. Yes, sir.

11:04:45   Q. And in the center console, you found cellphones; am I

11:04:49   right?

11:04:49   A. I don't recall.

11:04:50   Q. If I showed you a copy of that -- of your report where

11:04:54   you wrote that the center console contained three cellphones,

11:04:59   would that refresh your memory?

11:05:00   A. Yes, it would.

11:05:02        MR. KHOJAYAN:  May I approach, Your Honor?

11:05:33        THE CLERK:  Just the one sentence?

11:05:35        MR. KHOJAYAN:  That's right.

11:05:35   Q. Does that look like your report?

11:05:38   A. Yes, sir.

11:05:38   Q. And has it refreshed your memory?

11:05:40   A. Yes it has.

11:05:41   Q. In the center console, were there cellphones?

1  11:05:44    A. Yes, there were.

2  11:05:46    Q. Okay.  Later, you said you searched the car, correct?

3  11:06:01    A. That is correct.

4  11:06:01    Q. And you told us that you found a revolver; is that right?

5  11:06:05    A. That is correct.

6  11:06:06    Q. And that was a Smith & Wesson 9mm revolver; am I right?

7  11:06:11    A. Yes, sir.

8  11:06:15          MR. KHOJAYAN:  Oh, you know, could the clerk --

9  11:06:21    could your assistant -- the Martinez big folder, please.  If

10 11:06:30    you could show him -- can show the witness, please, 4017.

11 11:07:03    Q. Officer Gervais, in front of you is 4017.  Can you take a

12 11:07:09    look at that, please?  It's, I think, two pages long.

13 11:07:14    A. Two pages?

14 11:07:15    Q. Including the cover sheet.

15 11:07:17          Is that a -- that is a copy -- that is a picture of

16 11:07:19    the revolver you found; am I right?

17 11:07:21    A. It's a picture of a Smith & Wesson revolver, yes.

18 11:07:25          MR. KHOJAYAN:  Your Honor, I move 4017 into

19 11:07:27    evidence.

20 11:07:28          MS. RICHMOND:  Your Honor, lack of foundation.  The

21 11:07:30    witness didn't establish this was the revolver recovered.

22 11:07:33    Q. Is this the revolver that you recovered?

23 11:07:36    A. I don't recall.

24 11:07:38    Q. The Smith & Wesson 9mm revolver, did you -- the items

25 11:07:43    that you spoke about that you found in the Nissan Sentra, we

11:07:48   noticed there were exhibit tags.  Did you put those exhibit

11:07:51   tags?

11:07:51   A. No, I did not.

11:07:52   Q. Any item from the Nissan Sentra, did you help book any

11:07:59   item into evidence?

11:08:00   A. Yes, I did.

11:08:01   Q. What about the revolver, is that -- did you book the

11:08:05   revolver into evidence?

11:08:06   A. Yes, I did.

11:08:07   Q. Has the Government shown you any pictures of the 9mm

11:08:14   revolver that you found?

11:08:15   A. I've seen a picture of a 9mm revolver.

11:08:19   Q. You don't know if this picture, 4017, is the 9mm revolver

11:08:25   that you found or not?

11:08:26   A. No, I do not.

11:08:28   Q. From January 28, 2019, until today, October 8, 2025, have

11:08:36   you received any information that the 9mm revolver you found

11:08:40   was used in any murder of anyone?

11:08:43   A. No, I have not.

11:08:49        MR. KHOJAYAN:  Let's show Government's 1203.

11:09:13   Q. Government -- I'm showing -- I'm publishing 1203.

11:09:16        This is the Nissan Sentra that you approached on

11:09:20   January 28, 2019, right?

11:09:21   A. Yes, it is.

11:09:22   Q. And it was impounded; is that correct?

1  11:09:28   A. It was stored, yes.

2  11:09:29   Q. Stored?

3  11:09:30          And where is that Nissan Sentra today, do you know?

4  11:09:35   A. I have no idea.

5  11:09:36   Q. Was it released from impound?

6  11:09:38   A. I have no idea.

7  11:09:39   Q. Do you have any idea whether that Nissan Sentra that --

8  11:09:44   contained any GPS system within the car?

9  11:09:48   A. I don't know.

10 11:09:49   Q. Let's show -- I'm showing you 1209.

11 11:10:18          It appears to be the -- this was the back of the

12 11:10:22   Nissan, the trunk; am I right?

13 11:10:24   A. That is correct.

14 11:10:24   Q. And this is how it looked on the date of your encounter

15 11:10:28   with the Nissan?

16 11:10:29   A. Yes.

17 11:10:30   Q. 1209 depicts two baseball bats, it looks like, two

18 11:10:36   aluminum baseball bats; am I right?

19 11:10:38   A. Yes.

20 11:10:39   Q. Between January 28, 2019, and today, October 8, 2025,

21 11:10:44   have you come upon any information that these items were used

22 11:10:49   in any murder?

23 11:10:51   A. No.

24 11:10:52          MS. RICHMOND:  Objection, Your Honor, foundation,

25 11:10:53   outside the scope.

| | |
|---|---|
| 1 11:10:57 | THE COURT: That's just yes or no. |
| 2 11:10:59 | Q. And your answer, sir? |
| 3 11:11:00 | A. No. |
| 4 11:11:01 | Q. These were booked into evidence; is that correct? |
| 5 11:11:04 | A. Yes. |
| 6 11:11:05 | Q. And based on your law enforcement training, when they are |
| 7 11:11:10 | booked into evidence, does law enforcement, as far as you |
| 8 11:11:13 | know, examine items to -- for any DNA evidence? |
| 9 11:11:18 | A. They can, yes. |
| 10 11:11:19 | Q. And as well fingerprint evidence; am I correct? |
| 11 11:11:24 | A. If requested, yes. |
| 12 11:11:25 | Q. Those types of things, DNA evidence, fingerprint |
| 13 11:11:29 | evidence, those are important in a criminal investigation, as |
| 14 11:11:32 | far as you know? |
| 15 11:11:32 | A. As far as I know, yes. |
| 16 11:11:35 | THE COURT: All criminal investigations? DNA? |
| 17 11:11:39 | THE WITNESS: Not all, no, sir. |
| 18 11:11:41 | Q. What about murder investigations, in a murder |
| 19 11:11:44 | investigation, as far as your law enforcement training, would |
| 20 11:11:47 | DNA evidence be important in a murder criminal -- criminal |
| 21 11:11:52 | murder investigation? |
| 22 11:11:53 | MS. RICHMOND: Objection, foundation for this |
| 23 11:11:54 | witness. |
| 24 11:11:55 | THE COURT: Sustained. |
| 25 11:12:00 | Q. In your law enforcement training, do you -- you do -- you |

1  11:12:04   did get training on collecting evidence, correct?

2  11:12:07    A. In the field, yes.

3  11:12:08    Q. And sorry, in the field?  How do you mean?  Did you

4  11:12:13   attend any courses?

5  11:12:14    A. There are no courses as far as the academy is concerned

6  11:12:19   on collecting evidence.  It's done through patrol training.

7  11:12:21   So during your six months of patrol training, that is when

8  11:12:24   you learn how to collect evidence, the proper procedures.

9  11:12:27    Q. As well, there is a Los Angeles Sheriff manual, right?

10 11:12:30    A. There is a manual, yes.

11 11:12:32    Q. And you've read the manual?

12 11:12:33    A. Yes.

13 11:12:34    Q. And it does contain sections on collecting evidence,

14 11:12:38   correct?

15 11:12:38    A. It does, yes.

16 11:12:39    Q. And part of that includes that in the course of

17 11:12:45   collecting evidence, you are to use gloves; am I correct?

18 11:12:49    A. That is correct.

19 11:12:50         MS. RICHMOND:  Objection, Your Honor, foundation,

20 11:12:52   hearsay, outside the scope, relevance.

21 11:12:55         MR. KHOJAYAN:  He's law enforcement collecting

22 11:12:58   evidence in this case, Your Honor.

23 11:12:59         THE COURT:  Okay.  Go ahead.

24 11:13:00    Q. And the purpose -- and the reason -- what is the purpose,

25 11:13:05   as far as you know, as to why law enforcement -- sheriffs are

1 11:13:09    directed to use gloves when collecting evidence?

2 11:13:11    A. So that way you don't contaminate the item that you are

3 11:13:15    collecting.

4 11:13:15    Q. And did you do that in this case?

5 11:13:16    A. I don't recall.

6 11:13:18    Q. Let me show you 12010.

7 11:13:29        THE COURT:  12010.

8 11:13:30    Q. 12010 depicts a knife in the trunk; am I correct?

9 11:13:34    A. Yes.

10 11:13:35   Q. From January 28, 2019, until today, October 8, 2025, have

11 11:13:43   you learned of any evidence connecting this knife with any

12 11:13:49   violent crime?

13 11:13:51   A. No, I have not.

14 11:13:52   Q. Have you received any evidence that this knife was used

15 11:13:56   in any murder?

16 11:13:57   A. No, I have not.

17 11:14:00       MR. KHOJAYAN:  1211.

18 11:14:11   Q. 1211 depicts the back of the -- the backseats of the

19 11:14:15   Nissan Sentra; am I correct?

20 11:14:20   A. That is correct.

21 11:14:21   Q. Have you learned if any part of the interior of the

22 11:14:24   Nissan Sentra was examined for any blood evidence?

23 11:14:29       MS. RICHMOND:  Your Honor, this witness has

24 11:14:31   testified that he made the arrest and passed the case on.

25 11:14:33   There is no foundation for this.

11:14:40      THE COURT:  There really isn't.  Wasn't he a trainee

11:14:43 or something at the time?

11:14:46      MR. KHOJAYAN:  He's come to testify about the car

11:14:47 and the evidence within the car.  I'm just asking him whether

11:14:52 he knows whether it's been examined in that way.  He can say

11:14:55 yes or no.

11:14:55      THE COURT:  Were you a trainee at the time?

11:14:57      THE WITNESS:  Yes, sir.  I was on my second day of

11:14:59 training.

11:15:00 Q. Your -- who was the officer with you?

11:15:03 A. That was Deputy Espinosa.

11:15:07 Q. And you don't know what happened to this Nissan Sentra,

11:15:12 am I right, after January 28, '20 -- do you know?

11:15:15 A. That is correct.

11:15:23 Q. You do not know about any examinations conducted

11:15:30 regarding the interior of this Nissan Sentra, do you?

11:15:32 A. That's correct.

11:15:33 Q. You do not know; am I right?

11:15:36 A. Do not know.

11:15:37 Q. All right.  2013 depicts -- there is an Exhibit Number 8.

11:15:53 I think you testified that this is a container that -- is

11:16:00 this for marijuana?  Is that what you said?

11:16:02 A. It's commonly used to crush marijuana, yes.

11:16:05 Q. Do you have any information about the connection between

11:16:10 this item in 1213 and any murder accusation in this case?

1  11:16:16    A. No, I do not.

2  11:16:18            MR. KHOJAYAN:  1214, please.

3  11:16:24    Q. And 1214 depicts a lighter.  Do you have any information

4  11:16:29    about the relevance -- or the connection between this lighter

5  11:16:31    and any murder investigation in this case?

6  11:16:34    A. No, I do not.

7  11:16:40            MR. KHOJAYAN:  1215.

8  11:16:42    Q. 1215 depicts the interior of this -- I should say the

9  11:16:48    trunk.  It looks very messy; do you agree?

10 11:16:51    A. Yes.

11 11:16:51    Q. Did you come upon any -- based on what you saw on

12 11:16:58    January 28, 2019, and your review of the interior of the

13 11:17:02    Nissan and the trunk of the Nissan, did it appear to you that

14 11:17:05    the car had been cleaned at all recently?

15 11:17:09    A. Based off the picture?  No.

16 11:17:26            MR. KHOJAYAN:  1218.

17 11:17:27    Q. 1218 is a picture of a Rams cap; am I right?

18 11:17:35    A. Yes.

19 11:17:36    Q. Do you have any information that this cap was used in any

20 11:17:43    murder?

21 11:17:43    A. No, I do not.

22 11:17:54            MR. KHOJAYAN:  May I -- could you help -- Ben, could

23 11:18:01    you please show Government's 1219?

24 11:18:18    Q. Officer Gervais, 1219, I'm publishing for the jury.  It's

25 11:18:21    a beanie that has the letters MS on it.  Do you see that?

1 11:18:25   A. Yes, I do.

2 11:18:26   Q. Do you have -- you booked this into evidence, right?

3 11:18:29   A. Yes, I did.

4 11:18:30   Q. And because -- you booked it into evidence to allow other

5 11:18:34   people to -- other law enforcement to potentially examine

6 11:18:37   this item of evidence, correct?

7 11:18:40   A. It could be, yes.

8 11:18:41   Q. Yes.  And do you have any information whether this 1219,

9 11:18:49   1220 -- sorry, 1219, 1220, 1221, those are different beanies;

10 11:18:55   am I right?

11 11:18:56          MS. RICHMOND:  Your Honor, this is asked and

12 11:18:57   answered on the same line with a lack of foundation.

13 11:19:02          THE COURT:  If I overrule the objection, will this

14 11:19:04   be the last one of these?

15 11:19:10          MR. KHOJAYAN:  Is that -- are you expecting an

16 11:19:12   answer?  I'm almost done, Your Honor.

17 11:19:20          THE COURT:  Okay.

18 11:19:21          MR. KHOJAYAN:  All right.  It's overruled?

19 11:19:26          Thank you.  I'm almost done, Your Honor.  I'm

20 11:19:28   making --

21 11:19:29          THE COURT:  I was trying to point out that this was

22 11:19:33   as inexperienced as you can get.

23 11:19:35          MR. KHOJAYAN:  But that has nothing to do with the

24 11:19:36   item of evidence that I'm asking.

25 11:19:39   Q. 1219, 1220 --

| | |
|---|---|
| 1 11:19:41 | MR. KHOJAYAN:  Can you show 1220, please? |
| 2 11:19:44 | Q. -- is another beanie you found; am I right, 1220? |
| 3 11:19:47 | A. Yes, it is. |
| 4 11:19:48 | MR. KHOJAYAN:  And 1221. |
| 5 11:19:52 | Q. 1221 is yet another beanie with the eye hole and the |
| 6 11:19:56 | mouth hole showing, right? |
| 7 11:19:57 | A. Yes, it is. |
| 8 11:19:58 | Q. All right.  You booked these into evidence? |
| 9 11:19:59 | A. Yes, I did. |
| 10 11:20:00 | Q. And when you booked it into evidence, did you place each |
| 11 11:20:03 | one in an individual bag? |
| 12 11:20:05 | A. I don't recall. |
| 13 11:20:06 | Q. All right.  And do you have any information whether any |
| 14 11:20:11 | -- 1219, 1220, 1221 was tested by law enforcement after you |
| 15 11:20:15 | booked it into evidence? |
| 16 11:20:17 | A. I have no idea. |
| 17 11:20:20 | Q. Do you know who would? |
| 18 11:20:21 | A. Most likely the crime lab, but I am just guessing at that |
| 19 11:20:26 | point. |
| 20 11:20:28 | Q. All right.  And you -- how many occupants did the car |
| 21 11:20:34 | have; do you recall? |
| 22 11:20:35 | A. The vehicle had four occupants. |
| 23 11:20:38 | Q. And you arrested the four occupants for -- you said you |
| 24 11:20:43 | arrested them, right? |
| 25 11:20:44 | A. Yes, sir. |

1 11:20:44   Q. You did not arrest them for murder; am I right?

2 11:20:46   A. That is correct.

3 11:20:47   Q. And you arrested them for -- reasonable cause robbery is

4 11:20:53   one of the charges; am I right?

5 11:20:54   A. That is correct.

6 11:20:55   Q. Robbery of whom; do you know?

7 11:21:00   A. It's reasonable cause because we don't.

8 11:21:02   Q. Did you ever come to find out whom?

9 11:21:05        MS. RICHMOND:  Your Honor, again, foundation.

10 11:21:06        MR. KHOJAYAN:  He's the one that arrested them for

11 11:21:08   the charge.

12 11:21:08        MS. RICHMOND:  And relevance.  He's repeatedly

13 11:21:11   stated he passed off the case.

14 11:21:12        THE COURT:  Sustained.

15 11:21:25        MR. KHOJAYAN:  One moment, please.

16 11:21:27        (Pause in proceedings.)

17 11:21:46   Q. The 9mm -- 9mm revolver, you booked it into evidence; is

18 11:21:52   that correct?

19 11:21:52   A. That's correct.

20 11:21:53   Q. Do you know what happened to that revolver after you

21 11:21:57   booked it into evidence?

22 11:21:57   A. No, I do not.

23 11:21:59   Q. Do you have any information whether it was tested by

24 11:22:01   anyone?

25 11:22:02   A. No, I do not.

11:22:05    1        MR. KHOJAYAN:  Thank you.

11:22:05    2                DIRECT EXAMINATION

11:22:11    3   BY MS. RICHMOND:

11:22:11    4    Q. Deputy Gervais, did you say it was your second day on the

11:22:21    5   job?

11:22:21    6    A. That's correct.

11:22:21    7    Q. And you were still in training?

11:22:22    8    A. Yes, ma'am.

11:22:22    9    Q. And your job was to be a patrol officer?

11:22:25   10    A. Yes.

11:22:25   11    Q. Which mostly involves vehicle violations?

11:22:27   12    A. Vehicle violations, yes.

11:22:29   13    Q. Are you a homicide detective?

11:22:30   14    A. No, I am not.

11:22:31   15    Q. Do you investigate murders?

11:22:33   16    A. No, I do not.

11:22:34   17    Q. Do you investigate robberies?

11:22:36   18    A. No, I do not.

11:22:37   19    Q. Did you pass off the investigation in this case?

11:22:39   20    A. I finished my portion and handed it off to the

11:22:41   21   detectives, yes.

11:22:41   22    Q. So you had no further involvement in it?

11:22:43   23    A. No, I did not.

11:22:44   24    Q. So all these questions about further tests and DNA, you

11:22:47   25   have nothing to do with any of that, right?

1 11:22:48    A. Absolutely nothing.

2 11:22:56            MS. RICHMOND:  Nothing further, Your Honor.

3 11:22:58            MR. KHOJAYAN:  Nothing further.  Thank you.

4 11:22:59            THE COURT:  May this witness be excused?

5 11:23:01            MR. KHOJAYAN:  Yes, Your Honor.

6 11:23:03            THE COURT:  Thank you, sir.

7 11:23:04            THE WITNESS:  Thank you, sir.

8 11:23:06            MR. BALDING:  The United States calls Herman

9 11:23:35    Frettlohr.

10 11:23:35            THE CLERK:  Stop right there.

11 11:23:42    THEREUPON:

12 11:23:42                        HERMAN FRETTLOHR,

13 11:23:42    Called in these proceedings, and after having been first duly

14 11:23:42    sworn, testifies as follows:

15 11:23:51            THE CLERK:  Thank you.  Please be seated in this

16 11:23:53    chair.

17 11:23:57            Please state your first and last name, spell it, and

18 11:24:01    speak slow for the record.

19 11:24:03            THE WITNESS:  Herman Frettlohr.  First name Herman,

20 11:24:05    H-e-r-m-a-n; Frettlohr is F-r-e-t-t-l-o-h-r.

21 11:24:14            THE CLERK:  Thank you.

22 11:24:14                        DIRECT EXAMINATION

23 11:24:16    BY MR. BALDING:

24 11:24:16    Q. Good morning.

25 11:24:19    A. Good morning.

1   11:24:19    Q. Are you currently employed?

2   11:24:21    A. I am.

3   11:24:21    Q. What is your employment?

4   11:24:23    A. I am a detective for the Los Angeles Police Department,

5   11:24:27    currently assigned to Robbery-Homicide Division, West Bureau

6   11:24:31    section.

7   11:24:32    Q. How long have you been a peace officer?

8   11:24:34    A. 31 years.

9   11:24:37    Q. In 2018, what was your assignment?

10  11:24:39    A. At the time, I was a homicide supervisor at the LAPD, at

11  11:24:45    West Bureau Homicide.

12  11:24:46    Q. Were you also a member of a task force?

13  11:24:49    A. I was.

14  11:24:49    Q. Do you recall the name of that task force?

15  11:24:52    A. The Los Angeles Metropolitan Violent Crime Task Force.

16  11:24:57    Q. And what is the purpose of that task force?

17  11:24:59    A. We were investigating murders that were occurring within

18  11:25:04    the city and in the county related to MS-13.

19  11:25:08    Q. And as part of that task force, did you work with local,

20  11:25:12    state, and federal agencies?

21  11:25:14    A. I did.

22  11:25:14    Q. Did you work on a large investigation of a series of

23  11:25:20    murders related to the MS-13 gang in or around that time?

24  11:25:23    A. I did.

25  11:25:24    Q. Do you speak Spanish?

1  11:25:27   A. I do.

2  11:25:27   Q. Are you fluent?

3  11:25:28   A. I am.

4  11:25:29   Q. In this investigation related to the MS-13 gang, was one

5  11:25:35   of your roles to interview individuals who had been arrested?

6  11:25:39   A. Yes.

7  11:25:39   Q. And was it to see if they would agree to speak with you

8  11:25:44   and other law enforcement?

9  11:25:45   A. Yes.

10 11:25:45   Q. Are these interviews sometimes -- do they occur before a

11 11:25:51   suspect has a lawyer?

12 11:25:52   A. Yes.

13 11:25:53   Q. But is the suspect informed of their right to an

14 11:25:57   attorney?

15 11:25:57   A. Yes.

16 11:25:58   Q. And the right to have an attorney if -- appointed if they

17 11:26:02   can't afford one?

18 11:26:03   A. Yes.

19 11:26:03   Q. And the right to remain silent?

20 11:26:07   A. Yes.

21 11:26:08   Q. And are they informed that statements can be used against

22 11:26:10   them if they choose to make them?

23 11:26:11   A. Yes.

24 11:26:12   Q. Do you typically record these interviews?  Or did you in

25 11:26:15   that time period?

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 11:26:16  A. Yes.

2 11:26:17  Q. Generally, what is the purpose of these interviews?

3 11:26:22  A. To elicit either a confession or additional information

4 11:26:27  on the investigation.

5 11:26:28  Q. What are you trying to do in the investigation?

6 11:26:29  A. Solve it.

7 11:26:32  Q. You've got a homicide; you are trying to figure out what

8 11:26:35  happened?

9 11:26:35  A. Correct.

10 11:26:36  Q. Trying to find out who did it, so that future homicides

11 11:26:41  don't occur?

12 11:26:42  A. Yes.

13 11:26:42  Q. Trying to get an accurate picture of what happened?

14 11:26:46  A. Correct.

15 11:26:48       MS. MANINGO:  Objection, Your Honor, leading.

16 11:26:50       THE COURT:  Sustained.

17 11:26:53  Q. Do you want to know what happened?

18 11:26:55  A. Yes.

19 11:26:56  Q. As part of the investigation we are talk about -- talking

20 11:27:00  about, did you investigate the murder of an individual named

21 11:27:03  Brayan Andino?

22 11:27:04  A. I assisted the investigating officers on that case.

23 11:27:08  Q. Did you interview an individual named Bryan Rosales-Arias

24 11:27:12  as part of that investigation?

25 11:27:13  A. I did.

1 11:27:14    Q. Did that interview occur on or about May 30, 2019?

2 11:27:19    A. Yes.

3 11:27:20    Q. Showing you what's previously been entered into evidence

4 11:27:24    as Exhibit 428.  Do you recognize the person on the screen?

5 11:27:27    A. I do.

6 11:27:28    Q. Who is that?

7 11:27:29    A. Bryan Rosales-Arias.

8 11:27:34    Q. Is that what he looked like on or about the time you

9 11:27:37    interviewed him?

10 11:27:38    A. Pretty much, yes.

11 11:27:40         MR. BALDING:  Your Honor, I'm going to elicit

12 11:27:43    testimony that I think a limiting instruction would be

13 11:27:45    appropriate here that it's only as to this defendant.  We can

14 11:28:06    provide it.

15 11:28:06         THE COURT:  Is it likely that there could be any

16 11:28:12    spillover to any other defendant in this case?

17 11:28:15         MR. BALDING:  I think it would be appropriate to

18 11:28:16    read the limiting instruction, because it's statements made

19 11:28:19    in custody by this specific defendant.

20 11:28:22         THE COURT:  I'm going to take that as a "yes."

21 11:28:25         MR. BALDING:  Yes.

22 11:28:25         THE COURT:  Ladies and gentlemen, well, you've heard

23 11:28:27    what I just heard.  And it is going to be important for you,

24 11:28:33    not only in this particular instance, but in this case, that

25 11:28:36    when you hear evidence, if that evidence is relevant to a

1  11:28:41    particular person, you are to apply it to that particular

2  11:28:44    person and no one else.

3  11:28:45         You are to determine the guilt and innocence of each

4  11:28:48    of these individuals as individuals.  Your verdict with

5  11:28:52    respect to one should not reflect or influence your verdict

6  11:28:57    on any other.

7  11:28:57         Now, if indeed we are going to hear evidence related

8  11:29:01    to this individual, then consider it as to -- as applicable

9  11:29:06    to this individual only, okay?

10 11:29:14    Q. Now, when you interviewed Defendant Bryan Rosales-Arias,

11 11:29:18    did you inform him of his rights that day?

12 11:29:20    A. Yes.

13 11:29:21    Q. Including all the rights we just talked about?

14 11:29:24    A. Correct.

15 11:29:24    Q. Did he agree to waive those rights and speak to you?

16 11:29:28    A. He -- it was an implied waiver.

17 11:29:35    Q. What does that mean?

18 11:29:36    A. That means that I read him his rights.  He stated he

19 11:29:39    understood them.  I started asking him questions, and he

20 11:29:42    answered them.

21 11:29:43    Q. Prior to interviewing him, had you learned of a moniker

22 11:29:46    or nickname that he was associated with?

23 11:29:48    A. Yes.

24 11:29:49    Q. What was that?

25 11:29:50    A. Yela.

1  11:29:51   Q. During his interview, did you confront him with that

2  11:29:54   moniker?

3  11:29:55   A. I did.

4  11:29:55   Q. What did he say about that moniker?  What was his

5  11:29:58   reaction?

6  11:29:58   A. He said he had that nickname since he was a child.

7  11:30:03   Q. During your investigation -- during the investigation,

8  11:30:06   did you review records from a Facebook account that you had

9  11:30:10   identified as belonging to him, to Bryan Rosales-Arias, prior

10 11:30:13   to the interview with him?

11 11:30:15   A. I did.

12 11:30:15   Q. Did you review multiple pages of the Facebook records

13 11:30:20   from the year 2017?

14 11:30:22   A. I reviewed two pages with him.

15 11:30:25   Q. And -- but you reviewed, not with him.  I'm talking about

16 11:30:29   before the interview, had you reviewed multiple pages from

17 11:30:32   that time period of his Facebook account?

18 11:30:35   A. Yes, I did.

19 11:30:36   Q. And among the records you reviewed, were there several

20 11:30:40   between March and August of 2017 in which the user using that

21 11:30:43   account, his account, shared a phone number with another

22 11:30:45   user?

23 11:30:46   A. Yes.

24 11:30:46   Q. And was that phone number 323-705-0661?

25 11:30:51   A. Yes.

1   11:30:51   Q. During the interview, did you show him one of his

2   11:31:01   Facebook records in which he shared that 0661 phone number?

3   11:31:04   A. Yes, the page specifically that had that phone number on

4   11:31:09   it.

5   11:31:09   Q. And what was his reaction?

6   11:31:11   A. When I asked him if that was him, he implied in the

7   11:31:17   affirmative by saying "um-hum."

8   11:31:24   Q. Could you look at the binder -- one of the binders to

9   11:31:27   your left.  It's Exhibit 459.  You have to look to -- to your

10  11:31:32   left.  I think it should be in the left cart, maybe the top

11  11:31:42   shelf of that cart.

12  11:31:52   A. Thank you.  459?  Which number again?

13  11:32:10   Q. 459.

14  11:32:12   A. Okay.  I have it.

15  11:32:17   Q. And do you recognize that?

16  11:32:18   A. Yes.

17  11:32:19   Q. What is it?

18  11:32:20   A. That is the -- a copy of the Facebook record that I

19  11:32:27   showed Bryan that day.

20  11:32:30           MR. BALDING:  Move to admit 459.

21  11:32:33           MS. MANINGO:  No objection, Your Honor.

22  11:32:33           THE COURT:  Received.

23  11:32:33           (Exhibit No. 459 received.)

24  11:32:45           MR. BALDING:  Publishing 459.

25  11:32:47   Q. Is the user name that you associated with this account

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 11:32:52   depicted in Exhibit 459 as Alexander Arias?

2 11:32:57    A. Yes.

3 11:32:58    Q. And is it the Facebook account number ending in 3191?

4 11:33:04    A. Correct.

5 11:33:05    Q. And is that -- the entry I have boxed, is that where he

6 11:33:16   shares that 0661 phone number we talked about?

7 11:33:18    A. Yes.

8 11:33:19    Q. Did you also review a Facebook entry from that same

9 11:33:25   account with the name Alexander Arias, and ending in 3191,

10 11:33:31   from later in that year, November 21, 2017?

11 11:33:34    A. Yes.

12 11:33:34    Q. And did the user of that account send a different phone

13 11:33:41   number to a different user in that Facebook record you

14 11:33:45   received?

15 11:33:45    A. Yes.

16 11:33:46    Q. And so the number he gave had changed?

17 11:33:49    A. Correct.

18 11:33:50    Q. Was that new number 323-536-5866?

19 11:33:55    A. Correct.

20 11:33:56    Q. And the date of that sharing, was that November 21, 2017?

21 11:34:02    A. Yes.

22 11:34:02    Q. And was that less than a month after the Brayan Andino

23 11:34:08   murder?

24 11:34:09    A. Yes.

25 11:34:10    Q. And it was the same Facebook user name and account number

1 11:34:12  on the documents with the new number and the old number that

2 11:34:16  you talked about?

3 11:34:16   A. Correct.

4 11:34:20   Q. During the course of the investigation, did you also

5 11:34:23  interview a person named Roberto Corado-Ortiz, or Infernal?

6 11:34:30   A. Yes.

7 11:34:31   Q. Displaying Exhibit 429.

8 11:34:34       Do you recognize the person in this photograph?

9 11:34:36   A. I do.

10 11:34:37   Q. Who is that?

11 11:34:38   A. That is Roberto Corado-Ortiz.

12 11:34:43   Q. Is that generally what he looked like when you

13 11:34:47  interviewed him?

14 11:34:47   A. Yes.

15 11:34:48   Q. And did you interview him multiple times?

16 11:34:50   A. I did.

17 11:34:51   Q. Did those both occur in October of 2018?

18 11:34:54   A. Yes.

19 11:34:57   Q. I want to focus on the second interview.  Do you recall

20 11:35:00  that being sometime on or around October 26th of 2018?  Does

21 11:35:05  that sound possible?

22 11:35:06   A. That's -- that's correct, yes.

23 11:35:10       MR. BALDING:  Again, Your Honor, the following

24 11:35:13  testimony would apply only to Defendant Corado-Ortiz.

25 11:35:20       THE COURT:  All right.  Ladies and gentlemen, you

1 11:35:22    heard what the prosecutor just said.  What you are about to

2 11:35:25    hear will only apply to that one defendant and no other.

3 11:35:28            Go ahead.

4 11:35:29            MR. BALDING:  Thank you, Your Honor.

5 11:35:30    Q. And again, before you interviewed him, did he agree to

6 11:35:36    waive his rights that you had mentioned earlier?

7 11:35:38    A. Yes.

8 11:35:38    Q. And speak to you?

9 11:35:40    A. Yes.

10 11:35:40    Q. Was that interview recorded?

11 11:35:43    A. It was.

12 11:35:44    Q. Did he discuss his background?

13 11:35:48    A. He did.

14 11:35:48    Q. And did you ask him about the murder of Brayan Andino?

15 11:35:53    A. I did.

16 11:35:54    Q. Did you ask him about another murder, the murder of Roger

17 11:35:57    Chavez?

18 11:35:57    A. I did.

19 11:35:58    Q. Have you recently listened to a recording of that

20 11:36:02    interview?

21 11:36:02    A. I did.

22 11:36:03    Q. And have you reviewed several individual clips that were

23 11:36:08    made from that recording?

24 11:36:09    A. Yes, I did.

25 11:36:10    Q. And did you listen to them on CDs and mark your initials

1 11:36:14   on certain disks to show that you had listened to the clip

2 11:36:17   that was on the CD?

3 11:36:18   A. Yes.

4 11:36:18   Q. I'm going to ask you to pull the binders that have

5 11:36:25   Exhibits 541 through 605 -- or 606 in them.

6 11:36:52   A. I'm at 541.

7 11:36:53   Q. And could you look at 541.

8 11:36:55        Do you recognize what is Exhibit 541?

9 11:36:57   A. Yes.  It's a compact disk with the United States vs.

10 11:37:02  Chavez-Larin, et al., and it has my initials and the date

11 11:37:05  that I reviewed it, which was September the 5th, 2025.

12 11:37:10  Q. Would you look at 542?

13 11:37:17  A. It's a similarly described compact disk, also with my

14 11:37:21  initials and the same date -- I'm so sorry.  I apologize.

15 11:37:26  September the 5th, 2025, and my initials.

16 11:37:29  Q. And then I'm just going to ask you -- if you could look

17 11:37:32  at a few, and then I guess describe them.

18 11:37:33        How about 545 and 548 and 552?

19 11:37:41  A. 545?  A similarly described compact disk with my initials

20 11:37:49  and the date, September 5, 2025.

21 11:37:52        And the next one?

22 11:37:54  Q. 548?

23 11:37:55  A. Another white compact disk, the same description, my

24 11:38:05  initials, and the date, September 5, 2025.

25 11:38:08  Q. And you don't have to describe it each time, but I'm just

11:38:13   going to ask if it's similar with your initials.

11:38:15         552?

11:38:16   A. 552.  Yes, it's my initials and the date of September 5,

11:38:26   2025.

11:38:26   Q. And 555?

11:38:29   A. Another compact disk, my initials, and the date

11:38:40   September 5, 2025.

11:38:41   Q. 556?

11:38:42   A. 556.  Again, another compact disk, my initials, same

11:38:45   date.

11:38:46   Q. 563?

11:38:48   A. Another compact disk with my initials and the same date

11:38:57   of September 5, 2025.

11:38:59   Q. 573?

11:39:01   A. That would be the next -- the next --

11:39:08   Q. Is it the other binder in front of you?

11:39:11         THE CLERK:  The one right in front of you.

11:39:14   Q. Detective, in front of you.  I think --

11:39:15   A. Oh, I'm sorry.  I apologize.

11:39:25         Another compact disk with the same initial -- my

11:39:27   initials and the same date.

11:39:29   Q. And I'm sorry, was that 573?

11:39:32   A. That's correct.

11:39:32   Q. How about 574?

11:39:34   A. Another compact disk with my initials and the same --

1 11:39:42   same date.

2 11:39:43   Q. 5 -- or 602?

3 11:39:46   A. Another compact disk with my initials, no date.

4 11:40:07   Q. 603?

5 11:40:08   A. 603.  Another compact disk with my initials, also no

6 11:40:16   date.

7 11:40:16   Q. 604?

8 11:40:17   A. Another compact disk with my initials, no date.

9 11:40:23   Q. 605?

10 11:40:25   A. Another compact disk with my initials, no date.

11 11:40:33   Q. And finally, 606?

12 11:40:35   A. A compact disk with my initials, no date.

13 11:40:41   Q. And have you reviewed transcripts associated with the

14 11:40:44   clips that are on each of those disks and confirmed the

15 11:40:48   speakers that are depicted in the transcripts?

16 11:40:50   A. Yes.

17 11:40:53        MR. BALDING:  Your Honor, I would move to admit 541,

18 11:40:56   542, 545, 548, 552, 555, 556, 563, 573, 574, 602, 603, 604

19 11:41:11   and 605.  And when I say "admit," I would say conditionally

20 11:41:14   admit the T exhibits associated with those, and as the Court

21 11:41:17   mentioned, we'll discuss the admission of the actual

22 11:41:19   recordings later.

23 11:41:20        THE COURT:  All right.  They will be tentatively

24 11:41:25   admitted.

25 08:31:31        (Exhibit Nos. 541, 542, 545, 548, 552, 555, 556,

1 11:41:26    563, 573, 574, 602, 603, 604, and 605 received.)

2 11:41:26         MR. BALDING:  I skipped 606.  The parties have

3 11:41:28    discussed, we don't actually have the CDs for 608 and 609,

4 11:41:33    but they are subsets of 606, which he reviewed, so I would

5 11:41:36    also request to conditionally admit 608-T and 609-T.

6 11:41:39         THE COURT:  They will be admitted under the same

7 11:41:41    limitations.

8 08:31:31         (Exhibit Nos. 608-T and 609-T received.)

9 11:41:42    Q. When you interviewed Defendant Corado-Ortiz, did he talk

10 11:41:46    about where he was from?

11 11:41:47    A. Yes.

12 11:41:48    Q. Did he talk about his affiliation, if any, with the MS-13

13 11:41:55    gang?

14 11:41:55    A. Yes, he did.

15 11:41:56    Q. What did he say?

16 11:41:57    A. He said that he joined MS-13 when he was 11 years old.

17 11:42:02    He became a shot caller for his clique when he was 13.  He --

18 11:42:08    or 14.  I'm sorry.  He became -- let me backtrack a little

19 11:42:13    bit.

20 11:42:14         He started affiliating with MS-13 when he was 11,

21 11:42:19    but he became a gang member -- or was jumped in at 13.  Then

22 11:42:25    he was promoted to shot caller and eventually by the time he

23 11:42:29    was 17 he was running a program.

24 11:42:33    Q. And is shot caller of a -- that would be shot caller of a

25 11:42:37    clique?

1 11:42:37    A. Yes.

2 11:42:38    Q. And shot caller of a program, is that a higher position?

3 11:42:40    A. It is.

4 11:42:41    Q. Did he say which clique he was a member of in

5 11:42:44    El Salvador?

6 11:42:45    A. The Los Angeles Locos, Salvatruchas.

7 11:42:51    Q. I'm going to play Exhibit 541 and show you next to it

8 11:43:01    Exhibit 541-T.  And before I start the names on the

9 11:43:10    transcript, Frettlohr, is that your voice when we see that

10 11:43:13    name?

11 11:43:13    A. Yes.

12 11:43:13    Q. And Corado-Ortiz, or Infernal, is that Defendant

13 11:43:21    Corado-Ortiz?

14 11:43:21    A. It is.

15 11:43:22            (Thereupon, the audio was played.)

16 11:44:16    Q. Are you familiar with any rival gangs of MS?

17 11:44:20    A. I am.

18 11:44:21    Q. What is in your understanding the primary rival?

19 11:44:25    A. The primary rival is 18th Street.

20 11:44:27    Q. Is that the case both here in Los Angeles and in

21 11:44:30    El Salvador?

22 11:44:30    A. It is.

23 11:44:43    Q. I paused it about the 58-second mark.  I'm playing it

24 11:44:46    again.

25 11:44:46            (Thereupon, the audio was played.)

11:45:30   1   Q. Do you see where he uses the term, "I got my strap" in

11:45:36   2   that recording?

11:45:43   3   A. Yes.

11:45:45   4   Q. Do you have an understanding of what a "strap" is?

11:45:47   5   A. Yes, a handgun.

11:46:00   6   Q. I'm showing you -- I'm playing Exhibit 542 and showing

11:46:06   7   you 542-T.

11:46:12   8        (Thereupon, the audio was played.)

11:47:24   9   Q. Did Defendant Corado-Ortiz talk about the benefits of

11:47:30   10  being a high-ranking member of MS-13 in El Salvador?

11:47:33   11  A. He did.

11:47:36   12  Q. Did you ever talk about his monikers?

11:47:41   13  A. I did.

11:47:41   14  Q. Do you recall any of those monikers?

11:47:44   15  A. Yes.  We spoke of four.

11:47:46   16  Q. What were they?

11:47:46   17  A. His first one was -- he said it -- an English word but

11:47:51   18  with a -- kind of like a Spanish translation of "fanton," and

11:47:55   19  he was describing him as phantom.  The next one was

11:48:01   20  "Spectro," like specter.  Then eventually when he was running

11:48:05   21  the program at 17, he was called Infernal.  And he also

11:48:13   22  discussed Infierno as a -- with his affiliation with Fultons.

11:48:24   23        MR. BALDING:  Ms. English, do you want me to

11:48:26   24  continue?  Okay.  We can take a break now.

11:48:30   25        THE CLERK:  Okay.  We are going to take our lunch

1 11:48:33    break and be back by 1:15.

2 11:48:38              (Thereupon, the jury retired from the courtroom.)

3 11:48:38              (Thereupon, there was a lunch recess.)

4 13:29:31              THE CLERK:  All right.  I think we are back in

5 13:29:32    session.

6 13:29:36              Government?

7 13:29:36              MR. LARSEN:  Good afternoon.  We are outside the

8 13:29:39    presence of the jury.  The Government calls William Ruano.

9 13:30:10              THE CLERK:  Stop.  Face me.  Come right here.  Raise

10 13:30:16    your right hand.

11 13:30:16    THEREUPON:

12 13:30:16                   WILLIAM ALBERTO RUANO-GRANADOS,

13 13:30:16    Called in these proceedings, and after having been first duly

14 13:30:31    sworn, testifies as follows:

15 13:30:31              THE CLERK:  Thank you.  Please be seated.

16 13:30:40              Did you guys put this here?  Oh, okay.  I'm sorry.

17 13:30:51              Please state your first and last name, spell it, and

18 13:30:54    speak slowly for the record.

19 13:31:00              THE WITNESS:  William Alberto Ruano-Granados.

20 13:31:38              THE INTERPRETER:  May the interpreter spell?

21 13:31:39              THE CLERK:  Yes, please.

22 13:31:40              THE INTERPRETER:  William, W-i-l-l-i-a-m; Ruano,

23 13:31:46    R-u-a-n-o; Granados, G-r-a-n-a-d-o-s.

24 13:31:52              THE COURT:  Are you his attorney?

25 13:31:55              MS. TULEKYAN:  Yes, Your Honor.

13:31:56          THE COURT:  Would you please state your name for the

13:31:58   record.

13:31:58          MS. TULEKYAN:  Agavni Tulekyan; A-g-a-v-n-i, last

13:32:02   name T-u-l-e-k-y-a-n.

13:32:10          THE COURT:  Common spelling.  All right.  Thank you.

13:32:10                          DIRECT EXAMINATION

13:32:17   BY MR. LARSEN:

13:32:17    Q. Good afternoon, Mr. Ruano.

13:32:18    A. Good afternoon.

13:32:18    Q. Were you a member of a criminal street gang known as

13:32:23   MS-13?

13:32:23    A. I'm going to invoke the Fifth, to remain silent.

13:32:41    Q. Did you participate in the murder of Bradley Hanaway?

13:32:44    A. No --

13:32:50          MS. TULEKYAN:  I'm sorry, Your Honor, Mr. Ruano is

13:32:52   going to invoke the Fifth Amendment right to remain silent as

13:32:57   to each question.

13:32:58          THE COURT:  I figured that, but it doesn't do any

13:33:00   good if we don't ask the question.

13:33:03    Q. Let me try that again.  Did you participate in the murder

13:33:06   of Bradley Hanaway?

13:33:07    A. I invoke the Fifth.

13:33:21    Q. Did you participate in the murder of Osvaldo Hernandez?

13:33:25    A. I invoke the Fifth.

13:33:30    Q. Have you committed other crimes you have not been charged

1 13:33:32    with?

2 13:33:32     A. I invoke the Fifth.

3 13:33:36     Q. Do you intend to plead the Fifth in response to every

4 13:33:40    question I ask you?

5 13:33:40     A. Yes.

6 13:33:46          MR. LARSEN:  At this time, Your Honor, the

7 13:33:47    Government would ask to find Mr. Ruano unavailable.

8 13:33:50          MR. LECHMAN:  Your Honor, just for the record -- Ben

9 13:33:52    Lechman on behalf of Mr. Chavez-Larin -- we just want to

10 13:33:54    preserve our objection.  I know the Court has already ruled

11 13:33:56    on this issue, but I just wanted to make sure the Court noted

12 13:33:59    our objection.

13 13:34:00          THE COURT:  All right, sir.  Can I assume that you

14 13:34:05    are invoking your rights under the Fifth Amendment on the

15 13:34:08    advice of your attorney?

16 13:34:09          THE WITNESS:  Yes.

17 13:34:17          THE COURT:  And that is what you intend to do with

18 13:34:18    respect to each and every question, regardless of what the

19 13:34:22    question pertains to; is that correct?

20 13:34:24          THE WITNESS:  Yes.

21 13:34:27          THE COURT:  Okay.  The Court finds that this witness

22 13:34:29    is unavailable.

23 13:34:31          All right.  You may step down, sir.  You are

24 13:34:35    excused.

25 13:34:47          Your next real witness?

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 13:34:52                MS. VARGAS:  Thank you, Your Honor.  The United

2 13:34:53    States calls CW-X.

3 13:34:58                MR. LECHMAN:  I feel like we are missing an

4 13:34:59    important component right now.

5 13:35:01                THE CLERK:  He went to get them.

6 13:35:04                MS. VARGAS:  Details.

7 13:35:07                MR. BALDING:  Just for the record, this is -- the

8 13:35:07    last witness was out of order, and we intend to continue to

9 13:35:10    finish direct later with Detective Frettlohr.

10 13:35:12               THE COURT:  Okay.

11 13:35:12               MR. BALDING:  Thank you, Your Honor.

12 13:35:13               THE COURT:  Yeah, because I was worried about that.

13 13:37:46               (Thereupon, the jury returned to the courtroom.)

14 13:38:24               THE COURT:  All right.  Everyone is here who should

15 13:38:26    be.  Ms. Vargas, who is your next witness?

16 13:38:30               MS. VARGAS:  The United States calls CW-X.

17 13:38:34               THE COURT:  All right.

18 13:38:37               THE CLERK:  Raise your right hand to be sworn.

19 13:38:40    THEREUPON:

20 13:38:40                               CW-X,

21 13:38:40    Called in these proceedings, and after having been first duly

22 13:38:40    sworn, testifies as follows:

23 13:38:56               THE CLERK:  Please state your first and last name,

24 13:38:59    and spell it for the record.

25 13:39:03               THE INTERPRETER:  Interpreter spelling:  CW-X.

| | |
|---|---|
| 1 13:39:28 | THE CLERK:  Thank you. |
| 2 13:39:31 | THE COURT:  On the Government's witness list, which |
| 3 13:39:32 | one -- |
| 4 13:39:33 | THE CLERK:  I'll tell her. |
| 5 13:39:34 | THE COURT:  Good.  Thank you. |
| 6 13:39:37 | THE INTERPRETER:  Interpreter correction for the |
| 7 13:39:39 | name, Alexander is in one word.  Alexander. |
| 8 13:39:45 | THE COURT:  It's one word? |
| 9 13:39:46 | THE INTERPRETER:  Yes, Your Honor. |
| 10 13:39:47 | THE COURT:  That is unusual. |
| 11 13:39:49 | THE INTERPRETER:  Alexander. |
| 12 13:39:49 | DIRECT EXAMINATION |
| 13 13:39:54 | BY MS. VARGAS: |
| 14 13:39:54 | Q. Good afternoon, CW-X. |
| 15 13:39:56 | A. Good afternoon. |
| 16 13:39:58 | Q. Have you ever been a part of a criminal street gang |
| 17 13:40:05 | called MS-13? |
| 18 13:40:06 | A. Yes. |
| 19 13:40:10 | Q. What is the highest rank you ever achieved in that gang? |
| 20 13:40:21 | A. To be a homeboy. |
| 21 13:40:22 | Q. How did you get that rank? |
| 22 13:40:23 | A. By killing someone. |
| 23 13:40:26 | Q. Who did you kill? |
| 24 13:40:27 | A. A guy who was called Winnie the Pooh. |
| 25 13:40:34 | Q. Now, I want to ask you more about that murder, but I want |

13:40:38   to ask you first:  Did you do that on your own or on behalf

13:40:43   of MS-13?

13:40:43    A. In the name of the gang MS-13.

13:40:57    Q. Have you committed other crimes on behalf of the gang as

13:40:59   well?

13:40:59    A. Yes, three more.

13:41:05    Q. Three more murders or three more other crimes?

13:41:08    A. Three more murders.

13:41:14    Q. I'm going to ask you about that, too, but before I do, I

13:41:18   want to ask you very briefly about the period before you

13:41:21   joined the gang.

13:41:23         Were you born in the U.S.?

13:41:24    A. No.

13:41:34    Q. Where were you born?

13:41:36    A. I was born in El Salvador.

13:41:38    Q. Were you an adult or a child when you came?

13:41:41    A. I was a child when I came.

13:41:46    Q. Did you have permission from the U.S. Government to enter

13:41:50   the U.S. when you did?

13:41:51    A. No.

13:41:56    Q. When you first moved to the U.S., what part of town did

13:42:00   you live in?

13:42:01    A. To North Hollywood.

13:42:11    Q. That is here in the Valley in Los Angeles?

13:42:12    A. Yes.

13:42:15  1   Q. Do you know now whether that area is in any particular

13:42:19  2   gang's territory?

13:42:20  3   A. Yes.  It was, and it is, MS-13 territory.

13:42:32  4   Q. Any particular clique within MS-13?

13:42:39  5   A. Fulton Locos.

13:42:42  6   Q. Is that the clique that you ultimately joined?

13:42:45  7   A. Yes.

13:42:45  8   Q. How old were you when you first joined?

13:42:48  9   A. I started hanging out with them when I was 13.

13:42:56 10   Q. Did they give you a nickname?

13:42:58 11   A. Yes.

13:42:59 12   Q. What was it?

13:43:00 13   A. Silent.

13:43:03 14   Q. Was there a location within Fulton territory where Fulton

13:43:08 15   clique members would hang out a lot?

13:43:10 16   A. Yes.  It was a place that they called the wash.

13:43:20 17   Q. Now, the jury has heard that before, but could you just

13:43:23 18   briefly explain what that is?

13:43:24 19   A. It was like an area where there is a middle and you can

13:43:38 20   walk along the edges.

13:43:39 21   Q. Like near the LA River?

13:43:41 22   A. Yes, something like that.

13:43:44 23   Q. Now, thinking about the wash, and thinking about where

13:43:46 24   you first lived, how close or far were those places?

13:43:49 25   A. About two minutes away.

1  13:43:57    Q. Walking?

2  13:43:57    A. Yes.

3  13:43:58    Q. Looking at the people now in this courtroom, do you see

4  13:44:04    anyone here who was -- who was in the gang already when you

5  13:44:09    first joined?

6  13:44:10    A. Yes.

7  13:44:17    Q. Who?

8  13:44:18    A. Delito.

9  13:44:21    Q. Do you know that person's real name?

10 13:44:23    A. Walter Chavez.

11 13:44:28    Q. So you testified that you saw that person in the

12 13:44:30    courtroom.  Could you please point out where that person is

13 13:44:36    sitting and something that that person is wearing?

14 13:44:38    A. He's sitting next to the man who is talking, and he's

15 13:44:53    wearing a blue jacket.

16 13:44:55    Q. Does he have any particular hairstyle?

17 13:44:58    A. He's bald.

18 13:45:02         MS. VARGAS:  Identifying Defendant Chavez-Larin?

19 13:45:06         THE COURT:  That's right.

20 13:45:06    Q. At the time you met Defendant Chavez-Larin, did you know

21 13:45:09    that he was part of MS-13?

22 13:45:11    A. Yes, he already was.

23 13:45:17    Q. How do you know that?

24 13:45:18    A. Because he taught me a few things about how to hang out

25 13:45:29    with the clique.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 13:45:30    Q. What did he teach you?

2 13:45:31    A. Walking around always with a penknife, a knife on us, the

3 13:45:40    territories that you can walk in, how to graffiti the walls,

4 13:45:49    how to collect rent.

5 13:45:52    Q. I'm going to ask you about some of those things, but

6 13:45:56    first, you said that Defendant Chavez-Larin told you you

7 13:46:00    should be carrying a knife.  Is that what you said?

8 13:46:02    A. Correct.

9 13:46:06    Q. Did he say why?

10 13:46:07    A. Because the gang has a lot of enemies, and it's like war

11 13:46:15    out there.

12 13:46:16    Q. You testified that Defendant Chavez-Larin told you about

13 13:46:21    graffitiing, tagging the walls, right?

14 13:46:23    A. Yes.

15 13:46:29    Q. Did you do that?

16 13:46:30    A. Yes.

17 13:46:31    Q. Did you ever see him do it?

18 13:46:33    A. Yes.

19 13:46:34    Q. Do you know why the gang would do that?

20 13:46:37        Why did you do it, I guess?

21 13:46:39    A. To mark territory.

22 13:46:43    Q. You also testified about collecting rent.

23 13:46:49    A. Yes.

24 13:46:49    Q. Is that like payments from people around town?

25 13:46:53    A. Yes.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 13:46:55  Q. Who did you collect rent payments from?

2 13:46:59  A. They would send us -- they would send me to go collect

3 13:47:12  rent from people, like, from roach coaches.

4 13:47:15  Q. Who would send you?

5 13:47:16  A. Delito.

6 13:47:18  Q. What would you do with the money?

7 13:47:20  A. I would return it to him.

8 13:47:24  Q. For his own personal use, to your knowledge?

9 13:47:27  A. I don't know.  I would just give it to him.

10 13:47:34  Q. When you first started out, what was your role in the

11 13:47:37  gang, if it had a name?

12 13:47:42  A. I was just like a paro.

13 13:47:46  Q. Paro, you said?

14 13:47:48  A. Yes.

15 13:47:50       MS. VARGAS:  I want to now ask to publish what has

16 13:47:56  been conditionally admitted as Exhibit 104 and 104-T, please.

17 13:48:16       (Thereupon, the video was played.)

18 13:48:19  Q. Did you see a person in this video?

19 13:48:24  A. Yes.

20 13:48:25  Q. Who did you see?

21 13:48:27  A. Delito.

22 13:48:29  Q. Now, I want to focus your attention on the writing at the

23 13:48:36  sort of bottom of Exhibit 104.  And it's also translated,

24 13:48:45  just side by side, in Exhibit 104-T.

25 13:48:52       Have you read that?

13:48:54  A. Yes, I've read that.

13:48:56  Q. So in English -- I'll read the English.  "Declared wars?

13:49:01  No problem."

13:49:06        Is that what it says in Spanish, too?

13:49:09  A. Yes.

13:49:10  Q. Now, just a few moments ago, you testified that

13:49:14  Mr. Chavez-Larin told you to carry a knife because it was

13:49:17  like a war out there?

13:49:24  A. Yes.

13:49:24  Q. Have you heard him say something like that before?

13:49:27  A. Yes.

13:49:31  Q. Now, further on in this message, it says, "Let the dead

13:49:36  rain down, for they will be from your hood."

13:49:42        Do you know what he's referring to?

13:49:43  A. To all the enemies.

13:49:49  Q. It was a message to enemies of MS-13?

13:49:52  A. Yes.

13:49:53  Q. Now, at the time that you started with the gang and from

13:49:57  that point forward, did you have an understanding of who

13:49:59  MS-13's enemies were?

13:50:01  A. More or less.

13:50:08  Q. Who were they?

13:50:09  A. The main ones were the 18th Street, and many gangs around

13:50:21  the barrio.

13:50:23  Q. And "barrio" just means like your hood, your

13:50:26  neighborhood, right?

13:50:26   A. Yes.

13:50:29   Q. Does it refer specifically to like your gang's territory?

13:50:34   A. Yes, our gang.

13:50:39        MS. VARGAS:  Your Honor, move to admit Exhibit 104

13:50:42  and 104-T.

13:50:45        THE COURT:  Without objection.  They will be

13:50:49  admitted.

13:50:49        (Exhibit Nos. 104 and 104-T received.)

13:50:49   Q. So at the beginning of your testimony --

13:50:55        MS. VARGAS:  You can take it down.

13:50:56   Q. At the beginning of your testimony, you said that the

13:50:58  highest rank you achieved within MS-13 was homeboy, right?

13:51:02   A. Yes.

13:51:08   Q. And you also said that when you started out, you were a

13:51:11  paro?

13:51:11   A. Yes.

13:51:13   Q. Did anyone ever explain to you how to get from paro to

13:51:18  homeboy?

13:51:19   A. Yes.

13:51:23   Q. Who?

13:51:24   A. Delito, with another guy they called Big Foot.

13:51:33   Q. And what did Mr. Chavez-Larin say?

13:51:34   A. That to become a homeboy you have to kill someone.

13:51:43   Q. Did you want to be a homeboy?

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

13:51:49  1    A. Yes.  I wanted to be respected.

13:51:54  2    Q. So in your mind, you connected being a homeboy with being

13:51:57  3    respected?

13:51:58  4    A. Yes.

13:52:03  5    Q. When you were a paro, did you feel respect for the

13:52:06  6    homeboys who were already homeboys?

13:52:08  7    A. Yes.

13:52:10  8    Q. Did you show it?

13:52:12  9    A. Yes.

13:52:14  10   Q. How did you show it?

13:52:15  11   A. Whenever they would send me to get things, I would go.

13:52:22  12   Q. You did what you were asked?

13:52:24  13   A. I would do anything they would ask me to do.

13:52:30  14   Q. So you said that you wanted to become a homeboy to be

13:52:33  15   respected, right?

13:52:34  16   A. Yes.

13:52:36  17   Q. Did you want to kill?

13:52:38  18   A. I did not want to kill, but I did want to be a homeboy.

13:52:46  19   Q. And you testified that you did in fact kill, right?

13:52:50  20   A. Yes.

13:52:52  21   Q. And you did in fact become a homeboy, right?

13:52:56  22   A. Yes.

13:52:57  23   Q. Why did you do it?

13:52:59  24   A. For respect and out of honor to the barrio.

13:53:09  25   Q. Did you commit that murder alone?

1 13:53:12    A. No.

2 13:53:14    Q. Please turn to what's already been identified as

3 13:53:24    Exhibit 788, please, in your binder.  It's going to be in one

4 13:53:27    of the binders in front of you.  I think it might be one of

5 13:53:33    the binders on the floor.

6 13:53:37        MS. VARGAS:  Just to your right, Julie.

7 13:53:40        THE INTERPRETER:  Yes.  It's out here.

8 13:53:46        Did you say 788?

9 13:53:48        MS. VARGAS:  I did.

10 13:54:25    Q. Is that in front of you now?

11 13:54:27    A. Yes.

12 13:54:28    Q. Do you see that it's two pages?

13 13:54:30    A. Yes.

14 13:54:34    Q. Do you recognize that document?

15 13:54:35    A. Yes.  I had seen this already.

16 13:54:42        MS. VARGAS:  Your Honor, at this time I move to

17 13:54:43    admit and publish Exhibit 788.

18 13:54:46        THE COURT:  Done.

19 13:54:47        (Exhibit No. 788 received.)

20 13:54:48    Q. I would like you now just to look at page 1.

21 13:54:51        MS. VARGAS:  I'll ask to publish it as well.

22 13:54:55    Q. You've testified that your first murder involved a victim

23 13:54:59    named Winnie Pooh, right?

24 13:55:05    A. Yes.

25 13:55:06    Q. Looking at the first page of Exhibit 788, do you

1 13:55:13  recognize the person in this photograph?

2 13:55:14  A. More or less.  I only saw him one time.

3 13:55:25  Q. What was that one time?

4 13:55:26  A. Well, when we took him to the mountains.

5 13:55:34  Q. Did you kill him?

6 13:55:35  A. No.

7 13:55:38  Q. Did you kill Winnie Pooh?

8 13:55:40  A. I participated, but they killed him that day.

9 13:55:51  Q. You killed him in a group?

10 13:55:53  A. Yes.

11 13:55:55  Q. I'm going to ask you more about that.  Before I do, will

12 13:55:58  you please flip to the second page of Exhibit 788.

13 13:56:11          Looking at the person in the top left corner, do you

14 13:56:14  know who that person is?

15 13:56:15  A. Yes.

16 13:56:19  Q. What's his name?

17 13:56:21  A. They used to call him Penny or Caprichoso.

18 13:56:26  Q. Do you know what clique he's from?

19 13:56:28  A. Yes.  He's from the Fulton clique.

20 13:56:32  Q. Your clique?

21 13:56:33  A. Yes.

22 13:56:34  Q. Did he participate in Winnie Pooh's murder?

23 13:56:38  A. He drove.

24 13:56:42  Q. So he was there?

25 13:56:43  A. Yes.

1 13:56:44   Q. And he knew it was going to happen?

2 13:56:46   A. Yes.

3 13:56:47   Q. I want to ask you about the second row, second picture to

4 13:56:54   the left.  Do you know who that person is?

5 13:56:59   A. Yes.

6 13:57:01   Q. Who?

7 13:57:01   A. Delito.

8 13:57:03   Q. Same person sitting in this courtroom?

9 13:57:06   A. Yes.

10 13:57:08   Q. What about the person on the second row all the way to

11 13:57:12   the right?

12 13:57:13   A. Yes.

13 13:57:16   Q. Who is that?

14 13:57:16   A. It's me.

15 13:57:19   Q. Look at the other photos in this flyer.

16 13:57:25          Were these people with you at the murder of Winnie

17 13:57:28   Pooh?

18 13:57:28   A. That's right.

19 13:57:32   Q. Were there any more people as well?

20 13:57:34   A. Yes, there were more people.

21 13:57:39   Q. How about people from Fulton, are there people from your

22 13:57:42   clique, Fulton, who are not on this poster?

23 13:57:45   A. Yes, they are not in the pictures.

24 13:57:51   Q. Can you think of someone who isn't pictured who was

25 13:57:54   there?

13:57:54 A. There is a guy that was called Carabina and another one

13:58:07 they called Swagger.

13:58:08 Q. Okay.  So Carabina and Swagger, both from Fulton?

13:58:13 A. Yes.

13:58:13 Q. And neither of whom are on this picture?

13:58:17 A. That's right.

13:58:18 Q. Were there others as well?

13:58:19 A. As best I remember, yes.

13:58:25 Q. Okay.

13:58:26       MS. VARGAS:  I'm going to now ask for the poster

13:58:28 board.

13:58:43 Q. I'm going to now go through this demonstrative here.

13:58:46       You testified that Defendant Chavez-Larin was there,

13:58:50 right?

13:58:53 A. Yes.

13:58:54 Q. How about the person who is right here?  Can you see him

13:58:58 well?

13:59:00 A. Yes.

13:59:01 Q. Do you know him as Jose Castillo?

13:59:06 A. I knew him as Diabolico.

13:59:08 Q. And you've already identified this person, Fernando

13:59:13 Garcia-Parada?

13:59:15 A. Yes.

13:59:15 Q. How about this person, Jefferson Guevara?

13:59:20 A. I don't know him.

1  13:59:21    Q. Have you seen him before?

2  13:59:25    A. No.

3  13:59:25    Q. How about her?

4  13:59:26    A. Yes, I remember having seen her.

5  13:59:30    Q. Was she there?

6  13:59:31    A. Yes.

7  13:59:31    Q. Same question (indicating).

8  13:59:35    A. I know him.

9  13:59:36    Q. He was there?

10  13:59:37    A. Yes, he was there.

11  13:59:39    Q. How about this person?

12  13:59:41    A. I don't remember.

13  13:59:43    Q. How about this one?

14  13:59:45    A. That is Carabina, right?

15  13:59:49    Q. My question to you.

16  13:59:51    A. Yes.

17  13:59:52    Q. How about him?

18  13:59:54    A. Yes.

19  13:59:57    Q. He was there, too?

20  13:59:57    A. Yes.

21  13:59:59    Q. Him?

22  14:00:02    A. Yes.

23  14:00:03    Q. Who is it?

24  14:00:03    A. It's me.

25  14:00:05    Q. How about him?

114:00:07    A. Also.

214:00:09    Q. Okay.

314:00:11         MS. VARGAS:  You can take it down.

414:00:19    Q. Now, I want to ask you about --

514:00:22         MS. VARGAS:  Oh, sorry, put that back up.  Sorry.

614:00:33    Q. I want to ask you about this person.  Do you see that

714:00:37    person's face?  It's pretty far.

814:00:40    A. I can see it.

914:00:42    Q. Okay.  Do you know his name or what they call him?

1014:00:46    A. Yes.  They call him Pollo.

1114:00:51    Q. Have you -- so before the night of Winnie Pooh's murder,

1214:01:04    had you met Pollo before?

1314:01:06    A. No, that was the first time.

1414:01:13    Q. So you didn't know him very well?

1514:01:16    A. No.  Hardly.

1614:01:20    Q. What about the other Fulton members?

1714:01:31    A. I had already met some.

1814:01:34    Q. So did you -- had you met them or do you know them?

1914:01:39    A. I knew them.

2014:01:44    Q. Thinking about this person right here in this picture,

2114:01:48    you identified him as Carabina?

2214:01:51    A. Yes.

2314:01:51    Q. Have you ever heard him called Chino?

2414:01:56    A. Yes, they used to call him Chino.

2514:01:59    Q. Now, within this group, the people -- among the people

1 14:02:03  who killed Elvin Hernandez, is he the only Chino from Fulton?

2 14:02:15   A. They used to call him Chino, but there is also another

3 14:02:17  Chino.

4 14:02:18   Q. Was the other Chino at Elvin Hernandez's murder?

5 14:02:22   A. No.

6 14:02:23   Q. All right.  So the only Chino from Fulton who was also at

7 14:02:28  the Elvin Hernandez murder is Carabina?

8 14:02:31   A. Yes.

9 14:02:37   Q. We talked about Pollo.  Did you know what his rank was

10 14:02:46  before this murder took place?

11 14:02:47   A. No.

12 14:02:55   Q. You said you didn't know him well, right?

13 14:02:58   A. Yes.

14 14:02:59   Q. Let's go back to the day of Winnie Pooh's murder.

15 14:03:09        Remember how it all started?

16 14:03:10   A. Yes.

17 14:03:11   Q. How did it start?

18 14:03:13   A. We were hanging out in the Valley.  We had a stolen van.

19 14:03:26  It seems like Delito received a phone call.  He got happy and

20 14:03:34  he said we were going to go hang out with the Francis.

21 14:03:38   Q. You said that we were hanging out together.  Who is "we"?

22 14:03:41   A. Me, Delito, Caprichoso, Carabina, and Swagger.

23 14:03:52   Q. Was there anyone on this poster board here?  You

24 14:03:57  testified Swagger was with you?

25 14:04:02   A. Yes.

14:04:03  Q. And Carabina, the same person as Chino from Fulton?

14:04:08  A. Yes.

14:04:09  Q. And Mr. Chavez-Larin was there, too?

14:04:12  A. Also.

14:04:14  Q. Okay.  And you testified that Mr. Chavez got a phone

14:04:18  call.  Did you hear that phone call?

14:04:19  A. I did not hear the call, but it made him happy.

14:04:27  Q. What happened after the phone call?

14:04:29  A. Well, we drove to where the Francis were.

14:04:35  Q. And then what happened?

14:04:36  A. We arrived at a destroyer.

14:04:42  Q. The jury knows this, but can you remind them what a

14:04:45  destroyer is?

14:04:46  A. Yes.  It's an abandoned house.

14:04:50  Q. So you drive to the destroyer in the Francis clique and

14:04:55  what happens?

14:04:55  A. We were hanging out at the destroyer.  I remember having

14:05:07  seen that Winnie Pooh came in.  And then I saw suddenly that

14:05:17  Delito slapped him on the face, and with one of the slaps, it

14:05:22  landed him right down to the ground.

14:05:25       And then I saw Caprichoso got on top of him and

14:05:32  started slapping him.  And when I saw that, I was surprised.

14:05:47  And then afterwards, Delito, with the other people from the

14:05:49  Francis clique, started talking.

14:05:52  Q. Let me stop you with a question.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

14:05:54          Among the people, the Fultons, at this destroyer,

14:05:58  who is the highest-ranking Fulton there?

14:06:00   A. It was Delito.

14:06:08   Q. All right.  So you testified Delito had a conversation

14:06:10  with people from Francis?

14:06:12   A. Yes.

14:06:15   Q. Were you part of that conversation?

14:06:17   A. I was there.

14:06:20   Q. Could you hear it?

14:06:21   A. No.

14:06:23   Q. Okay.  So what happened after you saw this conversation

14:06:26  happening?

14:06:26   A. Delito gathered us all up and said we were going up to

14:06:38  the mountains.

14:06:39   Q. When you say he "gathered us all up," who was he

14:06:42  gathering?

14:06:43   A. Our clique, Fulton.

14:06:47   Q. So he told you you were going to the mountains.  Did he

14:06:50  say why?

14:06:50   A. Not at that moment, but when we were driving, he told us.

14:06:58   Q. Okay.  So he gathered you to go drive.  Do you remember

14:07:02  what car you drove?

14:07:03   A. Yes.  It was a stolen van.

14:07:11   Q. How do you know it was a stolen van?

14:07:13   A. Well, at times the barrio had stolen cars.

14:07:20  Q. Did they use them in crimes?

14:07:23  A. Yes, at times.

14:07:27  Q. So is it fair to say that all the Fultons got into the

14:07:31  van?

14:07:31  A. Yes.

14:07:35  Q. Anyone who is not in the Fulton clique get in the van?

14:07:39  A. No, it was just the Fulton cliques.

14:07:47  Q. Now, you have testified that you were aware that people

14:07:49  from the Francis clique were at this destroyer, right?

14:07:58  A. Yes.

14:07:59  Q. Do you know if there were members of any other cliques at

14:08:04  the destroyer as well?

14:08:05  A. Yes, there were cliques from Francis and Parkview.

14:08:13  Q. So Francis, Parkview, and Fulton; is that right?

14:08:17  A. Yes.

14:08:19  Q. Are those all MS-13 cliques?

14:08:21  A. Yes.

14:08:24  Q. Friendly with each other?

14:08:26  A. Yes, they are friendly.

14:08:30  Q. Okay.  So you and the other Fultons are in the van.  Then

14:08:35  what happens?

14:08:35  A. We were driving, and I saw another car was following us.

14:08:51  And that was when Delito told us that we were going to go

14:08:54  kill Winnie the Pooh.

14:08:55  Q. Did he tell you why?

14:08:56   1   A. Yes.

14:08:58   2   Q. Why?

14:08:59   3   A. Because he was infiltrated with the 18th -- from the

14:09:07   4   18th.

14:09:07   5   Q. So you thought he was an enemy?

14:09:09   6   A. Yes.

14:09:10   7   Q. So to be clear, you weren't part of those conversations

14:09:13   8   Delito had with other members in that little huddle, right?

14:09:17   9   A. No.

14:09:23  10   Q. And so the first time you were hearing about Winnie

14:09:26  11   Pooh's impending murder was in that van?

14:09:29  12   A. Yes, in the van.

14:09:35  13   Q. When you are in the van, you said that there was a car

14:09:40  14   following you, right?

14:09:41  15   A. Yes.

14:09:44  16   Q. Did you recognize the -- anyone in that car?

14:09:48  17   A. Yes.  I saw a woman got in, there was Winnie Pooh, there

14:10:02  18   was Pollo, and other members of Francis.

14:10:07  19   Q. So you guys were driving together up to the mountain?

14:10:09  20   A. That's right.

14:10:12  21   Q. With the Fulton van leading?

14:10:14  22   A. Yes.

14:10:17  23   Q. Do you remember who was driving?

14:10:19  24   A. Yes.  It was Carabina.

14:10:24  25   Q. The first one?

14:10:25    A. Yes.

14:10:26    Q. Did he seem like he knew where he was going already?

14:10:33    A. It seemed so, yes.

14:10:38    Q. Remember who was sitting next to Chino in the front
14:10:48  passenger seat?

14:10:49    A. Caprichoso.

14:10:54    Q. Did you guys go straight to the mountains or stop
14:10:57  anywhere on the way?

14:10:58    A. We stopped on the way.

14:11:03    Q. Where?

14:11:03    A. We stopped at a 7-Eleven.

14:11:08    Q. Did you get out?

14:11:10    A. Some got out.  I did not.

14:11:15    Q. Do you know why they stopped?

14:11:16    A. Well, I asked Delito why were they getting out.  And he
14:11:28  told me they were going to buy alcohol.

14:11:29    Q. Did you know why they were buying alcohol?

14:11:32    A. No, but I asked him.

14:11:37    Q. What did he say?

14:11:38    A. So there would be no fingerprints on the body.

14:11:45    Q. What happened next?

14:11:48    A. We left, and we drove to the mountains.

14:11:54    Q. Did your car eventually stop?

14:11:57    A. Yes, the car stopped.

14:12:00    Q. What happened when the car stopped?

1  14:12:02    A. Well, when we stopped the car, I saw -- well, we all got

2  14:12:18    out, and I also saw the other car also got out, but their

3  14:12:21    faces were all covered.

4  14:12:23    Q. Did you cover your face?

5  14:12:24    A. No.

6  14:12:26    Q. Did any member of the Fulton clique cover their face?

7  14:12:30    A. No.

8  14:12:32    Q. But members of the other clique or cliques did?

9  14:12:35    A. Yes.

10  14:12:38    Q. Did you see what they covered their faces with?

11  14:12:41    A. With shirts.

12  14:12:45    Q. Okay.  What happened after you saw that the other cliques

13  14:12:49    had covered their faces?

14  14:12:50    A. We walked for about 30 seconds to a minute.  I remember

15  14:13:07    having heard they told Winnie Pooh to get down on his knees.

16  14:13:14    And they said, "Not like that.  Go all the way down."  Then I

17  14:13:26    saw a member from the other clique started stabbing his back

18  14:13:28    with a knife.

19  14:13:29    Q. Stabbing Winnie Pooh's back?

20  14:13:31    A. Yes.

21  14:13:33    Q. Did Winnie Pooh do anything?

22  14:13:36    A. No, he was just screaming.

23  14:13:40    Q. What did you do?

24  14:13:41    A. Nothing.  I was just watching.

25  14:13:46    Q. What happened next?

1  14:13:46   A. They passed the knife along to all the other Mara

2  14:14:04   members.  At one time, they handed it over to Delito, and

3  14:14:07   Delito stabbed him.  And then I saw he gave it to me.  And he

4  14:14:15   told me, "It's your turn."  So I went and I stabbed him as

5  14:14:20   well.  And then I returned it back to him, and he gave it to

6  14:14:31   Swagger.

7  14:14:41            MS. VARGAS:  Should I continue, Your Honor?

8  14:14:44            THE COURT:  How are you feeling?  If you want to

9  14:14:49   head for the bunker...

10  14:14:52            MS. VARGAS:  Okay.

11  14:14:53            THE COURT:  Seriously.  In fact, anybody feeling a

12  14:14:57   little uncomfortable, let me know.  All right.  Woke me up,

13  14:15:03   though.

14  14:15:05            MS. VARGAS:  It's just the beginning, Your Honor.

15  14:15:09   Okay.  I'll just continue until told not to.

16  14:15:14   Q. You had just testified that you stabbed Winnie Pooh

17  14:15:18   before returning the knife to Defendant Chavez, right?

18  14:15:21   A. Correct.

19  14:15:27   Q. Where did you stab him?

20  14:15:32   A. I stabbed him on the neck and the back.

21  14:15:41   Q. Was he still screaming?

22  14:15:42   A. No.

23  14:15:46   Q. You also testified that you saw Defendant Chavez stabbing

24  14:15:49   Winnie Pooh; is that right?

25  14:15:50   A. Correct.

1 14:15:55    Q. Did you see where he stabbed Winnie Pooh?

2 14:15:58    A. Also on the back, the feet, and the neck.

3 14:16:07    Q. Was Winnie Pooh screaming when Defendant Chavez stabbed

4 14:16:11    him?

5 14:16:11    A. No.

6 14:16:18    Q. The stabbing eventually stop?

7 14:16:21    A. Yes.

8 14:16:23    Q. Did you see what happened to Winnie Pooh's body?

9 14:16:27    A. Yes.  I saw that they -- they threw the alcohol that they

10 14:16:36    had bought on him.  And then I saw four members grabbed him

11 14:16:46    and they sort of swung him down into the cliff.

12 14:16:50    Q. You said you saw four people swing him toward the cliff,

13 14:16:54    right?

14 14:16:54    A. Yes.

15 14:16:59    Q. Do you know who any of those four people were?

16 14:17:02    A. No, just one.

17 14:17:09    Q. Who was that person?

18 14:17:10    A. It was Swagger.

19 14:17:16    Q. That is this person here, CW-U?

20 14:17:21    A. Yes.

21 14:17:25    Q. Did you see anyone try and clean up the crime scene at

22 14:17:28    all?

23 14:17:28    A. No.

24 14:17:34    Q. What happened next?

25 14:17:35    A. We all left.  We walked back to the car.  When we got

14:17:49    into the van, Delito said -- asked me how I felt.  And I -- I

14:17:58    told him I felt kind of maniacal.  And he told me, "That's

14:18:05    nothing.  That's just the beginning."

14:18:08    Q. What did you understand him to mean when he said, "That's

14:18:10    just the beginning"?

14:18:11    A. Because I hadn't killed, because I had to do my own

14:18:25    death.

14:18:25    Q. Meaning you weren't the only one who stabbed Winnie Pooh?

14:18:31    A. Yes.

14:18:32    Q. He was asking you to find your own death, your own murder

14:18:35    victim?

14:18:39    A. That's right.

14:18:41    Q. Is it right that this is your first homicide, Winnie

14:18:44    Pooh's murder?

14:18:45    A. Yes.

14:18:51    Q. What, if anything, did that mean for you in terms of your

14:18:55    rank in the gang?

14:18:56    A. Well, I thought I would make it up to homeboy.

14:19:07    Q. And you testified that you did?

14:19:09    A. Yes.

14:19:10    Q. Now, when you were sort of just starting up in the gang,

14:19:15    you testified that you wanted to become a homeboy, right?

14:19:17    A. Yes.

14:19:22    Q. After doing the Winnie Pooh murder, did you still want to

14:19:27    do that?

1 14:19:27   A. No.

2 14:19:32   Q. But you did become a homeboy; isn't that right?

3 14:19:35   A. Yes, I did make homeboy.

4 14:19:40   Q. Did you get jumped in?

5 14:19:41   A. Yes, I was jumped in.

6 14:19:44   Q. Anyone force you to do that?

7 14:19:46   A. No.

8 14:19:49   Q. You wanted to?

9 14:19:51   A. Yes.

10 14:19:52   Q. Who jumped you in?

11 14:19:54   A. A guy they call Little Blackie, Delito, Caprichoso, and a

12 14:20:09   guy I think was Conejo.

13 14:20:11   Q. Do you remember about when you got jumped in?

14 14:20:15   A. Toward the end of 2017.

15 14:20:23   Q. You testified that when you first started in the gang,

16 14:20:26   they called you Silent, right?

17 14:20:27   A. Yes.

18 14:20:31   Q. After you got jumped in as a homeboy, did you get a name

19 14:20:36   change?

20 14:20:36   A. Yes.

21 14:20:40   Q. Did you get to pick your name?

22 14:20:42   A. Yes.  There was a list that you could choose the name

23 14:20:51   that you wanted to use.

24 14:20:52   Q. Anyone show you that list?

25 14:20:54   A. Yes.

14:20:56  Q. Who?

14:20:56  A. It was Delito.

14:20:59  Q. What name did you pick from that list?

14:21:02  A. Oh, I picked to be called Morro.

14:21:08  Q. What does that mean?

14:21:09  A. Like a young kid.

14:21:17  Q. Now, did you end up keeping the nickname Morro?

14:21:25  A. No.

14:21:25  Q. Why not?

14:21:27  A. Because that name was already used in El Salvador.

14:21:36  Q. And you can't have the same name as someone in

14:21:38  El Salvador?

14:21:39  A. No.

14:21:42  Q. To be clear, it's used by someone else in MS-13 in

14:21:45  El Salvador, right?

14:21:46  A. Yes.

14:21:50  Q. Who told you that it was taken?

14:21:52  A. Delito.

14:21:55  Q. Did you get a new name?

14:21:58  A. Yes, I was given a new name.

14:22:02  Q. What was that new name?

14:22:03  A. Well, the only one that was left, and the one I had to

14:22:11  take was Maniatico.

14:22:13  Q. Maniatico?

14:22:15  A. Yes.

1 14:22:19    Q. Separate from this case, you have been arrested before,

2 14:22:25    right?

3 14:22:26    A. Yes.

4 14:22:28    Q. Thinking about your first-ever arrest, do you remember

5 14:22:31    what led to that arrest?

6 14:22:32    A. Yes, I was in -- I went to juvie, juvenile.

7 14:22:44    Q. Remember -- like, were you in school still?

8 14:22:46    A. Yes, I was going to school.

9 14:22:49    Q. Briefly, what happened?

10 14:22:51    A. Well, there was a guy at school that was looking for

11 14:23:08    trouble with me, and he came over to the wash one time, and I

12 14:23:11    ran him off, and he went to school saying that I tried to

13 14:23:14    kill him. And I -- when I went to school, I got arrested,

14 14:23:28    but I told them I hadn't tried to kill him. When he was

15 14:23:32    running away, he had fallen down and gotten himself scraped

16 14:23:35    up on the rocks.

17 14:23:36    Q. So you didn't actually try to kill him?

18 14:23:38    A. No.

19 14:23:39    Q. But you did get sort of punished for that anyway?

20 14:23:43    A. Yes.  I went to juvie.

21 14:23:48    Q. Are you familiar with something -- an incident that took

22 14:23:53    place at a restaurant called Little San Salvador?

23 14:23:57    A. Yes, I do remember.

24 14:24:02    Q. Like, 2015?

25 14:24:04    A. Yes.

1 14:24:06   Q. What happened?

2 14:24:12   A. We were just hanging out at that restaurant, but they

3 14:24:18   wouldn't let us in because we were very young.  And the big

4 14:24:25   homeboys, the older ones were inside, and they came out with

5 14:24:36   a guy that they wanted to beat up, so we beat him up when he

6 14:24:40   was outside.  And I remember that the guy that we were

7 14:24:49   beating up grabbed me by the neck.

8 14:24:52   Q. I'm going to interrupt you.

9 14:24:53          And then what happened?

10 14:24:57  A. And he was pulling on me.  And I remember that a homeboy

11 14:25:05  came up and hit him with a bottle in the face.  And when that

12 14:25:15  happened, I took off running and another homeboy came up and

13 14:25:18  shot him a couple of times, and we all just left.

14 14:25:24  Q. Who shot whom a couple of times?

15 14:25:25  A. A homeboy they called Little Boy.

16 14:25:34  Q. Did you have a gun that day?

17 14:25:37          THE INTERPRETER:  I'm sorry?

18 14:25:38  Q. Did you have a gun that day?

19 14:25:41  A. No, not that day.

20 14:25:42  Q. Did you fire a gun that day?

21 14:25:43  A. No.

22 14:25:45  Q. Did you know before this all happened that there was

23 14:25:49  going to be a shooting that day?

24 14:25:50  A. No.

25 14:25:55  Q. And to be clear, you did throw punches in this fight,

1  14:25:58  right?

2  14:25:59  A. Yes, I did throw.

3  14:26:06  Q. And you were part of the gang at this point, right?

4  14:26:09  A. Yes, I was hanging out.

5  14:26:14  Q. Have you ever been shot before?

6  14:26:18  A. Yes, I have been shot.

7  14:26:22  Q. What happened?

8  14:26:22  A. I was walking around the clique collecting rent, and I

9  14:26:36  heard a car honking, and I threw the barrio sign, and they

10 14:26:48  threw it back, and then they came back to where I was at, so

11 14:26:53  I thought they were homeboys from another clique.  And when

12 14:27:02  they came up close, they brought out a gun, and they started

13 14:27:05  to shoot at me.  But just that one time.

14 14:27:11  Q. Where did you get shot?

15 14:27:13  A. In my right leg.

16 14:27:16  Q. You are okay now?

17 14:27:21  A. Yes.

18 14:27:22  Q. Thinking about other crimes you've committed with MS-13,

19 14:27:28  separate from any murder that happened, have you committed

20 14:27:30  any other crimes on behalf of the gang?

21 14:27:32  A. Yes.

22 14:27:44  Q. What?

23 14:27:45  A. Robberies.

24 14:27:51  Q. Tell us about them.

25 14:27:53  A. Well, one time I went in with a guy they called Kevin and

14:28:10  1   another guy they called "Boart", and we went in to steal

14:28:13  2   purses from -- from a site.  And we went in and I barely got

14:28:22  3   any of those things, but we did leave.

14:28:25  4             MS. VARGAS:  Now, just to clarify, were they --

14:28:28  5   because of a translation issue.  Are they purses or bags?

14:28:34  6   I'm just trying to ask the actual Spanish word the witness is

14:28:37  7   using.

14:28:38  8             THE INTERPRETER:  The word is carteras,

14:28:41  9   c-a-r-t-e-r-a-s.

14:28:45 10             MS. VARGAS:  May the interpreter inquire?

14:28:51 11    A. Bags.  Big bags.

14:28:55 12    Q. Was there anything of value inside the bags?

14:28:58 13    A. Nothing.  They were just new.

14:29:02 14    Q. But to be clear, you broke and entered into a place that

14:29:05 15   you were not allowed to go?

14:29:07 16    A. That's right.

14:29:15 17    Q. And in your head, you wanted to steal something, right?

14:29:18 18    A. Yes.

14:29:20 19    Q. You said that you did this with some other people.  One

14:29:25 20   person was called Kevin, right?

14:29:30 21    A. Yes.

14:29:31 22    Q. Do you know what that person goes by?

14:29:33 23    A. They call him Mentiroso.

14:29:39 24    Q. Is he in the Fulton clique?

14:29:41 25    A. Yes.

1  14:29:41    Q. Did you make any money off of that robbery?

2  14:29:46    A. Yes, we made a little.

3  14:29:51    Q. Like, what is a little?

4  14:29:53    A. About $500.

5  14:29:56    Q. What about other robberies you have done?

6  14:30:01    A. I did do one other robbery.  We went into a house --

7  14:30:19    Kevin and I went into the house, and we tied up a woman.

8  14:30:21    Q. Is this the same Kevin, Mentiroso?

9  14:30:24    A. Yes.

10 14:30:24    Q. Okay.  So you tied up a person?

11 14:30:28    A. Yes.

12 14:30:29    Q. Then what happened?

13 14:30:30    A. We went in.  We left her tied up there.  We went further

14 14:30:43    in, and we grabbed cash money, we grabbed jewelry, and a

15 14:30:54    bottle that was there.

16 14:30:56    Q. Like, a bottle of alcohol?

17 14:30:57    A. Yes.

18 14:30:59    Q. Drinking alcohol?

19 14:31:00    A. Yes.

20 14:31:01    Q. You just testified that you tied somebody up, right?

21 14:31:06    A. Yes.

22 14:31:09    Q. Is she the person who lived in that house?

23 14:31:13    A. She was like the servant.

24 14:31:16    Q. Like, a housekeeper?

25 14:31:19    A. Yes.

114:31:19  Q. Where did you tie her up.  Like, how did you tie her up?

214:31:22  A. When we came in, and we just told her to put her hands

314:31:36  together, so she put them together, and we tied her up.

414:31:38  Q. Did she seem scared?

514:31:42  A. Yeah, she was scared.

614:31:46  Q. Were you guys armed?

714:31:47  A. No.

814:31:49  Q. With a gun or a knife or any kind of weapon?

914:31:51  A. No, we didn't have a gun or -- or a knife.

1014:31:59  Q. Do you know how much cash you took?

1114:32:02  A. About $20,000.

1214:32:08  Q. Did you count every bill?

1314:32:09  A. Yes.  Afterwards, yes.

1414:32:14  Q. Was that your cut, 20,000, or was it more or less?

1514:32:18  A. No, that was the whole thing for every -- for everybody.

1614:32:28  Q. Did you guys split that?

1714:32:30  A. Yes.

1814:32:31  Q. How much was your personal cut?

1914:32:35  A. About -- about 7,000, 6,000.

2014:32:43  Q. And of course, you also had that jewelry that you took,

2114:32:45  right?

2214:32:45  A. Yes.

2314:32:47  Q. Did you tell your partners in crime about that jewelry

2414:32:51  you took?

2514:32:52  A. No, I didn't tell them about that.

```
1  14:32:59    Q. Did you take any money -- of that 20,000, did you take

2  14:33:07    any off the top for yourself?

3  14:33:10    A. Yes.  When we were all on the freeway and the others

4  14:33:23    were -- when we were driving, I took a little bit, and then I

5  14:33:26    gave Mentiroso a little bit off the top, too.

6  14:33:29    Q. What did you do with the money that you stole?

7  14:33:33    A. I bought a car, and the clique was asking me to help out

8  14:33:48    so they could buy drugs.

9  14:33:49    Q. Help out with what?

10 14:33:50    A. By giving them money to buy drugs.

11 14:33:56    Q. Did you give them money?

12 14:33:58    A. Yes.  I gave them $500.

13 14:34:05    Q. And you said that that was to buy drugs.  Was that like

14 14:34:07    for the clique's personal drug consumption?

15 14:34:09    A. No, it was to sell.

16 14:34:19    Q. So you've talked about robberies that you did?

17 14:34:24    A. Yes.

18 14:34:24    Q. Have you ever been a lookout for any robbery?

19 14:34:29    A. Yes.

20 14:34:34    Q. What happened?

21 14:34:35    A. Well, I remember one time we were in Malibu.

22 14:34:43    Q. Who is "we"?

23 14:34:43    A. It was me, Infernal.  There was one other guy, but I

24 14:34:58    don't remember his name.  And we went up -- kind of midway up

25 14:35:05    the mountain, and they got out with machetes and the gun that
```

14:35:17  1  they had in Infernal's truck.  They got out and they robbed

14:35:31  2  some telephones and some bank cards and some vaping pens from

14:35:35  3  him.  I stayed in the car, just watching out the sides to

14:35:43  4  make sure that no one was coming by.

14:35:46  5  Q. Were you inside the car with the doors closed?

14:35:51  6  A. No.  I opened one door and went out.

14:35:55  7  Q. So you were outside the car, but you stayed by the car?

14:35:57  8  A. Yes.

14:36:01  9  Q. You testified that one of the people there at the robbery

14:36:07 10  was a person called Infernal; is that right?

14:36:11 11  A. Yes.

14:36:14 12  Q. Do you see that person here in the courtroom today?

14:36:17 13  A. Yes.

14:36:24 14  Q. Would you please point him out, an article of clothing,

14:36:31 15  something he looks like?

14:36:33 16  A. Yes.  He's sitting down with the white shirt, it looks

14:36:45 17  like.

14:36:45 18  Q. Does he have any hairstyle or facial hair or anything

14:36:50 19  like that?

14:36:51 20  A. Yes.  He has his hair toward the back.

14:37:00 21        MS. VARGAS:  Identifying Defendant Corado-Ortiz.

14:37:07 22        THE COURT:  "Toward the back."

14:37:08 23  Q. Could you be more specific where the person is sitting?

14:37:11 24  A. Yes.  He's all the way in back in front of that lady in

14:37:18 25  yellow.

1 14:37:20                THE COURT:  Okay.  Good enough.

2 14:37:25    Q. What did you see Defendant Corado do?

3 14:37:29    A. Nothing.  They just got out to steal.

4 14:37:34    Q. From people?

5 14:37:35    A. Yes.

6 14:37:36    Q. What about any other robberies -- any other robberies

7 14:37:46    where you were a lookout?

8 14:37:48    A. Not that I remember.

9 14:37:55    Q. What about robberies that you -- that you were planning

10 14:37:59   to do but didn't work out?

11 14:38:01   A. Oh, yes, there was another time, too, that Infernal and I

12 14:38:13   were in a truck.  It was me, Infernal, Street Boy, and White

13 14:38:21   Boy.  We were on our way to do a robbery that day, but the

14 14:38:31   sheriffs stopped us when they saw the truck.

15 14:38:34   Q. Was this before or after the robbery that you just

16 14:38:38   described, also in Infernal's truck?

17 14:38:41   A. It was before.

18 14:38:49   Q. At this robbery, or attempted robbery, right, the robbery

19 14:39:01   you were planning, you said that you were in Infernal's

20 14:39:04   truck, right?

21 14:39:04   A. Yes.

22 14:39:10   Q. Do you know what color his truck is?

23 14:39:13   A. Yes.  It was four doors, a black truck.

24 14:39:21   Q. Like, an open cab in the back?

25 14:39:23   A. Yes.

1 14:39:25  Q. Were there any weapons in the car?

2 14:39:29  A. Yes.  He always carried a machete or a gun.

3 14:39:37  Q. And to your knowledge, were you-all planning on using the

4 14:39:40  machete and the gun in the robbery that you were planning to

5 14:39:42  do?

6 14:39:42  A. Just the --

7 14:39:55        THE INTERPRETER:  May the interpreter inquire?

8 14:39:57        MS. VARGAS:  Yes, please.

9 14:39:59        THE WITNESS:  Just the gun.  Just the gun.

10 14:40:01  Q. To your knowledge?

11 14:40:02  A. Yes.

12 14:40:02  Q. You eventually were arrested in this case, right?

13 14:40:07  A. Yes.

14 14:40:11  Q. Did you admit at first to the cops that you were part of

15 14:40:15  these robberies or attempted robberies?

16 14:40:17  A. No.

17 14:40:26  Q. Did you lie about it?

18 14:40:29  A. Yes, I lied to them.

19 14:40:37  Q. Now, prosecutors also asked you about those robberies,

20 14:40:40  right?

21 14:40:40  A. Yes.

22 14:40:43  Q. When asked, did you admit it to them?

23 14:40:46  A. Yes, I admitted it to them.

24 14:40:52  Q. I do want to ask you about that more in a bit.  But at

25 14:40:57  the beginning of your testimony, you said that apart from

1  14:41:01   Winnie Pooh, you were part of three other murders, right?

2  14:41:05   A. Correct.

3  14:41:19   Q. I want to ask you about a murder that took place in

4  14:41:26   Malibu in July of 2018.

5  14:41:34   A. Yes.

6  14:41:35   Q. Were you there for that murder?

7  14:41:36   A. Yes, I was there.

8  14:41:41   Q. Were you alone?

9  14:41:42   A. No, I was with Infernal.

10 14:41:46   Q. Anyone else?

11 14:41:49   A. At the moment, it was just me and him.

12 14:41:52   Q. So the people who killed that person is just you and him?

13 14:41:56   A. No, there were more.

14 14:42:01   Q. Who?

15 14:42:02   A. Mentiroso, Extrano, Little Devil, and a kid they called

16 14:42:17   Carlitos.

17 14:42:18   Q. So you have previously identified Mr. Corado as Infierno,

18 14:42:23   right?

19 14:42:24   A. Correct.

20 14:42:26   Q. And you said that Mentiroso is someone you know as CW-O,

21 14:42:32   right?

22 14:42:32   A. Yes.

23 14:42:35   Q. Can you please look at Exhibit 597 in your binder?  I

24 14:42:43   think it's in a different binder.

25 14:42:45          THE INTERPRETER:  597?

1  14:42:47         MS. VARGAS:  Yes, please.

2  14:43:06         THE WITNESS:  597?

3  14:43:08    Q. Yes, please.

4  14:43:55    A. 597 is not here.

5  14:43:58         MS. VARGAS:  Great.

6  14:44:00         It's actually already in evidence, so I can just

7  14:44:02    publish it, Your Honor, if that's okay.

8  14:44:33    Q. Do you recognize this?

9  14:44:34    A. Yes.

10 14:44:36    Q. Where do you recognize it from?

11 14:44:38    A. I had already seen it before.

12 14:44:42    Q. When did you first see it?

13 14:44:44    A. When I was at the police station.

14 14:44:52    Q. Do you see in this Exhibit 597 how there is four photos?

15 14:44:59    A. Yes.

16 14:45:04    Q. Anyone missing from here?

17 14:45:08    A. Yes.  Extrano and Carlitos are missing.

18 14:45:15    Q. So just to be clear, regarding the four people whose

19 14:45:20    photos appear in Exhibit 597, were those people present at

20 14:45:24    the Malibu murder I just asked you about?

21 14:45:25    A. Yes.

22 14:45:34    Q. And if you look at Exhibit 597, sort of in the top half

23 14:45:39    center of that exhibit, you will see a photograph of a person

24 14:45:42    in a blue hat?

25 14:45:51    A. Yes.

1 14:45:52   Q. Do you recognize that person?

2 14:45:54   A. More or less, yes.

3 14:45:57   Q. Where do you recognize him more or less from?

4 14:45:59   A. That day we went to kill him.

5 14:46:06   Q. He was the person you helped kill in Malibu?

6 14:46:09   A. Yes.

7 14:46:11   Q. So now I want to talk about the four photographs toward

8 14:46:16   the bottom of the page.  There is numbers written toward the

9 14:46:25   top of the photographs, so that is what I will use to refer

10 14:46:28  to the people.

11 14:46:29          You see the person pictured underneath the number 1?

12 14:46:33  A. Yes, I recognize him.

13 14:46:40  Q. Who is it?

14 14:46:40  A. That is Infernal.

15 14:46:44  Q. Defendant Corado?

16 14:46:46  A. Yes.

17 14:46:47  Q. How about number 2?

18 14:46:49  A. That is Mentiroso.

19 14:46:53  Q. CW-0?

20 14:46:56  A. Yes.

21 14:46:56  Q. How about number 3?

22 14:46:59  A. Yes, they call him Little Devil.

23 14:47:05  Q. How about number 4?

24 14:47:06  A. Yes, that is me.

25 14:47:10  Q. You also testified that there were -- that these four

14:47:14    people were not the only ones at the Malibu murder?

14:47:22    A. Yes, there were more.

14:47:23    Q. You also testified that someone called Extrano was there?

14:47:27    A. Yes.

14:47:31    Q. Do you see that person in the courtroom today?

14:47:34    A. Yes.

14:47:36    Q. Could you, with your finger, indicate where, what that

14:47:44    person is wearing?

14:47:52    A. Oh, yes.  He's sitting over there, and he has a blue

14:47:55    shirt on.

14:48:01    Q. Wearing --

14:48:02    A. Like a sky blue.

14:48:03    Q. Wearing headphones up or headphones down?

14:48:06    A. Up.

14:48:09        MS. VARGAS:  Identifying the defendant, Your Honor?

14:48:11        THE COURT:  I think so.  Sometimes it's hard to

14:48:17    tell.

14:48:19        MS. VARGAS:  Shall I inquire more?

14:48:20        THE COURT:  No, go ahead.

14:48:21    Q. How did the day start?

14:48:25    A. I was hanging out with Infernal.

14:48:36        MS. VARGAS:  Sorry, just to clarify, Your Honor,

14:48:38    when the witness identified the person as Extrano, may the

14:48:42    record reflect that the -- that the witness has identified

14:48:46    Erick Rosales-Arias?

14:48:48          THE COURT:  That is what my understanding was,

14:48:52   because of the blue shirt designation.

14:48:54          MS. VARGAS:  Thank you, Your Honor.

14:48:55          THE COURT:  Thank you.

14:48:56   Q. Now, before we move on -- I know I asked you another

14:48:59   question, so forgive me.

14:49:00          With regard to Infernal, did you know at any point

14:49:05   whether he was a member of a gang?

14:49:07   A. Yes.  He was a member of a clique that was called Los

14:49:18   Angeles Locos.

14:49:18   Q. Was that a clique within MS-13?

14:49:20   A. Yes.

14:49:22   Q. Do you know if he had any particular role within that

14:49:25   clique?

14:49:25   A. Yes.  He was like the corredor for his clique.

14:49:36   Q. Is that a leader?

14:49:37   A. Yes.

14:49:38   Q. Now, what about -- you testified CW-O, Mentiroso, was a

14:49:43   Fulton, right?

14:49:45   A. Yes.

14:49:46   Q. And what about Extrano, was he a gang member?

14:49:50   A. Yes.

14:49:51   Q. What kind of gang?

14:49:53   A. He was from Infernal's clique.

14:50:01   Q. That is Los Angeles Locos?

14:50:02  A. Yes.

14:50:04  Q. You also testified that there were two other people

14:50:08  there, Little Devil and Carlitos, right?

14:50:11  A. Yes.

14:50:15  Q. Were they affiliated with any gang, to your knowledge?

14:50:18  A. Yes.  They were hanging out with the Fulton clique.

14:50:26  Q. Do you know if they were full-fledged Fulton homeboys or

14:50:51  members?  Did you know them well?

14:50:53  A. Yes, they were just like paros or chequeos.

14:51:04  Q. So just hanging out, low level?

14:51:06  A. That's right.

14:51:10  Q. You testified that Defendant Corado was a corredor,

14:51:17  right?

14:51:17  A. Yes.

14:51:19  Q. What about Defendant Erick Rosales-Arias, did you know

14:51:24  his level in the Los Angeles Locos?

14:51:26  A. He was also like a paro or chequeo.

14:51:37  Q. Did you know him well at the time?

14:51:39  A. Not that well.

14:51:43  Q. Do you know about how many times you had met him by then?

14:51:46  A. About two times.

14:51:52  Q. I'm going to go back to the murder in Malibu that you

14:51:56  just testified about.  On that day, did you meet up with

14:52:04  Defendant Corado-Ortiz?

14:52:06  A. Yes, I was with him.

14:52:11  Q. Do you know about what time you guys met up?

14:52:16  A. It was around 1:00 or 2:00 in the afternoon.

14:52:21  Q. Where did you meet up?

14:52:23  A. He went to pick me up at my house.

14:52:27  Q. That is in the Valley?

14:52:28  A. Yes.

14:52:28  Q. What did you guys do?

14:52:29  A. We were smoking, and then all of a sudden Delito called

14:52:40  us.

14:52:40  Q. How do you know it was Delito who called?

14:52:42  A. Because Infernal told me it was Delito.

14:52:48  Q. Did you hear the conversation?

14:52:49  A. No.

14:52:51  Q. Do you know what it was about?

14:52:54  A. Infernal just told me that we should go to where Delito

14:53:04  was.

14:53:04  Q. Did you?

14:53:04  A. Yes, we went.

14:53:06  Q. What happened?

14:53:07  A. We got there and Delito was fixing the tires on his car,

14:53:22  and then all of a sudden a call came in to Infernal, too, and

14:53:31  Infernal started to talk something over with Delito.  And

14:53:39  then Delito just told me, "Hey, go up the mountain with

14:53:44  Infernal."

14:53:44  Q. When Defendant Chavez told you to go up to the mountain

114:53:48    with Infernal, did you know what he was talking about?

214:53:54    A. Not at the moment.

314:53:58    Q. So did you end up going to the mountains with Infernal?

414:54:03    A. Yes, we went to the mountain.

514:54:08    Q. Anything else happened in that place where you and

614:54:12    Infernal and Delito were?

714:54:13    A. Not that I remember.

814:54:19    Q. So you went to the mountains.  Is that close or far from

914:54:23    where you were at the time?

1014:54:24    A. It was far.  It was Malibu.

1114:54:32    Q. Someone drive?

1214:54:33    A. Yes, Infernal was driving.

1314:54:38    Q. What kind of car?

1414:54:39    A. The same four-door black truck.

1514:54:45    Q. The same four-door black truck as the robberies?

1614:54:48    A. Yes.

1714:54:55        MS. VARGAS:  Your Honor, I understand that the Court

1814:54:57    wants a break now.

1914:55:00        THE CLERK:  10 minutes.

2014:55:02        (Thereupon, the jury retired from the courtroom.)

2114:55:03        (Thereupon, there was a brief recess.)

2215:06:44        (Thereupon, the jury returned to the courtroom.)

2315:07:19        THE COURT:  All right.  Ms. Vargas?

2415:07:23    BY MS. VARGAS:

2515:07:23    Q. Mr. CW-X, before the break, you testified that you and

15:07:28    Mr. Corado-Ortiz drove to Malibu in the black truck, right?

15:07:35    A. Correct.

15:07:38    Q. When you were in the truck driving to Malibu, did you

15:07:43    know what the purpose was of your trip to Malibu?

15:07:53    A. Yes.  Infernal had told me that they had a chavala.

15:08:00    Q. When you use the word "chavala," what do you mean?

15:08:02    A. I'm referring to -- that is how we call our worst

15:08:15    enemies.

15:08:15    Q. Is that a person from a particular gang?

15:08:19    A. Yes.  18th Street.

15:08:24    Q. So Infernal told you that they had someone from 18th

15:08:30    Street?

15:08:30    A. Yes.

15:08:33    Q. Was it your understanding that they had someone from 18th

15:08:38    Street with them?

15:08:39    A. Yes.

15:08:42    Q. Who is the "them" in that?

15:08:50    A. Extrano, Mentiroso, Carlitos, Little Devil.

15:08:57    Q. Were you going to meet up with them?

15:08:59    A. Yes.

15:08:59    Q. So it was your understanding from Infernal that those

15:09:03    people you mentioned, Extrano, Little Devil, Carlitos, were

15:09:10    with someone from 18th Street?

15:09:12    A. Yes.

15:09:17    Q. Now, you guys are MS-13, right?

15:09:21          THE INTERPRETER:   I'm sorry?

15:09:22   Q. You guys are MS-13, right?

15:09:23   A. Yes.

15:09:24   Q. So why would you be hanging out with someone from 18th

15:09:28   Street?

15:09:28   A. I don't know, but they had him already.

15:09:34   Q. Had him for what?

15:09:36   A. To take him up to the mountains and kill him.

15:09:40   Q. So it was your understanding that the other group had

15:09:44   this 18th Streeter to kill him?

15:09:46   A. Yes.

15:09:51   Q. And why were you and Infernal joining them?

15:09:54   A. Because Infernal's homeboys were there, and Infernal was

15:10:07   the only one that had a gun at that moment.

15:10:08   Q. How did you know he had a gun?

15:10:11   A. Because he always had one in his truck.

15:10:15   Q. That day, did you see it?

15:10:16   A. Not at the time, but he did have it.

15:10:22   Q. When did you see it?

15:10:23   A. Before going to kill the guy.

15:10:31   Q. The 18th Streeter?

15:10:33   A. Yes.

15:10:34   Q. What happened when you saw the gun?

15:10:38   A. Nothing.  I was surprised, but he always had a gun on

15:10:49   him.

1  15:10:49   Q. So did Infernal take it out?

2  15:10:50   A. Yes.

3  15:10:52   Q. Before or after you arrived in Malibu?

4  15:10:56   A. After we had arrived in Malibu.

5  15:11:00   Q. He parked?

6  15:11:02   A. Yes, we parked.

7  15:11:05   Q. And he took it out?

8  15:11:05   A. Yes.

9  15:11:07   Q. Did he do anything when he took it out?

10 15:11:09   A. Yes.  I saw his -- his face, his eyes, like the devil's

11 15:11:22   eyes, and then he racked it.

12 15:11:26         MR. CLEARY:  Objection, Your Honor, nonresponsive.

13 15:11:32         THE COURT:  Sustained.

14 15:11:34         MR. JUAREZ:  Foundation regarding the devil.

15 15:11:36         THE COURT:  I don't know.

16 15:11:40         MR. JUAREZ:  Move to strike.

17 15:11:51         THE COURT:  I sustained the objection.

18 15:11:54   Q. So you testified you saw Infernal take out the gun?

19 15:11:57   A. Yes.

20 15:12:00   Q. Then what happened?

21 15:12:02   A. He racked it.  He just racked it.

22 15:12:09   Q. What happened after that?

23 15:12:10   A. He got out of the car, and I was behind him, and when he

24 15:12:25   arrived to where the 18th Street guy was, he shot him.  He

25 15:12:31   shot him in the head.

1  15:12:34   Q. I want to ask you more about what you saw, but I want to

2  15:12:37   just slow it down a bit.

3  15:12:42       When you got out of the car, who else did you see?

4  15:12:45   A. Who got out with me?

5  15:12:53   Q. When you got out, did you see any other people?

6  15:12:55   A. Yes.

7  15:12:57   Q. Who did you see?

8  15:12:58   A. I saw Extrano, Mentiroso, Carlitos, Little Devil, and the

9  15:13:12   chavala that they had.

10 15:13:13   Q. Do you know what they were doing?

11 15:13:14   A. Nothing.  They were just hanging out with him.

12 15:13:23   Q. And did you guys stay in that same spot or did you move

13 15:13:28   elsewhere?

14 15:13:28   A. No, we took him higher up into the mountains.

15 15:13:34   Q. Do you know why?

16 15:13:35   A. Because there was a car close by, and they might be able

17 15:13:46   to hear the bullets -- the shots.

18 15:13:49       THE INTERPRETER:  Interpreter correction.

19 15:13:52   Q. At this point, you had already committed a murder, right?

20 15:13:56   A. True.

21 15:14:00   Q. Based on your understanding, did you need to commit

22 15:14:04   another murder at this point?

23 15:14:05   A. Not at the moment because I already was a homeboy.

24 15:14:15   Q. Right.

25 15:14:16       This is July 2018, right?

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

15:14:18  A. Yes.

15:14:19  Q. And you testified that you got fully jumped in at the end

15:14:23  of 2017, right?

15:14:24  A. Yes.

15:14:28  Q. You got made already?

15:14:34  A. Yes, I had succeeded in that already.

15:14:36  Q. So why did you go?

15:14:38  A. Because Delito told me to go.  He told me to go see if

15:14:51  Mentiroso and Little Devil were brave.

15:14:54  Q. So you were a homeboy, right?

15:14:56  A. Yes.

15:14:57  Q. And at this point were you aware whether Mentiroso was a

15:15:04  homeboy yet?

15:15:05  A. He was not.

15:15:09  Q. So your job there was to make sure that Mentiroso was

15:15:13  brave?

15:15:14  A. Yes.

15:15:18  Q. And you also said that your job was to make sure somebody

15:15:27  else was brave.  Who was that?

15:15:31  A. Little Devil.

15:15:34  Q. Also an affiliate of Fulton?

15:15:41  A. Yes.

15:15:41  Q. You testified earlier that Mr. Corado was a corredor of

15:15:47  his clique, right?

15:15:48  A. Yes.

15:15:51  Q. Was it your understanding at the time that he was already

15:15:54  a homeboy?

15:15:54  A. Yes, he already was a homeboy.

15:16:01  Q. Based on your knowledge, was it your understanding that

15:16:03  he would need to commit another murder?

15:16:05  A. He didn't need to.

15:16:13  Q. What was your understanding of Infernal's role there?

15:16:17  A. Also to watch over to see if his people were also brave.

15:16:28  Q. His people?

15:16:31  A. Yes, the homeboy, the chequeos that he has.

15:16:36  Q. Who is that?

15:16:37  A. Extrano.

15:16:40  Q. That's Defendant Erick Rosales-Arias?

15:16:43  A. Yes.

15:16:45  Q. So you testified that you got out of the car, right?

15:17:00  A. Yes.

15:17:00  Q. And at some point you guys moved the car, right?

15:17:03  A. Yes.

15:17:05  Q. At any point during that time in Malibu, did you realize

15:17:10  that Roger Chavez, this victim, the 18th Streeter, had a

15:17:16  phone?

15:17:16  A. No, I did not see that.

15:17:25  Q. Did you see him using a phone?

15:17:27  A. Yes, later on I did see.

15:17:32  Q. How did you see him?

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 15:17:33   A. Yes.  At one moment Infernal told me to cover my face

2 15:17:46   because the guy from 18th was recording.

3 15:17:48   Q. I want to show you what's been admitted as Exhibit 500.

4 15:17:59        (Thereupon, the video was played.)

5 15:18:15   Q. Pausing the video at about 5 seconds.

6 15:18:20        Do you recognize any vehicles that appear in the

7 15:18:23   video at this point?

8 15:18:23   A. Yes.  It's Infernal's truck.

9 15:18:30   Q. That is the one that you drove with him in to go to

10 15:18:32  Malibu in the first place?

11 15:18:33  A. Yes.

12 15:18:36  Q. And the same one as the robberies?

13 15:18:39  A. Yes.

14 15:18:40  Q. Okay.

15 15:18:41        MS. VARGAS:  Continuing playing, please.

16 15:18:43        (Thereupon, the video was played.)

17 15:18:43  Q. Did anyone do anything with their hand just now?

18 15:18:52  A. Yes.  The guy threw 18th Street sign.

19 15:19:02        MS. VARGAS:  Continue, please.

20 15:19:02        (Thereupon, the video was played.)

21 15:19:02  Q. Pausing now at about 38 seconds.

22 15:19:32        Do you recognize anyone in this video so far?

23 15:19:35  A. Yes.

24 15:19:37  Q. Who?

25 15:19:38  A. Infernal is there and I'm there.

15:19:44  Q. Could you use your finger to touch the screen and circle

15:19:48  where Infernal is and where you are?

15:19:50  A. This is Infernal.  And this is me.

15:20:00  Q. So Infernal is the figure on the left of the screen at

15:20:03  about 38 seconds?

15:20:06  A. Yes.

15:20:07  Q. And you are the figure on the right at about 38 seconds?

15:20:10  A. Yes.

15:20:16          MS. VARGAS:  Go ahead, please.

15:20:17          (Thereupon, the video was played.)

15:20:33  Q. What happened after Infernal told you to hide your face?

15:20:38  A. Nothing.  I just went to the car.

15:20:47  Q. Excuse me.

15:20:50          Then what happened?

15:21:02          THE INTERPRETER:  May the interpreter inquire?

15:21:04          MS. VARGAS:  Yes, please.

15:21:05          THE WITNESS:  Yeah, we got -- I got into the car and

15:21:14  we told the others to follow us in the car up to the

15:21:17  mountains.

15:21:18  Q. Then what happened?

15:21:23  A. We arrived at a secure place.

15:21:25  Q. What do you mean by "secure"?

15:21:26  A. Where there was nothing.  No car going by or nothing.

15:21:34  Q. Then what happened?

15:21:35  A. The other group in the car had already gotten out, and

15:21:48  1   they were by one of the -- oh, they were in a circle, and

15:22:00  2   Infernal and I got out.  I saw Infernal walked right up and

15:22:10  3   he shot the guy in the head with one shot.

15:22:13  4      Q. How close were you when you saw Infernal shoot Roger

15:22:17  5   Chavez in the head?

15:22:18  6      A. About 5 -- sorry, 8 feet away.

15:22:28  7      Q. What happened next?

15:22:29  8      A. I saw Mentiroso grab the gun and shot him another shot,

15:22:40  9   and then Extrano.  And they left him down there by the edge

15:22:49 10   of the street.

15:22:50 11      Q. When you say you saw Extrano, what did you see Extrano

15:22:53 12   do, if anything?

15:22:55 13      A. I saw that he also shot some shots in his brain.

15:23:07 14      Q. In the victim's head?

15:23:08 15      A. Yes.

15:23:10 16      Q. Did anyone else shoot Roger Chavez that day?

15:23:14 17      A. Yes.  Little Devil also shot.

15:23:21 18      Q. Did you shoot Roger Chavez?

15:23:23 19      A. No.

15:23:25 20      Q. Why not?

15:23:26 21      A. I did not.  I did not believe it was necessary.

15:23:34 22      Q. Why wasn't it necessary?

15:23:35 23      A. Because he was dead already.

15:23:41 24      Q. You testified that after Defendant Corado shot Roger

15:23:45 25   Chavez, he fell to the ground?

1 15:23:46   A. Yes.

2 15:23:52   Q. To be clear, the victim, Roger Chavez, fell, right?

3 15:23:56        THE INTERPRETER:  I'm sorry, counsel?

4 15:23:58   Q. To be clear, the victim, Roger Chavez, was the one who

5 15:24:01   fell?

6 15:24:01   A. Yes, he fell.

7 15:24:04   Q. Did anyone move his body or did it stay right there?

8 15:24:06   A. I saw Extrano was pushing him over to the edge of the

9 15:24:16   street.

10 15:24:16   Q. Did he do it alone?

11 15:24:17   A. Yes, he was pushing him, just him on his own.

12 15:24:24   Q. What happened next?

13 15:24:25   A. Yes.  Then I saw that, then I -- I got out of the car as

14 15:24:36   well, and I helped push him further down.

15 15:24:39   Q. You just testified that you got out of the car.  At what

16 15:24:42   point did you get in the car?

17 15:24:48   A. I had gotten in, and then I got out.

18 15:24:51   Q. So you got out to move the body?

19 15:24:53   A. Yes.

20 15:24:57   Q. Why did you move it?

21 15:24:58   A. Because they had left him on the edge there where he

22 15:25:06   could be seen.

23 15:25:08   Q. By cars passing by?

24 15:25:10   A. Yes.

25 15:25:11   Q. When you moved Roger Chavez's body, did you use any part

15:25:18  1    of your body to do that?

15:25:19  2    A. Yes.  I used my -- my feet.

15:25:31  3    Q. You kicked him?

15:25:34  4    A. When I was pushing him down, yes.

15:25:38  5    Q. Okay.  So you didn't push him with your hands, right?

15:25:41  6    A. No.

15:25:41  7    Q. You pushed him with your feet?

15:25:43  8    A. Yes.

15:25:44  9    Q. Did you report this murder to anyone in your clique?

15:25:57  10   A. Yes.

15:26:00  11   Q. Who?

15:26:01  12   A. To Delito.

15:26:03  13   Q. Why?

15:26:04  14   A. Because he had sent me to see if Mentiroso and Little

15:26:14  15   Devil were brave.

15:26:15  16   Q. To see if they would shoot?

15:26:17  17   A. Yeah, they shot.

15:26:21  18   Q. And you told that to Delito?

15:26:22  19   A. Yes, also that.

15:26:31  20        MS. VARGAS:  I'm about to change topics here, so I'm

15:26:33  21   happy to continue on, but I'm also happy to pause.

15:26:39  22        Understood.  I'll pause for the day, Your Honor.

15:26:44  23        THE COURT:  Sounds wonderful.

15:26:46  24        All right.  Remember the admonition.  See you bright

15:26:48  25   and early in the morning.

1 15:26:51          (Thereupon, the jury retired from the courtroom.)

2 15:26:53          (Thereupon, the Court was in recess.)

3

4          (CONTINUED) DIRECT EXAMINATION                    19

5          BY MR. BALDING

6          Exhibit No. 529                                   20

7          CROSS-EXAMINATION                                 28

8          BY MR. PACTOR

9          REDIRECT EXAMINATION                              40

10         BY MR. BALDING

11         DERRICK MCCLARIN                                  45

12         DIRECT EXAMINATION                                45

13         BY MS. RICHMOND

14         Exhibit No. 610                                   50

15         CROSS-EXAMINATION                                 57

16         BY MR. CLEARY

17         CROSS-EXAMINATION                                 64

18         BY MR. MCNICHOLAS

19         REDIRECT-EXAMINATION                              74

20         BY MS. RICHMOND

21         PHIL TERAMOTO                                     77

22         DIRECT EXAMINATION                                78

23         BY MR. LARSEN:

24         CROSS-EXAMINATION                                 91

25         BY MR. CLEARY

1      REDIRECT-EXAMINATION                                    96

2      BY MR. LARSEN

3      SHAWN GERVAIS                                          100

4      DIRECT EXAMINATION                                     100

5      BY MS. RICHMOND:

6      Exhibit Nos. 1203 through 1218                         105

7      Exhibits  No. 1219, 1220, 1221                         109

8      Exhibit No. 1002                                       110

9      CROSS-EXAMINATION                                      112

10     BY MR. KHOJAYAN

11     DIRECT EXAMINATION                                     125

12     BY MS. RICHMOND

13     HERMAN FRETTLOHR                                       126

14     DIRECT EXAMINATION                                     126

15     BY MR. BALDING

16     Exhibit No. 459                                        133

17     Exhibit Nos. 541, 542, 545, 548, 552, 555, 556,        139

18     563, 573, 574, 602, 603, 604, and 605

19     Exhibit Nos. 608-T and 609-T                           140

20     WILLIAM ALBERTO RUANO-GRANADOS                         143

21     DIRECT EXAMINATION                                     144

22     BY MR. LARSEN

23     CW-X                                                   146

24     DIRECT EXAMINATION                                     147

25     BY MS. VARGAS

1       Exhibit Nos. 104 and 104-T                                    154

2       Exhibit No. 788                                               156

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25